<table>
<tr><td>

1<br>
2<br>
3<br>
4<br>
5<br>
6<br>
7

</td><td>

Ben F. Pierce Gore (SBN 128515)<br>
PRATT & ASSOCIATES<br>
1901 S. Bascom Avenue, Suite 350<br>
Campbell, CA 95008<br>
Telephone: (408) 429-6506<br>
Fax: (408) 369-0752<br>
pgore@prattattorneys.com<br>
<br>
(Co-counsel listed on signature page)<br>
<br>
*Attorneys for Plaintiff*

</td></tr>
</table>

FILED

MAY - 2 2012

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

8

9            IN THE UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                      OAKLAND DIVISION

12

**C12-02204**

| | |
|---|---|
| 13   ALEX KHASIN, individually and on<br>behalf of all others similarly situated,<br><br>14<br><br>15                    Plaintiff,<br><br>16   v.<br><br>17   R. C. BIGELOW, INC.,<br><br>18                    Defendant. | Case No.<br><br>**CLASS ACTION AND REPRESENTATIVE ACTION**<br><br>**COMPLAINT FOR DAMAGES, EQUITABLE AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

19

20        Plaintiff, through his undersigned attorneys, brings this lawsuit against Defendant as to

21   his own acts upon personal knowledge, and as to all other matters upon information and belief.

22   In order to remedy the harm arising from Defendant's illegal conduct, which has resulted in

23   unjust profits, Plaintiff brings this action on behalf of a class of California consumers who,

24   within the last four years, purchased Defendant's tea products ("Misbranded Food Products").

25                              **INTRODUCTION**

26        1.      Every day, millions of Americans purchase and consume packaged foods.

27   Identical federal and California laws require truthful, accurate information on the labels of

28   packaged foods. This case is about a company that flouts those laws even after companies with

1  identical products with similar claims on their labels received warning letters from the FDA

2  notifying those companies that their products were misbranded. The law is clear: misbranded

3  food cannot legally be manufactured, held, advertised, distributed or sold. Misbranded food is

4  worthless as a matter of law, and purchasers of misbranded food are entitled to a refund of their

5  purchase price.

6         2.     Defendant R. C. Bigelow, Inc. (hereinafter "Bigelow" or "Defendant") is a tea

7  company based in Fairfield, Connecticut. It markets over 50 varieties of tea, including black,

8  green and herbal teas.

9         3.     Bigelow recognizes that health claims drive sales. It actively promotes the

10  presence of antioxidants in its tea products and the alleged health benefits from using these

11  products. In a recent press release Bigelow stated:

12

13      It is widely accepted in the medical and nutrition communities that all teas, both green and black, have health benefits deriving from polyphenols, the powerful antioxidants found in tea that help control free radicals (the unstable

14  compounds that destroy cells).

15      Research has shown polyphenols have many health benefits including fighting the effects of aging, and reducing the risk for some cancers, high cholesterol

16  and high blood pressure. Polyphenols can bolster the immune system to better resist flu, other virus and bacteria, strengthen capillaries and prevent infection.

17  New research studies are continually being conducted in order to better understand how tea polyphenols work to support good health and possibly to

18  prevent and treat many health conditions.

19  http://admin.specialtyfood.com/fileManager/65609Bigelow-Superfruit_Teasdocx_(1).pdf

20         4.     On its website, Bigelow goes even further in promoting the health benefits of its

21  tea products, specifically focusing on antioxidants:

22      The Most Potent Health Drink Ever by Jean Carper, EatSmart

23

24      Recent studies in leading medical journals declare tea a potential heart tonic, cancer blocker, fat buster, immune stimulant, arthritis soother, virus fighter and

25  cholesterol detoxifier…. □**Bottom line:** Each day you should drink three to six 8-ounce cups of tea. It can be black or green, hot or iced, decaf or not. **Here's**

26  **how tea helps your health:**□□**Saves arteries.** Drinking black tea helps prevent deadly clogging of arteries and reverses poor arterial functioning that

27  can trigger heart attacks and strokes, two major new studies have found….In another recent test, Joseph Vita, M.D., of the Boston University School of

28  Medicine, had heart patients drink either plain water or four cups of black tea

daily. In a month, impaired blood vessel functioning (a risk factor for heart attack and strokes) improved about 50% in the tea drinkers.☐☐**Inhibits cancer growth.** Tea has long been tied to a lower risk of stomach, colon and breast cancer, although the connection is not proven. Now lab studies find that tea chemicals actually may stop cancer growth...**Tames inflammation.** Researchers at Case Western Reserve University gave arthritis-prone mice either green tea or water. The human equivalent of four cups of green tea daily halved the mice's risk of developing arthritis. Also intriguing: TF-2, the newly discovered anti-cancer compound in black tea, suppresses the Cox-2 gene that triggers inflammation, says research at Rutgers. That's the same way the drugs Vioxx and Celebrex work. Also, in a UCLA study of 600 Chinese men and women, drinking green tea halved the risk of chronic stomach inflammation, which can lead to cancer.☐☐**Wipes out viruses.** Previous tests prove tea can neutralize germs, including some that cause diarrhea, pneumonia, cystitis and skin infections…. Flu viruses, too? Possibly. A recent Japanese study showed that gargling with black tea boosted immunity to influenza. Recent research at Harvard indicated that tea chemicals stimulated gamma-delta T-cells that bolster immunity against bacteria and viruses.☐☐**Burns calories.** Most surprising, green tea's antioxidant EGCG stimulates the body to burn calories, notably fat. In a Swiss study, a daily dose of 270mg EGCG (the amount in 2 to 3 cups of green tea) caused men to burn 4% more energy - about 80 extra calories a day. Green tea did not increase heart rate, and the calorie burning was not due to caffeine.☐☐**Plus:** Canadian researchers block cavities in mice by replacing their water with tea. Indian eye researchers have retarded cataracts in rats by feeding the animals tea extract. Israeli scientists block Parkinson's-like brain damage in mice by giving them green tea extract or pure EGCG. W☐☐**For the best benefit ....** Drink both black and green tea, the regular kind sold in bags or leaves in grocery stores. Their antioxidants are equal. But green tea boasts special-acting EGCG….

Just one cup of green tea a day can help to reduce the effects of gum disease, which is said to be caused by an inflammatory response to bacteria in the mouth…

Antioxidants contained within the tea help to fight the inflammation caused by periodontal disease…

http://www.bigelowtea.com/health/tea-and-beauty.aspx

**April 6, 2012** The World Health Organization celebrates World Health Day tomorrow on April 7th with an emphasis on "aging and health." It's a theme that resonates here at Bigelow Tea. We take this opportunity to remind you that tea is a wonderfully healthy indulgence at any age!

Americans are living longer: life expectancy is now 78.5 years, based on the latest data from the U.S. Centers for Disease Control and Prevention. That's great news, but we all want to ensure that our advancing years are as healthy and fulfilling as possible. Ongoing research suggests that both green and black tea have many potential health benefits, due primarily to an abundance of the polyphenols. These powerful antioxidants are known to

*Class Action Complaint*

hunt down free radicals, which have been linked to heart disease and general aging of cells in the body. Green tea has very high levels of ECGC, another antioxidant that has been the subject of numerous health studies.

http://www.bigelowteablog.com/

5.      In doing so, Bigelow uses its website to make unlawful (i) antioxidant, (ii) nutrient content, and (iii) health claims that have been expressly condemned by the Federal Food and Drug Administration ("FDA") in numerous enforcement actions and warning letters.

6.      Bigelow also makes unlawful health nutrient claims directly on packages of the Misbranded Food Products.  For example, the package front panel of Bigelow Green Tea with Lemon, shown below, bears the statement "*Healthy Antioxidants.*"   The back panel boasts, "*Mother Nature gave us a wonderful gift when she packed powerful antioxidants into green tea....*"   Such claims have been repeatedly targeted by the FDA as unlawful for tea and other food products.

FRONT OF PACKAGE                    SIDE OF PACKAGE

 

1

BACK OF PACKAGE

2

3



4

5

6

7

8

9

10

11

12

13    7.    The Misbranded Food Products each contain an unlawful antioxidant, nutrient

14    content and/or health claim on their label.

15    8.    If a manufacturer is going to make a claim on a food label, the label must meet

16    certain legal requirements that help consumers make informed choices and ensure that they are

17    not misled.  As described more fully below, Defendant has made, and continues to make, false

18    and deceptive claims in violation of federal and California laws that govern the types of

19    representations that can be made on food labels.   These laws recognize that reasonable

20    consumers are likely to choose products claiming to have a health or nutritional benefit over

21    otherwise similar food products that do not claim such benefits.

22    9.    Identical federal and California laws regulate the content of labels on packaged

23    food.  The requirements of the federal Food Drug & Cosmetic Act, 21 U.S.C. § 301, *et seq.*

24    ("FDCA") were adopted by the California legislature in the Sherman Food Drug & Cosmetic

25    Law, California Health & Safety Code § 109875, *et seq.* (the "Sherman Law").  Under FDCA

26    section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or

27    if it does not contain certain information on its label or in its labeling. 21 U.S.C. § 343(a).

28

*Class Action Complaint*

10. Under the FDCA, the term "false" has its usual meaning of "untruthful," while the term "misleading" is a term of art. Misbranding reaches not only false claims, but also those claims that might be technically true, but still misleading. If any one representation in the labeling is misleading, then the entire food is misbranded, and no other statement in the labeling can cure a misleading statement. "Misleading" is judged in reference to "the ignorant, the unthinking and the credulous who, when making a purchase, do not stop to analyze." *United States v. El-O-Pathic Pharmacy*, 192 F.2d 62, 75 (9th Cir. 1951). Under the FDCA, it is not necessary to prove that anyone was actually misled.

11. On August 23, 2010, the FDA sent a warning letter to Unilever, the parent company of Lipton Tea, one of Bigelow's biggest competitors, informing Unilever of Lipton Tea's failure to comply with the FDCA and its regulations (the "FDA Warning Letter," is attached hereto as Exhibit 1 and made a part hereof by reference) for remarkably similar nutrient content claims to those Bigelow is presently making on its product labels. The FDA Warning Letter to Unilever stated, in pertinent part:

**Unauthorized Nutrient Content Claims**

Under section 403(r)(1)(A) of the Act [21 U.S.C. 343(r)(1)(A)], a claim that characterizes the level of a nutrient which is of the type required to be in the labeling of the food must be made in accordance with a regulation promulgated by the Secretary (and, by delegation, FDA) authorizing the use of such a claim. The use of a term, not defined by regulation, in food labeling to characterize the level of a nutrient misbrands a product under section 403(r)(1)(A) of the Act.

Nutrient content claims using the term "antioxidant" must also comply with the requirements listed in 21 CFR 101.54(g). These requirements state, in part, that for a product to bear such a claim, an RDI must have been established for each of the nutrients that are the subject of the claim (21 CFR 101.54(g)(1)), and these nutrients must have recognized antioxidant activity (21 CFR 101.54(g)(2). The level of each nutrient that is the subject of the claim must also be sufficient to qualify for the claim under 21 CFR 101.54(b), (c), or (e) (21 CFR 101.54(g)(3)). For example, to bear the claim "high in antioxidant vitamin C," the product must contain 20 percent or more of the RDI for vitamin C under 21 CFR 101.54(b). Such a claim must also include the names of the nutrients that are the subject of the claim as part of the claim or, alternatively, the term "antioxidant" or "antioxidants" may be linked by a symbol (e.g., an asterisk) that refers to the same symbol that appears elsewhere on the same panel of the product label, followed by the name or names of the nutrients with recognized antioxidant activity (21 CFR 101.54(g)(4)). The use of a nutrient

content claim that uses the term "antioxidant" but does not comply with the requirements of 21 CFR 101.54(g) misbrands a product under section 403(r)(2)(A)(i) of the Act.

Your webpage entitled "Tea and Health" and subtitled "Tea Antioxidants" includes the statement, "LIPTON Tea is made from tea leaves rich in naturally protective antioxidants." The term "rich in" is defined in 21 CFR 101.54(b) and may be used to characterize the level of antioxidant nutrients (21 CFR 101.54(g)(3)). However, this claim does not comply with 21 CFR 101.54(g)(4) because it does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients. Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act.

This webpage also states: "[t]ea is a naturally rich source of antioxidants." The term "rich source" characterizes the level of antioxidant nutrients in the product and, therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "rich source" could be considered a synonym for a term defined by regulation (e.g., "high" or "good source"), nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "tea is a naturally rich source of antioxidants" does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients, as required by 21 CFR 101.54(g)(4). Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act.

The product label back panel includes the statement "packed with protective FLAVONOID ANTIOXIDANTS." The term "packed with" characterizes the level of flavonoid antioxidants in the product; therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "packed with" could be considered a synonym for a term defined by regulation, nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "packed with FLAVONOID ANTIOXIDANTS" does not comply with 21 CFR 101.54(g)1) because no RDI has been established for flavonoids. Thus, this unauthorized nutrient content claim causes your product to be misbranded under section 403(r)(2)(A)(i) of the Act.

The above violations are not meant to be an all-inclusive list of deficiencies in your products or their labeling. It is your responsibility to ensure that all of your products are in compliance with the laws and regulations enforced by FDA. You should take prompt action to correct the violations. Failure to promptly correct these violations may result in regulatory actions without further notice, such as seizure and/or injunction.

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm224509.htm.

12. As shown above, the front panel on Bigelow Green Tea products contains the statement *"Healthy Antioxidants."* The back panel touts the *"powerful antioxidants"* *"packed"* in green tea. The label also touts claimed health benefits from drinking these tea products. As determined by the FDA in the Unilever/Lipton warning letter, such health claims are in violation of 21 U.S.C. § 352(f)(1), and therefore the products are misbranded.

13. Defendant has made, and continues to make, food label claims that are prohibited by federal and California law. Under federal and California law, Defendant's Misbranded Food Products cannot legally be manufactured, advertised, distributed, held or sold. Defendant's false and misleading labeling practices stem from their global marketing strategy. The violations and misrepresentations are similar across Defendant's product labels and product lines.

## PARTIES

14. Plaintiff Alex Khasin is a resident of Walnut Creek, California who purchased Bigelow Tea products in California during the four (4) years prior to the filing of this Complaint (the "Class Period").

15. Defendant, R. C. Bigelow, Inc. is a Connecticut corporation with its principle place of business in Fairfield, Connecticut.

16. Bigelow is a leading producer of retail specialty tea products as well as black and green tea products. Bigelow sells its Misbranded Food Products to consumers through grocery stores, other retail stores and on its website throughout California.

## JURISDICTION AND VENUE

17. This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which: (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendant; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate.

18. The Court has jurisdiction over the federal claim alleged herein pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States.

19.     The Court has jurisdiction over the California claims alleged herein pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy under Article III of the United States Constitution.

20.     Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, and is between citizens of different states.

21.     The Court has personal jurisdiction over Defendant because a substantial portion of the wrongdoing alleged in this Complaint occurred in California, Defendant is authorized to do business in California, has sufficient minimum contacts with California, and otherwise intentionally avails itself of the markets in California through the promotion, marketing and sale of merchandise, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

22.     Because a substantial part of the events or omissions giving rise to these claims occurred in this District and because the Court has personal jurisdiction over Defendant, venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b).

## FACTUAL ALLEGATIONS

**A.    Identical California And Federal Laws Regulate Food Labeling**

23.     Food manufacturers are required to comply with federal and state laws and regulations that govern the labeling of food products.  First and foremost among these is the FDCA and its labeling regulations, including those set forth in 21 C.F.R. § 101.

24.     Pursuant to the Sherman Law, California has expressly adopted the federal labeling requirements as its own and indicated that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food regulations of this state."  California Health & Safety Code § 110100.

25.     In addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations.  For example, food products are misbranded

1   under California Health & Safety Code § 110660 if their labeling is false and misleading in one

2   or more particulars; are misbranded under California Health & Safety Code § 110665 if their

3   labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. §

4   343(q) and regulations adopted thereto; are misbranded under California Health & Safety Code

5   § 110670 if their labeling fails to conform with the requirements for nutrient content and health

6   claims set forth in 21 U.S.C. § 343(r) and regulations adopted thereto; are misbranded under

7   California Health & Safety Code § 110705 if words, statements and other information required

8   by the Sherman Law to appear on their labeling are either missing or not sufficiently

9   conspicuous; are misbranded under California Health & Safety Code § 110735 if they are

10  represented as having special dietary uses but fail to bear labeling that adequately informs

11  consumers of their value for that use; and are misbranded under California Health & Safety

12  Code § 110740 if they contain artificial flavoring, artificial coloring and chemical preservatives

13  but fail to adequately disclose that fact on their labeling.

**B.      FDA Enforcement History**

14

15      26.     In recent years the FDA has become increasingly concerned that food

16  manufacturers were disregarding food labeling regulations. To address this concern, the FDA

17  elected to take steps to inform the food industry of its concerns and to place the industry on

18  notice that food labeling compliance was an area of enforcement priority.

19      27.     In October 2009, the FDA issued a *Guidance For Industry: Letter Regarding*

20  *Point Of Purchase Food Labeling* to address its concerns about front of package labels ("2009

21  FOP Guidance"). The 2009 FOP Guidance advised the food industry:

22
          FDA's research has found that with FOP labeling, people are less likely to check
23        the Nutrition Facts label on the information panel of foods (usually, the back or
          side of the package). It is thus essential that both the criteria and symbols used in
24        front-of-package and shelf-labeling systems be nutritionally sound, well-designed
          to help consumers make informed and healthy food choices, and not be false or
25        misleading. The agency is currently analyzing FOP labels that appear to be
          misleading. The agency is also looking for symbols that either expressly or by
26        implication are nutrient content claims. We are assessing the criteria established
          by food manufacturers for such symbols and comparing them to our regulatory
27        criteria.

28

It is important to note that nutrition-related FOP and shelf labeling, while currently voluntary, is subject to the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. Therefore, FOP and shelf labeling that is used in a manner that is false or misleading misbrands the products it accompanies. Similarly, a food that bears FOP or shelf labeling with a nutrient content claim that does not comply with the regulatory criteria for the claim as defined in Title 21 Code of Federal Regulations (CFR) 101.13 and Subpart D of Part 101 is misbranded. We will consider enforcement actions against clear violations of these established labeling requirements. . .

… Accurate food labeling information can assist consumers in making healthy nutritional choices. FDA intends to monitor and evaluate the various FOP labeling systems and their effect on consumers' food choices and perceptions. FDA recommends that manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA laws and regulations. FDA will proceed with enforcement action against products that bear FOP labeling that are explicit or implied nutrient content claims and that are not consistent with current nutrient content claim requirements. FDA will also proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading.

28.    The 2009 FOP Guidance recommended that "manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA law and regulations" and specifically advised the food industry that it would "proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading."

29.    Despite the issuance of the 2009 FOP Guidance, Defendant did not remove the unlawful and misleading food labeling claims from their Misbranded Food Products.

30.    On March 3, 2010, the FDA issued an "Open Letter to Industry from [FDA Commissioner] Dr. Hamburg" (hereinafter, "Open Letter"). The Open Letter reiterated the FDA's concern regarding false and misleading labeling by food manufacturers. In pertinent part the letter stated:

In the early 1990s, the Food and Drug Administration (FDA) and the food industry worked together to create a uniform national system of nutrition labeling, which includes the now-iconic Nutrition Facts panel on most food packages. Our citizens appreciate that effort, and many use this nutrition information to make food choices. Today, ready access to reliable information about the calorie and nutrient content of food is even more

important, given the prevalence of obesity and diet-related diseases in the United States. This need is highlighted by the announcement recently by the First Lady of a coordinated national campaign to reduce the incidence of obesity among our citizens, particularly our children.

With that in mind, I have made improving the scientific accuracy and usefulness of food labeling one of my priorities as Commissioner of Food and Drugs. The latest focus in this area, of course, is on information provided on the principal display panel of food packages and commonly referred to as "front-of-pack" labeling. The use of front-of-pack nutrition symbols and other claims has grown tremendously in recent years, and it is clear to me as a working mother that such information can be helpful to busy shoppers who are often pressed for time in making their food selections. …

As we move forward in those areas, I must note, however, that there is one area in which more progress is needed. As you will recall, we recently expressed concern, in a "Dear Industry" letter, about the number and variety of label claims that may not help consumers distinguish healthy food choices from less healthy ones and, indeed, may be false or misleading.

At that time, we urged food manufacturers to examine their product labels in the context of the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. As a result, some manufacturers have revised their labels to bring them into line with the goals of the Nutrition Labeling and Education Act of 1990. Unfortunately, however, we continue to see products marketed with labeling that violates established labeling standards.

To address these concerns, FDA is notifying a number of manufacturers that their labels are in violation of the law and subject to legal proceedings to remove misbranded products from the marketplace. While the warning letters that convey our regulatory intentions do not attempt to cover all products with violative labels, they do cover a range of concerns about how false or misleading labels can undermine the intention of Congress to provide consumers with labeling information that enables consumers to make informed and healthy food choices

. . . .

These examples and others that are cited in our warning letters are not indicative of the labeling practices of the food industry as a whole. In my conversations with industry leaders, I sense a strong desire within the industry for a level playing field and a commitment to producing safe, healthy products. That reinforces my belief that FDA should provide as clear and consistent guidance as possible about food labeling claims and nutrition information in general, and specifically about how the growing use of front-of-pack calorie and nutrient information can best help consumers construct healthy diets.

I will close with the hope that these warning letters will give food manufacturers further clarification about what is expected of them as they review their current labeling. I am confident that our past cooperative efforts on nutrition information and claims in food labeling will continue as we jointly develop a practical, science-based front-of-pack regime that we can all use to help consumers choose healthier foods and healthier diets.

31.     Notwithstanding the Open Letter, Defendant continued to utilize unlawful food labeling claims despite the express guidance of the FDA in the Open Letter.

32.     In addition to its guidance to industry, the FDA has sent warning letters to industry, including many of Defendant's peer/competitor food manufacturers for the same types of unlawful nutrient content claims described above.

33.     In these letters the FDA indicated that, as a result of the same type of claims utilized by Defendant, products were in "violation of the Federal Food, Drug, and Cosmetic Act … and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR § 101)" and "misbranded within the meaning of section 403(r)(1)(A) because the product label bears a nutrient content claim but does not meet the requirements to make the claim."

34.     The warning letters were hardly isolated as the FDA has issued over ten (10) warning letters to other companies for the same type of food labeling claims at issue in this case.

35.     The FDA not only expected companies that received warning letters to correct their labeling practices but because these letters were made public and released to the press, FDA also anticipated that other firms would examine their food labels to ensure that they are in full compliance with food labeling requirements and make changes where necessary. Defendant did not change the labels on its Misbranded Food Products in response to these warning letters.

36.     Defendant also continued to ignore the 2009 FOP Guidance which detailed the FDA's guidance on how to make food labeling claims. Defendant ignored this guidance as well and continued to utilize unlawful claims on the labels of their Misbranded Food Products.  As such, the Defendant's Misbranded Food Products continue to run afoul of 2009 FOP Guidance as well as federal and California law.

37.     Despite the FDA's numerous warnings to industry, Defendant has continued to sell products bearing unlawful food labeling claims without meeting the requirements to make them.

38.     Plaintiff did not know, and had no reason to know, that the Defendant's Misbranded Food Products were misbranded and bore food labeling claims despite failing to meet the requirements to make those food labeling claims.

C.     **Defendant's Food Products Are Misbranded**

39.     Pursuant to Section 403 of the FDCA, a claim that characterizes the level of a nutrient in a food is a "nutrient content claim" that must be made in accordance with the regulations that authorize the use of such claims.   21 U.S.C. § 343(r)(1)(A).   California expressly adopted the requirements of 21 U.S.C. § 343(r) in § 110670 of the Sherman Law.

40.     Nutrient content claims are claims about specific nutrients contained in a product.  They are typically made on the front of packaging in a font large enough to be read by the average consumer.   Because these claims are relied upon by consumers when making purchasing decisions, the regulations govern what claims can be made in order to prevent misleading claims.

41.     Section 403(r)(1)(A) of the FDCA governs the use of expressed and implied nutrient content claims on labels of food products that are intended for sale for human consumption.  *See* 21 C.F.R. § 101.13.

42.     21 C.F.R. § 101.13 provides the general requirements for nutrient content claims, which California has expressly adopted.   *See* California Health & Safety Code § 110100.  21 C.F.R. § 101.13 requires that manufacturers include certain disclosures when a nutrient claim is made and, at the same time, the product contains certain levels of unhealthy ingredients, such as fat and sodium.  It also sets forth the manner in which that disclosure must be made, as follows:

> (4)(i) The disclosure statement "See nutrition information for ___ content" shall be in easily legible boldface print or type, in distinct contrast to other printed or graphic matter, and in a size no less than that required by §101.105(i) for the net quantity of contents statement, except where the size of the claim is less than two times the required size of the net quantity of contents statement,

in which case the disclosure statement shall be no less than one-half the size of the claim but no smaller than one-sixteenth of an inch, unless the package complies with §101.2(c)(2), in which case the disclosure statement may be in type of not less than one thirty-second of an inch.

(ii) The disclosure statement shall be immediately adjacent to the nutrient content claim and may have no intervening material other than, if applicable, other information in the statement of identity or any other information that is required to be presented with the claim under this section (e.g., see paragraph (j)(2) of this section) or under a regulation in subpart D of this part (e.g., see §§101.54 and 101.62). If the nutrient content claim appears on more than one panel of the label, the disclosure statement shall be adjacent to the claim on each panel except for the panel that bears the nutrition information where it may be omitted.

43.    An "expressed nutrient content claim" is defined as any direct statement about the level (or range) of a nutrient in the food (e.g., "low sodium" or "contains 100 calories"). *See* 21 C.F.R. § 101.13(b)(1).

44.    An "implied nutrient content claim" is defined as any claim that: (i) describes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (e.g., "high in oat bran"); or (ii) suggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient (e.g., "healthy, contains 3 grams (g) of fat"). 21 C.F.R. § 101.13(b)(2)(i-ii).

### 1.    **Defendant Makes Unlawful Antioxidant Claims**

45.    Federal and California regulations regulate antioxidant claims as a particular type of nutrient content claim. Specifically, 21 C.F.R. § 101.54(g) contains special requirements for nutrient claims that use the term "antioxidant":

(1)    the name of the antioxidant must be disclosed;

(2)    there must be an established Recommended Daily Intake ("RDI") for that antioxidant, and if not, no "antioxidant" claim can be made about it;

(3)    the label claim must include the specific name of the nutrient that is an antioxidant and cannot simply say "antioxidants" (e.g., "high in antioxidant vitamins C and E"),[1] *see* 21 C.F.R. § 101.54(g)(4);

---

[1] Alternatively, when used as part of a nutrient content claim, the term "antioxidant" or "antioxidants" (such

1        (4)     the nutrient that is the subject of the antioxidant claim must also have

2    recognized antioxidant activity, *i.e.*, there must be scientific evidence that after it is eaten and

3    absorbed from the gastrointestinal tract, the substance participates in physiological, biochemical

4    or cellular processes that inactivate free radicals or prevent free radical-initiated chemical

5    reactions, *see* 21 C.F.R. § 101.54(g)(2);

6        (5)     the antioxidant nutrient must meet the requirements for nutrient content

7    claims in 21 C.F.R. § 101.54(b), (c), or (e) for "High" claims, "Good Source" claims, and

8    "More" claims, respectively. For example, to use a "High" claim, the food would have to

9    contain 20% or more of the Daily Reference Value ("DRV") or RDI per serving. For a "Good

10   Source" claim, the food would have to contain between 10-19% of the DRV or RDI per

11   serving, *see* 21 C.F.R. § 101.54(g)(3); and

12       (6)     the antioxidant nutrient claim must also comply with general nutrient

13   content claim requirements such as those contained in 21 C.F.R. § 101.13(h) that prescribe the

14   circumstances in which a nutrient content claim can be made on the label of products high in

15   fat, saturated fat, cholesterol or sodium.

16     46.     The antioxidant labeling for Bigelow's Misbranded Food Products and the

17   claims on Bigelow's website promoting these products violate California law: (1) because the

18   names of the antioxidants are not disclosed on the product labels; (2) because there are no RDIs

19   for the antioxidants being touted, including flavonoids and polyphenols; (3) because the

20   claimed antioxidant nutrients fail to meet the requirements for nutrient content claims in 21

21   C.F.R. § 101.54(b), (c), or (e) for "High" claims, "Good Source" claims, and "More" claims,

22   respectively; and (4) because Defendant lacks adequate scientific evidence that the claimed

23   antioxidant nutrients participate in physiological, biochemical, or cellular processes that

24   inactivate free radicals or prevent free radical-initiated chemical reactions after they are eaten

25   and absorbed from the gastrointestinal tract.

26

27   as "high in antioxidants") may be linked by a symbol (such as an asterisk) that refers to the same symbol that
appears elsewhere on the same panel of a product label followed by the name or names of the nutrients with

28   the recognized antioxidant activity. If this is done, the list of nutrients must appear in letters of a type size
height no smaller than the larger of one half of the type size of the largest nutrient content claim or 1/16 inch.

47.     For example, as discussed in paragraph 5 above, the package label of Bigelow Green Tea with Lemon bears the statement "*Healthy Antioxidants*". The back panel further boasts, "*Mother Nature gave us a wonderful gift when she packed powerful antioxidants into green tea…*" Similar unlawful statements appear on all Bigelow tea products. Additional antioxidant nutrient content claims appear on Bigelow's websites.

48.     These same violations were condemned in numerous other warning letters to other tea companies including the April 11, 2011 warning letter to Diaspora Tea & Herb Co., LLC (attached as Exhibit 2) which states in pertinent part:

> Additionally, your website bears nutrient content claims using the term "antioxidant." … Such a claim must also include the names of the nutrients that are the subject of the claim as part of the claim or, alternatively, the term "antioxidant" or "antioxidants" may be linked by a symbol (e.g., an asterisk) that refers to the same symbol that appears elsewhere on the same panel of the product label, followed by the name or names of the nutrients with recognized antioxidant activity, 21 CFR 101.54(g)(4). The use of a nutrient content claim that uses the term "antioxidant" but does not comply with the requirements of 21 CFR 101.54(g) misbrands a product under section 403(r)(2)(A)(i) of the Act. The following are examples of nutrient content claims on your website that use the term "antioxidant" but do not include the names of the nutrients that are the subject of the claim as required under 21 CFR 101.54(g)(4): "Yerba Maté is…rich in… antioxidants." ; … "Caffeine-free Green Rooibos…contain[s] high concentrations of antioxidants….
>
> Additionally, the following are examples of nutrient content claims on your website that use the term "antioxidant," but where the nutrients that are the subject of the claim do not have an established RDI as required under 21 CFR 101.54(g)(1): … "White Tea… contain[s] high concentrations of… antioxidant polyphenols (tea catechins)…."; … "Antioxidant rich…222mg polyphenols per serving!"; … "Antioxidant rich…109mg polyphenols per serving!"□
>
> The above violations are not meant to be an all-inclusive list of deficiencies in your products and their labeling. It is your responsibility to ensure that products marketed by your firm comply with the Act and its implementing regulations. We urge you to review your website, product labels, and other labeling and promotional materials for your products to ensure that the claims you make for your products do not cause them to violate the Act. The Act authorizes the seizure of illegal products and injunctions against manufacturers and distributors of those products, 21 U.S.C. §§ 332 and 334

49.     For these reasons, Defendant's antioxidant claims at issue in this Complaint are misleading and in violation of 21 C.F.R. § 101.54 and California law, and the products at issue

1    are misbranded as a matter of law. Misbranded products cannot be legally manufactured,

2    advertised, distributed, held or sold and are legally worthless. Plaintiff and members of the

3    Class who purchased these products paid an unwarranted premium for these products.

4         50.    In addition to the FDA Warning Letters to Unilever and Diaspora Tea & Herb

5    Co., LLC discussed above (Exhibits 1 and 2), the FDA has issued numerous warning letters

6    addressing similar unlawful antioxidant nutrient content claims. *See, e.g.*, FDA warning letter

7    dated February 22, 2010 to Redco Foods, Inc. regarding its misbranded Salada Naturally

8    Decaffeinated Green Tea product because "there are no RDIs for (the antioxidants) grapeskins,

9    rooibos (red tea) and anthocyanins"; FDA warning letter dated February 22, 2010 to Fleminger

10   Inc. regarding its misbranded TeaForHealth products because the admonition "[d]rink high

11   antioxidant green tea" . . . "does not include the nutrients that are the subject of the claim or use

12   a symbol to link the term antioxidant to those nutrients". These warning letters were hardly

13   isolated. Defendant is aware of these FDA warning letters.

14        51.    Additional evidence of Bigelow's knowledge that its antioxidant health claims

15   are improper and misleading is provided by the November 25, 2009 Adjudication of the British

16   Advertising Standards Authority ("ASA") against one of Bigelow's biggest competitors, Tetley

17   Tea. There, the ASA found that Tetley's print and TV advertisements stating that Tetley

18   products were: "rich in antioxidants that can keep your heart healthy" were misleading. In so

19   holding, ASA stated:

20          Because the evidence we had seen was not directly relevant to the implied

21          claim that green tea, or the antioxidants in it, had general health benefits, we
            considered it was not sufficient substantiation for that claim. We concluded

22          that the ad was misleading.

23          On this point, the ad breached CAP (Broadcast) TV Advertising Standards

24          Code rules 5.1.1 (Misleading advertising), 5.2.1 (Evidence), 5.2.2
            (Implications), 8.3.1(a) (Accuracy in food advertising)

25

26          The ad must not be broadcast again in its current form. We told Tetley not to
            imply that a product had greater health benefits than it did if they did not hold

27          substantiation for the implied claims….

28

1    Adjudication of the ASA Council, Tetley GB Ltd., November 25, 2009.

2    http://www.asa.org.uk/ASA-action/Adjudications/2009/11/Tetley-GB-Ltd/TF_ADJ_47670.aspx

3        52.    The types of misrepresentations made above would be considered by a

4    reasonable consumer when deciding to purchase the products. Not only do Bigelow's

5    antioxidant, nutrient content and health claims regarding the benefits of "flavonoids" violate

6    FDA rules and regulations, they directly contradict current scientific research, which has

7    concluded: "[T]he evidence today does not support a direct relationship between tea

8    consumption and a physiological AOX [antioxidant] benefit." This conclusion was reported by

9    Dr. Jane Rycroft, Director of Lipton Tea Institute of Tea, in an article published in January,

10   2011, in which Dr. Rycroft states:

13           Only a few scientific publications report an effect of tea on free radical damage
             in humans using validated biomarkers in well designed human studies.
14           Unfortunately, the results of these studies are at variance and the majority of the
             studies do not report significant effects . . .

15           Therefore, despite more than 50 studies convincingly showing that flavonoids
16           possess potent antioxidant activity *in vitro,* the ability of flavonoids to act as an
             antioxidant *in vivo* [in humans], has not been demonstrated.

17           Based on the current scientific consensus that the evidence today does not
18           support a direct relationship between tea consumption and a physiological AOX
             benefit...

19           No evidence has been provided to establish that having antioxidant
20           activity/content and/or antioxidant properties is a beneficial physiological effect.

21   Rycroft, Jane, "The Antioxidant Hypothesis Needs to be Updated," Vol. 1, *Tea Quarterly Tea*

22   *Science Overview,* Lipton Tea Institute of Tea Research (Jan. 2011), pp. 2-3.

23       53.    This scientific evidence and consensus conclusively establishes the improper

24   nature of the Defendant's antioxidant claims as they cannot possibly satisfy the legal and

25   regulatory requirement that the nutrient that is the subject of the antioxidant claim must also

26   have recognized antioxidant activity, *i.e.,* there must be scientific evidence that after it is eaten

27   and absorbed from the gastrointestinal tract, the substance participates in physiological,

28

biochemical or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions, *see* 21 C.F.R. § 101.54(g)(2).

54.    Plaintiff and members of the Class who purchased the Misbranded Food Products paid an unwarranted premium for these products.

**2.    Defendant Makes Unlawful Nutritional Content Claims**

55.    The FDA regulations authorize use of a limited number of defined nutrient content claims. In addition to authorizing the use of only a limited set of defined nutrient content terms on food labels, FDA's regulations authorize the use of only certain synonyms for these defined terms. If a nutrient content claim or its synonym is not included in the food labeling regulations it cannot be used on a label. Only those claims, or their synonyms, that are specifically defined in the regulations may be used. All other claims are prohibited. 21 CFR § 101.13(b).

56.    Only approved nutrient content claims will be permitted on the food label, and all other nutrient content claims will misbrand a food. It should thus be clear which type of claims are prohibited and which are permitted. Manufacturers are on notice that the use of an unapproved nutrient content claim is prohibited conduct. 58 FR 2302. In addition, 21 U.S.C. § 343(r)(2) prohibits using unauthorized undefined terms and declares foods that do so to be misbranded.

57.    In order to appeal to consumer preferences, Defendant has repeatedly made unlawful nutrient content claims about antioxidants and other nutrients that fail to utilize one of the limited defined terms. These nutrient content claims are unlawful because they failed to comply with the nutrient content claim provisions in violation of 21 C.F.R. §§ 101.13 and 101.54, which have been incorporated in California's Sherman Law. To the extent that the terms used to describe antioxidants without a recognized daily value or RDI (such as "natural source") are deemed to be a synonym for a defined term like "contain" the claim would still be unlawful because, as these nutrients do not have established daily values, they cannot serve as the basis for a term that has a minimum daily value threshold.

58.    Similarly, the regulations specify absolute and comparative levels at which foods qualify to make these claims for particular nutrients (*e.g.*, low fat. . . more vitamin C.) and list synonyms that may be used in lieu of the defined terms. Certain implied nutrient content claims (*e.g.*, healthy) also are defined.  The daily values ("DVs") for nutrients that the FDA has established for nutrition labeling purposes have application for nutrient content claims, as well. Claims are defined under current regulations for use with nutrients having established DVs; moreover, relative claims are defined in terms of a difference in the percent DV of a nutrient provided by one food as compared to another. *See. e.g.* 21 C.F.R. §§ 101.13 and 101.54.

59.    Defendant has repeatedly made unlawful nutrient content claims about antioxidants and other nutrients that fail to utilize one of the limited defined terms appropriately. These nutrient content claims are unlawful because they fail to comply with the nutrient content claim provisions in violation of 21 C.F.R. §§ 101.13 and 101.54, which have been incorporated in California's Sherman Law.

60.    For example, claims that Bigelow's teas are "packed with powerful antioxidants" are unlawful. Defendant's teas do not meet the minimum nutrient level threshold to make such a claim.

61.    These very same violations over nutrient content claims for tea products were condemned in the FDA Warning Letter to Unilever/Lipton discussed above and attached as Exhibit 1. In the warning letter to Unilever, the FDA stated:

> The product label back panel includes the statement "packed with protective FLAVONOID ANTIOXIDANTS." The term "packed with" characterizes the level of flavonol antioxidants in the product; therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "packed with" could be considered a synonym for a term defined by regulation, nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). **The claim "packed with FLAVONOID ANTIOXIDANTS" does not comply with 21 CFR 101.54(g)1 because no RDI has been established for flavonoids. Thus, this unauthorized nutrient content claim causes your product to be misbranded** under section 403(r)(2)(A)(i) of the Act.

1    Just as the FDA found Unilever's use of the phrase "packed with flavonoid antioxidants" to be

2    in violation of law, Bigelow's use of the phrase "packed with powerful antioxidants" is in

3    violation of law. Therefore, as with Unilever, such a violation causes Bigelow's products "to be

4    misbranded under section 403(r)(2)(A)(i) of the Act".

5

6         62.    The nutrient content claims regulations discussed above are intended to ensure

7    that consumers are not misled as to the actual or relative levels of nutrients in food products.

8         63.    Defendant has violated these referenced regulations. Therefore, Defendant's

9    Misbranded Food Products are misbranded as a matter of federal and California law and cannot

10   be sold or held because they are legally worthless. Defendant has also violated 21 C.F.R. §

11   101.54(g)(1), which prohibits food manufacturers from making claims regarding the nutritional

12   value of their products when the products fail to disclose that no RDI has been established for

13   the touted nutrients.

14        64.    For example, Bigelow Misbranded Food Products claim to be "packed with

15   powerful antioxidants" or "healthy antioxidants" or "green tea's antioxidant EGCG stimulates

16   the body to burn calories" but no RDI has been established for any antioxidant nutrient in its tea

17   products, including flavonoids, polyphenols or ECGC.  Thus, these products violate 21 C.F.R. §

18   101.54(g)(1).

19        65.    Claims that Bigelow products contain or are made with an ingredient such as tea

20   that is represented to contain a particular nutrient, or is prepared in a way that affects the

21   content of a particular nutrient in the food, can only be made if it at least a ''good source'' of

22   the nutrient that is associated with the ingredient or type of preparation. Thus, Bigelow's

23   statements that tea is "packed with powerful antioxidants" or "healthy antioxidants" trigger a

24   "good source" requirement (10 percent or more of the RDI or the DRV per reference amount

25   customarily consumed) which tea cannot demonstrate. 21 C.F.R. § 101.65(c)(3).

26        66.    Moreover, the FDA has condemned the use of such terms as "packed with"

27   "powerful" and "potent" in touting nutrient contents that do not have a recognized referenced

28   daily intake (RDI). As discussed above in paragraph 11 and 61 the FDA found Unilever's

products misbranded for the use of the phrase "packed with flavonoid antioxidants" because the antioxidant nutrients in tea do not have a recognized RDI.

67.     An example of the FDA finding a product misbranded due to an unlawful nutrient content claim with the use of the term "potent" of a nutrient without a recognized RDI is the September 24, 2002, FDA warning letter to Vermont Genseng Products, Ltd. informing the company that its products were misbranded for its use of potency term "high potency". In doing so the FDA stated:

> The product is misbranded within the meaning of section 403(r)(1)(A) of the Act in that the label bears the unauthorized nutrient content claims "highest potency" and "...many times more potent than...." Under 21 CFR 101.54(f), the claim "high potency" may be used only for vitamins or minerals that are present at 100 percent or more of the Reference Daily Intake (RDI). **Ginseng does not meet these requirements because it is not a vitamin or mineral and has no RDI. Your claims about the potency of American Ginseng Extract misbrand the product because they are not authorized by FDA regulation** or on the basis of an authoritative statement under section 403(r)(2)(G)(i) of the Act.

In spite of the clear condemnation of the term "potent" for a nutrient without a RDI, Bigelow's website refers to its products as "the most potent health drink ever" (see Paragraphs 4). As discussed above, antioxidants in tea products do not have an RDI. Therefore, Bigelow's claims of "packed with", "powerful" and "potent" referring to the antioxidants in tea misbrands the products.

68.     The type of misrepresentations made above would be considered by a reasonable consumer when deciding to purchase Defendant's Misbranded Food Products.  The failure to comply with the labeling requirements of 21 C.F.R. § 101.54 renders Defendant's products misbranded as a matter of federal and California law.

69.     In addition, 21 C.F.R. § 101.65, which has been adopted by California, sets certain minimum nutritional requirements for making an implied nutrient content claim that a product is healthy.  For example, for unspecified foods, the food must contain at least 10 percent of the RDI of one or more specified nutrients.  Defendant has misrepresented the healthiness of their products while failing to meet the regulatory requirements for making such claims.

70.     Plaintiff and members of the Class who purchased the Misbranded Food Products paid an unwarranted premium for these products.

1

### 3. **Defendant Makes Unlawful Health Claims**

2      71.      A health claim is a statement expressly or implicitly linking the consumption of

3   a food substance (*e.g.*, ingredient, nutrient, or complete food) to risk of a disease (*e.g.*,

4   cardiovascular disease) or a health-related condition (*e.g.*, hypertension). *See* 21 C.F.R. §

5   101.14(a)(1), (a)(2), and (a)(5). Only health claims made in accordance with FDCA

6   requirements, or authorized by FDA as qualified health claims, may be included in food

7   labeling. Other express or implied statements that constitute health claims, but that do not meet

8   statutory requirements, are prohibited in labeling foods.

9      72.      21 C.F.R. § 101.14, which has been expressly adopted by California, provides

10  when and how a manufacturer may make a health claim about its product. A "Health Claim"

11  means any claim made on the label or in labeling of a food, including a dietary supplement, that

12  expressly or by implication, including "third party" references, written statements (*e.g.*, a brand

13  name including a term such as "heart"), symbols (*e.g.*, a heart symbol), or vignettes,

14  characterizes the relationship of any substance to a disease or health-related condition. Implied

15  health claims include those statements, symbols, vignettes, or other forms of communication

16  that suggest, within the context in which they are presented, that a relationship exists between

17  the presence or level of a substance in the food and a disease or health-related condition (*see* 21

18  CFR § 101.14(a)(1)).

19     73.      Further, health claims are limited to claims about disease risk reduction, and

20  cannot be claims about the diagnosis, cure, mitigation, or treatment of disease. An example of

21  an authorized health claim is: "Three grams of soluble fiber from oatmeal daily in a diet low in

22  saturated fat and cholesterol may reduce the risk of heart disease. This cereal has 2 grams per

23  serving."

24     74.      A claim that a substance may be used in the diagnosis, cure, mitigation,

25  treatment, or prevention of a disease is a drug claim and may not be made for a food. 21 U.S.C.

26  § 321(g)(1)(D).

27

28

75. The use of the term "healthy" is not a health claim but rather an implied nutrient content claim about general nutrition that is defined by FDA regulation. In general, the term may be used in labeling an individual food product that:

> Qualifies as both low fat and low saturated fat;

> Contains 480 mg or less of sodium per reference amount and per labeled serving, and per 50 g (as prepared for typically rehydrated foods) if the food has a reference amount of 30 g or 2 tbsps or less;

> Does not exceed the disclosure level for cholesterol (*e.g.*, for most individual food products, 60 mg or less per reference amount and per labeled serving size); *and*

> Except for raw fruits and vegetables, certain frozen or canned fruits and vegetables, and enriched cereal-grain products that conform to a standard of identity, provides at least 10% of the daily value (DV) of vitamin A, vitamin C, calcium, iron, protein, *or* fiber per reference amount. Where eligibility is based on a nutrient that has been added to the food, such fortification must comply with FDA's fortification policy.

21 C.F.R. § 101.65(d)(2). The FDA's definition applies separate criteria to use of healthy on raw, single ingredient seafood or game meat products. 21 C.F.R. § 101.65(d)(2)(ii). FDA's regulation on healthy also encompasses other, derivative uses of health (*e.g.*, healthful, healthier) in food labeling. 21 C.F.R. § 101.65(d).

76. Bigelow has violated the provisions of 21 C.F.R. § 101.14, 21 C.F.R. § 101.65, 21 U.S.C. § 321(g)(1)(D) and 21 U.S.C. § 352(f)(1) on a number of its products and on its websites. For example, the claim on the package front label: "*Healthy Antioxidants*" and the claim on the package back panel: "*Mother Nature gave us a wonderful gift when she packed powerful antioxidants into green tea…*" is in violation of the aforesaid law.

77. Likewise the numerous claimed health benefits appearing on Bigelow's website is in violation of the aforesaid law. For example, on its website Bigelow states:

> **The Most Potent Health Drink Ever  It's tea time, say intriguing new research findings.**☐Recent studies in leading medical journals declare tea a potential heart tonic, cancer blocker, fat buster, immune stimulant, arthritis soother, virus fighter and cholesterol detoxifier…. ☐**Bottom line:** Each day you should drink three to six 8-ounce cups of tea. It can be black or green, hot or iced, decaf or not. **Here's how tea helps your health:**☐☐**Saves arteries.**

Drinking black tea helps prevent deadly clogging of arteries and reverses poor arterial functioning that can trigger heart attacks and strokes, two major new studies have found....In another recent test, Joseph Vita, M.D., of the Boston University School of Medicine, had heart patients drink either plain water or four cups of black tea daily. In a month, impaired blood vessel functioning (a risk factor for heart attack and strokes) improved about 50% in the tea drinkers.□ □**Inhibits cancer growth.** Tea has long been tied to a lower risk of stomach, colon and breast cancer, although the connection is not proven. Now lab studies find that tea chemicals actually may stop cancer growth. Rutgers University researchers showed that a compound in black tea called TF-2 caused colorectal cancer cells to "commit suicide"; normal cells were unaffected. "The effect is quite dramatic," said Rutgers professor Kuang Yu Chen, who speculates that the chemical might one day be made into an anti-cancer drug. **Tames inflammation.** Researchers at Case Western Reserve University gave arthritis-prone mice either green tea or water. The human equivalent of four cups of green tea daily halved the mice's risk of developing arthritis. Also intriguing: TF-2, the newly discovered anti-cancer compound in black tea, suppresses the Cox-2 gene that triggers inflammation, says research at Rutgers. That's the same way the drugs Vioxx and Celebrex work. Also, in a UCLA study of 600 Chinese men and women, drinking green tea halved the risk of chronic stomach inflammation, which can lead to cancer.□ □**Wipes out viruses.** Previous tests prove tea can neutralize germs, including some that cause diarrhea, pneumonia, cystitis and skin infections. New research by Milton Schiffenbauer of Pace University finds that black and green tea deactivates viruses, including herpes. When you drink tea, he says, chances are good you will wipe out viruses in your mouth. Flu viruses, too? Possibly. A recent Japanese study showed that gargling with black tea boosted immunity to influenza. Recent research at Harvard indicated that tea chemicals stimulated gamma-delta T-cells that bolster immunity against bacteria and viruses.□ □**Burns calories.** Most surprising, green tea's antioxidant EGCG stimulates the body to burn calories, notably fat. In a Swiss study, a daily dose of 270mg EGCG (the amount in 2 to 3 cups of green tea) caused men to burn 4% more energy - about 80 extra calories a day. Green tea did not increase heart rate, and the calorie burning was not due to caffeine.□ □**Plus:** Canadian researchers block cavities in mice by replacing their water with tea. Indian eye researchers have retarded cataracts in rats by feeding the animals tea extract. Israeli scientists block Parkinson's-like brain damage in mice by giving them green tea extract or pure EGCG. W□ □**For the best benefit ....** Drink both black and green tea, the regular kind sold in bags or leaves in grocery stores. Their antioxidants are equal. But green tea boasts special-acting EGCG.

http://www.bigelowtea.com/health/tea-and-beauty.aspx

78.    As FDA found in regard to the therapeutic claims made by Unilever/Lipton and Diaspora Tea & Herb Co. discussed above, the therapeutic claims on Bigelow's website and on its labels establish that their products are drugs because they are intended for use in the cure,

1   mitigation, treatment, or prevention of disease. Bigelow's Misbranded Food Products are not

2   generally recognized as safe and effective for the above referenced uses and, therefore, the

3   products are "new drugs" under section 201(p) of 21 U.S.C. § 321(p). New drugs may not be

4   legally marketed in the U.S. without *prior* approval from FDA as described in section 505(a) of

5   21 U.S.C. § 355(a). FDA approves a new drug on the basis of scientific data submitted by a

6   drug sponsor to demonstrate that the drug is safe and effective. Bigelow's health claims on its

7   websites, such as the claim set out above that "... TF-2, the newly discovered anti-cancer

8   compound in black tea, suppresses the Cox-2 gene that triggers inflammation.... That's the

9   same way the drugs Vioxx and Celebrex work" is in direct violation of law.

10          79.     As discussed above and as shown in Exhibits 1 and 2, the FDA has conducted

11  reviews of similar products to Bigelow's tea products and concluded that those companies were

12  "in violation of the Federal Food, Drug, and Cosmetic Act ... and the applicable regulations in

13  Title 21, Code of Federal Regulations, Part 101 (21 CFR 101)." FDA found the products to be

14  misbranded stating, "Your product is offered for conditions that are not amenable to self-

15  diagnosis and treatment by individuals who are not medical practitioners; therefore, adequate

16  directions for use cannot be written so that a layperson can use this drug safely for its intended

17  purposes. Thus, your ... product is misbranded under section 502(f)(1) of the Act in that the

18  labeling for this drug fails to bear adequate directions for use [21 U.S.C. § 352(f)(1)]."   *See*

19  Exhibits 1 and 2.

20          80.     The package front panel of Bigelow's Misbranded Food Products claims a level

21  of "*healthy antioxidants*" but their products do not contain any antioxidant substance or nutrient

22  with an established RDI. As set out above it also makes various health related claims on its

23  website of health benefits to be derived from using its products but, as with the Lipton and

24  Diaspora Tea & Herb Co. products, Bigelow's tea products do not have approval from FDA to

25  make the health related claims. In fact some of the health claims made by Bigelow on its

26  websites were specifically condemned by the FDA in finding the products of Unilever and

27  Diaspora Tea misbranded. For example Diaspora Tea's products were found to be misbranded

28  because it claimed: "The powerful antioxidants found in tea are believed to help prevent cancer

1   [and] lower cholesterol…."    Likewise, Unilever's products were found to be misbranded

2   because it claimed on its website "F]our recent studies in people at risk for coronary disease

3   have shown a significant cholesterol lowering effect from tea or tea flavonoids".    Yet Bigelow

4   continues to claim its tea products "Research has shown polyphenols have many health benefits

5   including fighting the effects of aging, and reducing the risk for some cancers, high cholesterol

6   and high blood pressure." As with Unilever and Diaspora Tea, these health related claims are in

7   violation of 21 U.S.C. § 352(f)(1) and therefore the Bigelow products are misbranded.

8         81.    Defendant has manufactured, advertised, distributed and sold products that are

9   misbranded under California law.    Misbranded products cannot be legally manufactured,

10  advertised, distributed or sold and are legally worthless as a matter of law.

11        82.    Plaintiff and members of the Class who purchased the Misbranded Food

12  Products paid an unwarranted premium for these products.

13  **D.    Defendant Has Violated California Law**

14        83.    Defendant has violated California Health & Safety Code §§ 109885 and 110390

15  which make it unlawful to disseminate false or misleading food advertisements that include

16  statements on products and product packaging or labeling or any other medium used to directly

17  or indirectly induce the purchase of a food product.

18        84.    Defendant has violated California Health & Safety Code § 110395 which makes

19  it unlawful to manufacture, sell, deliver, hold or offer to sell any misbranded food.

20        85.    Defendant has violated California Health & Safety Code § 110398 which makes

21  it unlawful to deliver or proffer for delivery any food that has been falsely advertised.

22        86.    Defendant has violated California Health & Safety Code § 110660 because its

23  labeling is false and misleading in one or more ways, as follows:

24              a.    They are misbranded under California Health & Safety Code § 110665

25  because their labeling fails to conform to the requirements for nutrient labeling set forth in 21

26  U.S.C. § 343(q) and the regulations adopted thereto;

27

28

b.    They are misbranded under California Health & Safety Code § 110670 because their labeling fails to conform with the requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and the regulations adopted thereto; and

c.    They are misbranded under California Health & Safety Code § 110705 because words, statements and other information required by the Sherman Law to appear on their labeling either are missing or not sufficiently conspicuous.

87.    Defendant has violated California Health & Safety Code § 110760 which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.

88.    Defendant has violated California Health & Safety Code § 110765 which makes it unlawful for any person to misbrand any food.

89.    Defendant has violated California Health & Safety Code § 110770 which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for deliver any such food.

90.    Defendant has violated the standard set by 21 C.F.R. § 101.2, which has been incorporated by reference in the Sherman Law, by failing to include on their product labels the nutritional information required by law.

.    91.    Defendant has violated the standards set by 21 CFR §§ 101.13, and 101.54, which have been adopted by reference in the Sherman Law, by including unauthorized antioxidant claims on their products. Defendant has violated the standards set by 21 CFR §§ 101.14, and 101.65, which have been adopted by reference in the Sherman Law, by including unauthorized health and healthy claims on their products.

E.    **Plaintiff Purchased Defendant's Misbranded Food Products**

92.    Plaintiff cares about the nutritional content of food and seeks to maintain a healthy diet.

93.    Plaintiff purchased Defendant's Misbranded Food Products at issue in this

Complaint during the Class Period including the following products:

Green Tea



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Green Tea Naturally Decaffeinated



Bigelow is pleased to share the fact that this box, bag, string and tag are made from sustainable (renewable) resources and are 100% biodegradable.

*Leave it to Mother Nature... and Bigelow!*

Mother Nature gave us a wonderful gift when she



Bigelow is pleased to share the fact that this box, bag, string and tag are made from sustainable (renewable) resources and are 100% biodegradable.

0 72310 04247 6

*Leave it to Mother Nature... and Bigelow!*

Mother Nature gave us a wonderful gift when she packed powerful antioxidants into green tea.

But not all green tea tastes the same. To make our *naturally* decaffeinated Green Tea, Bigelow uses only the finest quality tea that has been grown in higher-elevation gardens and gently processed to remove the caffeine yet retain the tea's natural, smooth flavor. Each tea bag is then wrapped in it's own protective pouch to seal in all the wonderful flavor and freshness.

*Naturally* Decaffeinated Bigelow Green Tea takes green tea enjoyment to a whole new level. It's a great way to help you relax and enjoy a healthier lifestyle.

Eunice & David Bigelow

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16



17    94.    Plaintiff read the labels on Defendant's Misbranded Food Products, including

18  the antioxidant and nutrient content health claims, where applicable, before purchasing them.

19  Absent the unlawful claims Plaintiff would have foregone purchasing Defendant's products and

20  bought other products readily available at a lower price.

21    95.    Plaintiff relied on Defendant's package labeling including the antioxidant,

22  nutrient content and health labeling claims including the *"healthy antioxidants"* and "packed

23  *powerful antioxidants*" claims, and based and justified the decision to purchase Defendant's

24  products in substantial part on Defendant's package labeling including the antioxidant, nutrient

25  content and health labeling claims including these claims.

26    96.    At point of sale, Plaintiff did not know, and had no reason to know, that

27  Defendant's products were misbranded as set forth herein, and would not have bought the

28  products had she known the truth about them.

97. At point of sale, Plaintiff did not know, and had no reason to know, that Defendant's antioxidant, nutrient content and health labeling claims including the "healthy antioxidants," and "packed with powerful antioxidants" claims were unlawful and unauthorized as set forth herein, and would not have bought the products had he known the truth about them.

98. As a result of Defendant's unlawful labeling claims including the antioxidant, nutrient content and health labeling claims including the "excellent source of antioxidants," "natural source of antioxidants" claims, Plaintiff and thousands of others in California purchased the products at issue.

99. Defendant's labeling, advertising and marketing as alleged herein is false and misleading and designed to increase sales of the products at issue. Defendant's misrepresentations are part of an extensive labeling, advertising and marketing campaign, and a reasonable person would attach importance to Defendant's representations in determining whether to purchase the products at issue.

100. A reasonable person would also attach importance to whether Defendant's products were legally salable, and capable of legal possession, and to Defendant's representations about these issues in determining whether to purchase the products at issue. Plaintiff would not have purchased Defendants' Misbranded Food Products had he known they were not capable of being legally sold or held.

## CLASS ACTION ALLEGATIONS

101. Plaintiff brings this action as a class action pursuant to Federal Rule of Procedure 23(b)(2) and 23(b)(3) on behalf of the following class:

> All persons in California who purchased Defendant's tea products within the last four years (the "Class").

102. The following persons are expressly excluded from the Class: (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

103. This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

104. <u>Numerosity</u>:  Based upon Defendant's publicly available sales data with respect to the misbranded products at issue, it is estimated that the Class numbers in the thousands, and that joinder of all Class members is impracticable.

105. <u>Common Questions Predominate</u>:  This action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only individual Class members.  Thus, proof of a common set of facts will establish the right of each Class member to recover.  Questions of law and fact common to each Class member include, for example:

a. Whether Defendant engaged in unlawful and misleading business practices by failing to properly package and label their Misbranded Food Products sold to consumers;

b. Whether the food products at issue were misbranded or unlawfully packaged and labeled as a matter of law;

c. Whether Defendant made unlawful and misleading antioxidant claims with respect to their food products sold to consumers;

d. Whether Defendant made unlawful and misleading nutrient content and health claims with respect to their food products sold to consumers;

e. Whether Defendants violated California Bus. & Prof. Code § 17200, *et seq.*, California Bus. & Prof. Code § 17500, *et seq.*, the Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*, California Civ. Code § 1790, *et seq.*, 15 U.S.C. § 2301, *et seq.*, and the Sherman Law;

f. Whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

g. Whether Defendant's unlawful, unfair and/or deceptive practices harmed Plaintiff and the Class; and

h. Whether Defendant was unjustly enriched by their deceptive practices.

106. <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the Class because Plaintiff bought Defendant's Misbranded Food Products during the Class Period.  Defendant's unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were received.  Plaintiff and the Class sustained similar injuries arising out of Defendant's conduct in violation of California law.  The injuries of each

member of the Class were caused directly by Defendant's wrongful conduct. In addition, the factual underpinning of Defendant's misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

107.     Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Neither Plaintiff nor Plaintiff's counsel have any interests that conflict with or are antagonistic to the interests of the Class members. Plaintiff has retained highly competent and experienced class action attorneys to represent their interests and those of the members of the Class. Plaintiff and Plaintiff's counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

108.     Superiority: There is no plain, speedy or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

1    109.   The prerequisites to maintaining a class action for injunctive or equitable relief

2    pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds

3    generally applicable to the Class, thereby making appropriate final injunctive or equitable relief

4    with respect to the Class as a whole.

5    110.   The prerequisites to maintaining a class action pursuant to Fed. R. Civ. P.

6    23(b)(3) are met as questions of law or fact common to class members predominate over any

7    questions affecting only individual members, and a class action is superior to other available

8    methods for fairly and efficiently adjudicating the controversy.

9    111.   Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to

10    be encountered in the management of this action that would preclude its maintenance as a class

11    action.

12                            **CAUSES OF ACTION**

13                          **FIRST CAUSE OF ACTION**
14                  **Business and Professions Code § 17200,** *et seq.*
                      **Unlawful Business Acts and Practices**
15

16    112.   Plaintiff incorporates by reference each allegation set forth above.

17    113.   Defendant's conduct constitutes unlawful business acts and practices.

18    114.   Defendant sold Misbranded Food Products in California during the Class Period.

19

20    115.   Defendant is a corporation and, therefore, each is a "person" within the meaning

21    of the Sherman Law.

22    116.   Defendant's business practices are unlawful under § 17200, *et seq.* by virtue of

23    Defendant's violations of Article 6 (misbranded food) of the Sherman Law.

24    117.   Defendant's business practices are unlawful under § 17200, *et seq.* by virtue of

25    Defendant's violations of § 17500, *et seq.*, which forbids untrue and misleading advertising.

26    118.   Defendant sold Plaintiff and the Class Misbranded Food Products that were not

27    capable of being sold legally and which were legally worthless. Plaintiff and the Class paid a

28    premium price for the Misbranded Food Products.

119.    As a result of Defendant's illegal business practices, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and to restore to any Class Member any money paid for the Misbranded Food Products.

120.    Defendant's unlawful business acts present a threat and reasonable continued likelihood of deception to Plaintiff and the Class.

121.    As a result of Defendant's conduct, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

## SECOND CAUSE OF ACTION
### Business and Professions Code § 17200, *et seq.*
### <u>Unfair Business Acts and Practices</u>

122.    Plaintiff incorporates by reference each allegation set forth above.

123.    Defendant's conduct as set forth herein constitutes unfair business acts and practices.

124.    Defendant sold Misbranded Food Products in California during the Class Period.

125.    Plaintiff and members of the Class suffered a substantial injury by virtue of buying Defendant's Misbranded Food Products that they would not have purchased absent Defendant's illegal conduct as set forth herein.

126.    Defendant's deceptive marketing, advertising, packaging and labeling of its Misbranded Food Products was of no benefit to consumers, and the harm to consumers and competition is substantial.

127.    Defendant sold Plaintiff and the Class Misbranded Food Products that were not capable of being legally sold and that were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

128.    Plaintiff and the Class who purchased Defendant's Misbranded Food Products had no way of reasonably knowing that the products were not properly marketed, advertised, packaged and labeled, and thus could not have reasonably avoided the injury each of them suffered.

129.    The consequences of Defendant's conduct as set forth herein outweighs any justification, motive or reason therefor.  Defendant's conduct is and continues to be illegal and contrary to public policy, and is substantially injurious to Plaintiff and the Class.

130.    As a result of Defendant's conduct, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

**THIRD CAUSE OF ACTION**
**Business and Professions Code § 17200, *et seq*.**
**Fraudulent Business Acts and Practices**

131.    Plaintiff incorporates by reference each allegation set forth above.

132.    Defendant's conduct as set forth herein constitutes fraudulent business practices under California Business and Professions Code sections § 17200, *et seq*.  Defendant sold Misbranded Food Products in California during the Class Period.

133.    Defendant's misleading marketing, advertising, packaging and labeling of the Misbranded Food Products was likely to deceive reasonable consumers, and in fact, Plaintiff and members of the Class were deceived.  Defendant has engaged in fraudulent business acts and practices.

134.    Defendant's fraud and deception caused Plaintiff and the Class to purchase Defendant's Misbranded Food Products that they would otherwise not have purchased had they known the true nature of those products.

135. Defendant sold Plaintiff and the Class Misbranded Food Products that were not capable of being sold legally and that were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

136. As a result of Defendant's conduct as set forth herein, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

**FOURTH CAUSE OF ACTION**
**Business and Professions Code § 17500, *et seq.***
**<u>Misleading and Deceptive Advertising</u>**

137. Plaintiff incorporates by reference each allegation set forth above.

138. Plaintiff asserts this cause of action for violations of California Business and Professions Code § 17500, *et seq.* for misleading and deceptive advertising against Defendant.

139. Defendant sold Misbranded Food Products in California during the Class Period.

140. Defendant engaged in a scheme of offering Misbranded Food Products for sale to Plaintiff and members of the Class by way of, *inter alia*, product packaging and labeling, and other promotional materials. These materials misrepresented and/or omitted the true contents and nature of Defendant's Misbranded Food Products. Defendant's advertisements and inducements were made within California and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq.* in that such product packaging and labeling, and promotional materials were intended as inducements to purchase Defendant's Misbranded Food Products and are statements disseminated by Defendant to Plaintiff and the Class that were intended to reach members of the Class. Defendant knew that these statements were misleading and deceptive as set forth herein.

- 40 -
*Class Action Complaint*

141.    In furtherance of their plan and scheme, Defendant prepared and distributed within California and nationwide via product packaging and labeling, and other promotional materials, statements that misleadingly and deceptively represented the ingredients contained in and the nature of Defendant's Misbranded Food Products.  Plaintiff and the Class necessarily and reasonably relied on Defendants' materials, and were the intended targets of such representations.

142.    Defendant's conduct in disseminating misleading and deceptive statements in California and nationwide to Plaintiff and the Class was and is likely to deceive reasonable consumers by obfuscating the true ingredients and nature of Defendant's Misbranded Food Products in violation of the "misleading prong" of California Business and Professions Code § 17500, *et seq.*

143.    As a result of Defendant's violations of the "misleading prong" of California Business and Professions Code § 17500, *et seq.*, Defendant has been unjustly enriched at the expense of Plaintiff and the Class.  Misbranded products cannot be legally sold and are legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

144.    Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

**FIFTH CAUSE OF ACTION**
**Business and Professions Code § 17500, *et seq.***
**<u>Untrue Advertising</u>**

145.    Plaintiff incorporates by reference each allegation set forth above.

146. Plaintiff asserts this cause of action against Defendant for violations of California Business and Professions Code § 17500, *et seq.*, regarding untrue advertising.

147. Defendant sold Misbranded Food Products in California during the Class Period.

148. Defendant engaged in a scheme of offering Misbranded Food Products for sale to Plaintiff and the Class by way of product packaging and labeling, and other promotional materials. These materials misrepresented and/or omitted the true contents and nature of Defendant's Misbranded Food Products. Defendant's advertisements and inducements were made in California and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq.* in that the product packaging and labeling, and promotional materials were intended as inducements to purchase Defendant's Misbranded Food Products, and are statements disseminated by Defendant to Plaintiff and the Class. Defendant knew that these statements were untrue.

149. In furtherance of their plan and scheme, Defendant prepared and distributed in California and nationwide via product packaging and labeling, and other promotional materials, statements that falsely advertise the ingredients contained in Defendant's Misbranded Food Products, and falsely misrepresented the nature of those products. Plaintiff and the Class were the intended targets of such representations and would reasonably be deceived by Defendant's materials.

150. Defendant's conduct in disseminating untrue advertising throughout California and nationwide deceived Plaintiff and members of the Class by obfuscating the contents, nature and quality of Defendant's Misbranded Food Products in violation of the "untrue prong" of California Business and Professions Code § 17500.

151. As a result of Defendant's violations of the "untrue prong" of California Business and Professions Code § 17500, *et seq.*, Defendant has been unjustly enriched at the

expense of Plaintiff and the Class. Misbranded products cannot be legally sold and are legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

152. Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

## SIXTH CAUSE OF ACTION
### Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*

153. Plaintiff incorporates by reference each allegation set forth above.

154. This cause of action is brought pursuant to the CLRA. This cause of action does not currently seek monetary relief and is limited solely to injunctive relief. Plaintiff intends to amend this Complaint to seek monetary relief in accordance with the CLRA after providing Defendant with notice pursuant to Cal. Civ. Code § 1782.

155. At the time of any amendment seeking damages under the CLRA, Plaintiff will demonstrate that the violations of the CLRA by Defendant were willful, oppressive and fraudulent, thus supporting an award of punitive damages.

156. Consequently, Plaintiff and the Class will be entitled to actual and punitive damages against Defendant for its violations of the CLRA. In addition, pursuant to Cal. Civ. Code § 1782(a)(2), Plaintiff and the Class will be entitled to an order enjoining the above-described acts and practices, providing restitution to Plaintiff and the Class, ordering payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court pursuant to Cal. Civ. Code § 1780.

157. Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

158. Defendant sold Misbranded Food Products in California during the Class Period.

159. Plaintiff and members of the Class are "consumers" as that term is defined by the CLRA in Cal. Civ. Code §1761(d).

160. Defendant's Misbranded Food Products were and are "goods" within the meaning of Cal. Civ. Code §1761(a).

161. By engaging in the conduct set forth herein, Defendant violated and continues to violate Sections 1770(a)(5), (7) (9), and (16) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that they misrepresent the particular ingredients, characteristics, uses, benefits and quantities of the goods.

162. By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(7) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that they misrepresent the particular standard, quality or grade of the goods.

163. By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(9) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that they advertise goods with the intent not to sell the goods as advertised.

164. By engaging in the conduct set forth herein, Defendant has violated and continues to violate Section 1770(a)(16) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that they represent that a subject of a transaction has been supplied in accordance with a previous representation when they have not.

165. Plaintiff requests that the Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to Cal. Civ. Code § 1780(a)(2). If Defendant is not restrained from engaging in these practices in the future, Plaintiff and the Class will continue to suffer harm.

1

2

**SEVENTH CAUSE OF ACTION**
**Restitution Based on Unjust Enrichment/Quasi-Contract**

3

4

5

6

166.     Plaintiff incorporates by reference each allegation set forth above.  As a result of Defendant's unlawful, fraudulent and misleading labeling, advertising, marketing and sales of Defendant's Misbranded Food Products, Defendant was enriched at the expense of Plaintiff and the Class.

7

8

9

10

11

12

13

167.     Defendant sold Misbranded Food Products to Plaintiff and the Class that were not capable of being sold or held legally and which were legally worthless.  It would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits they received from Plaintiff and the Class, in light of the fact that the products were not what Defendant purported them to be.  Thus, it would be unjust and inequitable for Defendant to retain the benefit without restitution to Plaintiff and the Class of all monies paid to Defendant for the products at issue.

14

15

168.     As a direct and proximate result of Defendant's actions, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

16

17

**EIGHTH CAUSE OF ACTION**
**Beverly-Song Act (Cal. Civ. Code § 1790, *et seq.*)**

18

169.     Plaintiff incorporates by reference each allegation set forth above.

19

20

170.     Plaintiff and members of the Class are "buyers" as defined by Cal. Civ. Code § 1791(b).

21

22

171.     Defendant is a "manufacturer" and "seller" as defined by Cal. Civ. Code § 1791(j) & (l).

23

24

172.     Defendant's food products are "consumables" as defined by Cal. Civ. Code § 1791(d).

25

26

173.     Defendant's nutrient and health content claims constitute "express warranties" as defined by Cal. Civ. Code § 1791.2.

27

28

174. Defendant, through its package labels, creates express warranties by making the affirmation of fact and promising that their Misbranded Food Products comply with food labeling regulations under federal and California law.

175. Despite Defendant's express warranties regarding their food products, it does not comply with food labeling regulations under federal and California law.

176. Defendant breached its express warranties regarding its Misbranded Food Products in violation of Cal. Civ. Code § 1790, *et seq.*

177. Defendant sold Plaintiff and members of the Class Misbranded Food Products that were not capable of being sold or held legally and which were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

178. As a direct and proximate result of Defendant's actions, Plaintiff and the Class have suffered damages in an amount to be proven at trial pursuant to Cal. Civ. Code § 1794.

179. Defendant's breaches of warranty were willful, warranting the recovery of civil penalties pursuant to Cal. Civ. Code § 1794.

## NINTH CAUSE OF ACTION
### Magnuson-Moss Act (15 U.S.C. § 2301, *et seq.*)

180. Plaintiff incorporates by reference each allegation set forth above.

181. Plaintiff and members of the Class are "consumers" as defined by 15 U.S.C. § 2301(3).

182. Defendant is a "supplier" and "warrantor" as defined by 15 U.S.C. § 2301(4) & (5).

183. Defendant's food products are "consumer products" as defined by 15 U.S.C. § 2301(1).

184. Defendant's nutrient and health content claims constitute "express warranties."

185. Defendant, through its package labels, creates express warranties by making the affirmation of fact and promising that its Misbranded Food Products comply with food labeling regulations under federal and California law.

186.    Despite Defendant's express warranties regarding their food products, it does not comply with food labeling regulations under federal and California law.

187    Defendant breached its express warranties regarding their Misbranded Food Products in violation of 15 U.S.C. §§ 2301, *et seq.*

188.    Defendant sold Plaintiff and members of the Class Misbranded Food Products that were not capable of being sold or held legally and which were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

189.    As a direct and proximate result of Defendant's actions, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of her claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, and on behalf of the general public, prays for judgment against Defendant as follows:

A.    For an order certifying this case as a class action and appointing Plaintiff and his counsel to represent the Class;

B.    For an order awarding, as appropriate, damages, restitution or disgorgement to Plaintiff and the Class for all causes of action other than the CLRA, as Plaintiff does not seek monetary relief under the CLRA, but intends to amend his Complaint to seek such relief;

C.    For an order requiring Defendant to immediately cease and desist from selling their Misbranded Food Products in violation of law; enjoining Defendant from continuing to market, advertise, distribute, and sell these products in the unlawful manner described herein; and ordering Defendants to engage in corrective action;

D.    For all equitable remedies available pursuant to Cal. Civ. Code § 1780;

E.    For an order awarding attorneys' fees and costs;

F.    For an order awarding punitive damages;

G.    For an order awarding pre-and post-judgment interest; and

1    H.    For an order providing such further relief as this Court deems proper.

2

3    Dated: May  2 , 2012              Respectfully submitted,

4

5    _Ben F. Pierce Gore (SBN 128515)_
     Ben F. Pierce Gore (SBN 128515)
6    PRATT & ASSOCIATES
     1901 S. Bascom Avenue, Suite 350
7    Campbell, CA  95008
     Telephone:  (408) 429-6506
8    Fax: (408) 369-0752
     pgore@prattattorneys.com
9
     Jay Nelkin
10   Carol Nelkin
     Stuart M. Nelkin
11   NELKIN & NELKIN, P.C.
     5417 Chaucer Drive
12   Houston, Texas 77005
     Telephone:  (281) 526-4500
13   Fax:  (713) 825-4161
     jnelkin@nelkinpc.com
14   cnelkin@nelkinpc.com
     snelkin@nelkinpc.com
15
     Don Barrett
16   David McMullan, Jr.
     Brian Herrington
17   Katherine B. Riley
     BARRETT LAW GROUP, P.A.
18   P.O. Box 927
     404 Court Square North
19   Lexington, MS 39095
     Telephone: (662) 834-2488
20   Toll Free: (877) 816-4443
     Fax: (662) 834-2628
21   dbarrett@barrettlawgroup.com
     donbarrettpa@yahoo.com
22   bherrington@barrettlawgroup.com
     kbriley@barrettlawgroup.com
23   kbriphone@yahoo.com
     dmcmullan@barrettlawgroup.com
24
     Charles Barrett
25   CHARLES BARRETT, P.C.
     6518 Hwy. 100, Suite 210
26   Nashville, TN 37205
     Telephone: (615) 515-3393
27   Fax: (615) 515-3395
     charles@cfbfirm.com
28

1                Richard Barrett
              LAW OFFICES OF RICHARD R. BARRETT, PLLC
2                2086 Old Taylor Road, Suite 1011
              Oxford, MS 38655
3                Telephone: (662) 380-5018
              Fax: (866) 430-5459
4                rrb@rrblawfirm.net

5                J. Price Coleman
              COLEMAN LAW FIRM
6                1100 Tyler Avenue, Suite 102
              Oxford, MS 38655
7                Telephone: (662) 236-0047
              Fax: (662) 513-0072
8                colemanlawfirmpa@bellsouth.net

9                Dewitt M. Lovelace
              Alex Peet
10               LOVELACE LAW FIRM, P.A.
              12870 U.S. Hwy 98 West, Suite 200
11               Miramar Beach, FL 32550
              Telephone: (850) 837-6020
12               Fax: (850) 837-4093
              dml@lovelacelaw.com
13

14               David Shelton
              ATTORNEY AT LAW
15               1223 Jackson Avenue East, Suite 202
              Oxford, MS 38655
16               Telephone: (662) 281-1212
              Fax: (662) 281-1312
17               david@davidsheltonpllc.com

18               Keith M. Fleischman
              Frank Karam
19               Ananda  N. Chaudhuri
              FLEISCHMAN LAW FIRM
20               565 Fifth Avenue, 7th Floor
              New York, New York  10017
21               Telephone:  212-880-9571
              keith@fleischmanlawfirm.com
22               frank@fkaramlaw.com
              achaudhuri@fleischmanlawfirm.com

23               Zona Jones
              PROVOST UMPHREY LAW FIRM LLP
24               490 Park Street
              P.O. Box 4905
25               Beaumont, TX 77704
              Telephone: (409) 299-5178
26               zjones@provostumphrey.com

27               *Attorneys for Plaintiff*

28

**EXHIBIT 1**

Case3:12-cv-02204-WHO Document1 Filed05/02/12 Page51 of 56

**U.S. Department of Health & Human Services**

U.S. Food & Drug Administration

## Inspections, Compliance, Enforcement, and Criminal Investigations

Home Inspections, Compliance, Enforcement, and Criminal Investigations Enforcement Actions Warning Letters

## Unilever United States, Inc. 8/23/10



**Department of Health and Human Services**

Public Health Service
Food and Drug Administration
College Park, MD 20740

August 23,2010

<b>WARNING LETTER</b>

**CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

Mr. Michael B. Polk
President of Unilever Americas
Unilever, Inc.
700 Sylvan Avenue
Englewood, NJ 07632-3113

Re: CFSAN-OC-10-24

Dear Mr. Polk:

The Food and Drug Administration (FDA) has reviewed the label for your "Lipton Green Tea 100% Natural Naturally Decaffeinated" product and reviewed your labeling for this product on your websites, www.lipton.com[1] and www.liptont.com[2] in August 2010. Based on our review, we have concluded that this product is in violation of the Federal Food, Drug, and Cosmetic Act (the Act). You can find the Act and regulations on FDA's website at www.fda.gov[3].

A link to .your website, www.lipton.com[4]. appears on your "Lipton Green Tea 100% Natural Naturally Decaffeinated" product label. This website directs U.S. visitors to another website, www.liptont.com[5]. We have determined that your websites, www.lipton.com[6] and www.liptont.com[7]. are labeling within the meaning of section 201(m) of the Act for your "Lipton Green Tea 100% Natural Naturally Decaffeinated" product.

**Unapproved New Drug**

Your website, www.liptont.com[8]. also promotes your Lipton Green Tea 100% Natural Naturally Decaffeinated product for conditions that cause it to be a drug under section 201(g)(1)(B) of the Act [21 U.S.C. § 321(g)(1)(B)].

For example, your webpage entitled "Tea and Health," subtitled "Heart Health Research" and further subtitled "Cholesterol Research" bears the following claim: "[F]our recent studies in people at risk for coronary disease

have shown a significant cholesterol lowering effect from tea or tea flavonoids ... One of these studies, on post-menopausal women, found that total cholesterol was lowered by 8% after drinking 8 cups of green tea daily for 12 weeks ...."

The therapeutic claims on your website establish that the product is a drug because it is intended for use in the cure, mitigation, treatment, or prevention of disease. Your Lipton Green Tea 100% Natural Naturally Decaffeinated product is not generally recognized as safe and effective for the above referenced uses and, therefore, the product is a "new drug" under section 201(p) of the Act [21 U.S.C. § 321(p)]. New drugs may not be legally marketed in the U.S. without prior approval from FDA as described in section 505(a) of the Act [21 U.S.C.
§ 355(a)]. FDA approves a new drug on the basis of scientific data submitted by a drug sponsor to demonstrate that the drug is safe and effective.

Your Lipton Green Tea 100% Natural Naturally Decaffeinated product is offered for conditions that are not amenable to self-diagnosis and treatment by individuals who are not medical practitioners; therefore, adequate directions for use cannot be written so that a layperson can use this drug safely for its intended purposes. Thus, your Lipton Green Tea 100% Natural Naturally Decaffeinated product is misbranded under section 502(f)(1) of the Act in that the labeling for this drug fails to bear adequate directions for use [21 U.S.C. § 352(f)(1)] .

**Unauthorized Nutrient Content Claims**

Under section 403(r)(1)(A) of the Act [21 U.S.C. 343(r)(1)(A)], a claim that characterizes the level of a nutrient which is of the type required to be in the labeling of the food must be made in accordance with a regulation promulgated by the Secretary (and, by delegation, FDA) authorizing the use of such a claim. The use of a term, not defined by regulation, in food labeling to characterize the level of a nutrient misbrands a product under section 403(r)(1)(A) of the Act.

Nutrient content claims using the term "antioxidant" must also comply with the requirements listed in 21 CFR 101.54(g). These requirements state, in part, that for a product to bear such a claim, an RDI must have been established for each of the nutrients that are the subject of the claim (21 CFR 101.54(g)(1)), and these nutrients must have recognized antioxidant activity (21 CFR 101.54(g)(2). The level of each nutrient that is the subject of the claim must also be sufficient to qualify for the claim under 21 CFR 101.54(b), (c), or (e) (21 CFR 101.54(g)(3)). For example, to bear the claim "high in antioxidant vitamin C," the product must contain 20 percent or more of the RDI for vitamin C under 21 CFR 101.54(b). Such a claim must also include the names of the nutrients that are the subject of the claim as part of the claim or, alternatively, the term "antioxidant" or "antioxidants" may be linked by a symbol (e.g., an asterisk) that refers to the same symbol that appears elsewhere on the same panel of the product label, followed by the name or names of the nutrients with recognized antioxidant activity (21 CFR 101.54(g)(4)). The use of a nutrient content claim that uses the term "antioxidant" but does not comply with the requirements of 21 CFR 101.54(g) misbrands a product under section 403(r)(2)(A)(i) of the Act.

Your webpage entitled "Tea and Health" and subtitled "Tea Antioxidants" includes the statement, "LIPTON Tea is made from tea leaves rich in naturally protective antioxidants." The term "rich in" is defined in 21 CFR 101.54(b) and may be used to characterize the level of antioxidant nutrients (21 CFR 101.54(g)(3)). However, this claim does not comply with 21 CFR 101.54(g)(4) because it does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients. Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act.

This webpage also states that "tea is a naturally rich source of antioxidants." The term "rich source" characterizes the level of antioxidant nutrients in the product and, therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "rich source" could be considered a synonym for a term defined by regulation (e.g., "high" or "good source"), nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "tea is a naturally rich source of antioxidants" does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients, as required by 21 CFR 101.54(g)(4). Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act.

The product label back panel includes the statement "packed with protective FLAVONOID ANTIOXIDANTS." The term "packed with" characterizes the level of flavonoid antioxidants in the product; therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "packed with" could be considered a synonym for a term defined by regulation, nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "packed with FLAVONOID ANTIOXIDANTS" does not comply with 21 CFR 101.54(g)1 because no RDI has been established for flavonoids. Thus, this unauthorized nutrient content claim causes your product to be misbranded under section 403(r)(2)(A)(i) of the Act.

Case3.12-cv-02204-WHO   Document1   Filed05/02/12   Page53 of 56

The above violations are not meant to be an all-inclusive list of deficiencies in your products or their labeling. It is your responsibility to ensure that all of your products are in compliance with the laws and regulations enforced by FDA. You should take prompt action to correct the violations. Failure to promptly correct these violations may result in regulatory actions without further notice, such as seizure and/or injunction.

We note that your label contains a chart entitled "Flavonoid Content of selected beverages and foods." The chart appears to compare the amounts of antioxidants in your product with the amount of antioxidants in orange juice, broccoli, cranberry juice and coffee. However, the information provided may be misinterpreted by the consumer because although the chart is labeled, in part, "Flavonoid Content," the y-axis is labeled "AOX"; therefore, the consumer might believe that the chart is stating the total amount of antioxidants rather than specifically measuring the amount of flavonoids in the product.

You should take prompt action to correct these violations. Please respond to this letter within 15 days from receipt with the actions you plan to take in response to this letter, including an explanation of each step being taken to correct the current violations and prevent similar violations. Include any documentation necessary to show that correction has been achieved. If you cannot complete corrective action within fifteen working days, state the reason for the delay and the time within which you will complete the correction.

You should direct your written reply to Latasha A. Robinson, Food and Drug Administration, Center for Food Safety and Applied Nutrition, 5100 Paint Branch Parkway, Office of Compliance (HFS-608), Division of Enforcement, College Park, Maryland 20740-3835.

Sincerely,

/s/

Jennifer A. Thomas
Acting Director
Office of Compliance
Center for Food Safety
and Applied Nutrition


cc: FDA New Jersey District

## Close Out Letter

- Unilever United States, Inc. - Close Out Letter 5/10/11 [9]

---

## Links on this page:

1. http://www.lipton.com/

2. http://www.liptont.com/

3. http://www.fda.gov

4. http://www.lipton.com/

5. http://www.liptont.com/

6. http://www.lipton.com/

7. http://www.liptont.com/

8. http://www.liptont.com/

9. /ICECI/EnforcementActions/WarningLetters/2010/ucm267398.htm


- Accessibility
- Contact FDA

**EXHIBIT 2**



U.S. Department of Health & Human Services

U.S. Food & Drug Administration

## Inspections, Compliance, Enforcement, and Criminal Investigations

Home Inspections, Compliance, Enforcement, and Criminal Investigations Enforcement Actions Warning Letters

## Diaspora Tea & Herb dba Rishi Tea 4/20/11



Department of Health and Human Services

Public Health Service
Food and Drug Administration
Minneapolis District Office
Central Region
250 Marquette Avenue, Suite 600
Minneapolis, MN  55401
Telephone: (612) 334-4100
FAX: (612) 334-4142

April 20, 2011

### WARNING LETTER

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Refer to MIN 11 – 21

Joshua Kaiser
President and Co-owner
Diaspora Tea & Herb Co., LLC
427 East Stewart Street
Milwaukee, Wisconsin  53207

Dear Mr. Kaiser:

This is to advise you that the Food and Drug Administration (FDA) reviewed your website at the Internet address http://www.rishi-tea.com/store/index.php [1] in January 2011.  FDA has determined that your Oolong Tea, Ginger, Organic Botanical, Green Oolong Tea, 100% Premium Tealeaf Powder, and Pu-erh Tea products are promoted for conditions that cause the products to be drugs under section 201(g)(1)(B) of the Federal Food, Drug and Cosmetic Act (the Act), 21 U.S.C. § 321(g)(1)(B).  The therapeutic claims on your website establish that these products are drugs because they are intended for use in the cure, mitigation, treatment, or prevention of disease.  Additionally, FDA has determined that your Yerba Maté Shade Grown, Organic Yerba Maté, White Tea, Pu-erh Tea, Green Oolong Tea, 100% Premium Tealeaf Powder, Matcha, 100% Premium Tea Powder, Blueberry Rooibos, Organic Fair Trade Rooibos Blend, Green Rooibos (Green Bush), Organic Fair Trade Botanical, and Super Green, Organic Japanese Green Tea products are also misbranded within the meaning of section 403(r)(1)(A) of the Act, 21 U.S.C. § 343(r)(1)(A). The marketing of these products with these claims violates the Act.  You can find copies of the Act through links on FDA's home page at http://www.fda.gov [2].

### I. Unapproved New Drugs

Examples of disease claims on your website http://www.rishi-tea.com/store/ [3] index.php include:

#### Ginger, Organic Botanical
- "[G]inger is used in food and drinks as a preventive medicine against colds [and] flus."

#### Green Oolong Tea, 100% Premium Tealeaf Powder
- "The powerful antioxidants found in tea are believed to help prevent cancer [and] lower cholesterol...."

#### Pu-erh Tea
- "Recent research suggests that consuming 5-8 cups of Pu-erh Tea each day can reduce cholesterol and plaque of the arteries."

#### Oolong Tea
- "Regular consumption of Oolong Tea is linked to the reduction of plaque in the arteries, reduction of cholesterol and lowering of blood sugar."
- "Oolong Tea is...prized for its cholesterol reducing...."

Your Oolong Tea, Ginger, Organic Botanical, Green Oolong Tea, 100% Premium Tealeaf Powder and Pu-erh Tea products are not generally recognized as safe and effective for the above referenced uses and, therefore, are also "new drugs" under section 201(p) of the Act, 21 U.S.C. § 321(p).  New drugs may not be legally marketed in the U.S. without prior approval from FDA, as described in section 505(a) of the Act, 21 U.S.C. § 355(a). FDA approves a new drug on the basis of scientific data submitted by a drug sponsor to demonstrate that the drug is safe and effective.

### II. Unauthorized Nutrient Content Claims

Under section 403(r)(1)(A) of the Act, a claim that characterizes the level of a nutrient which is of the type required to be in the labeling of the

food must be made in accordance with a regulation promulgated by the Secretary (and, by delegation, FDA) authorizing the use of such a claim. Characterizing the level of a nutrient in food labeling of a product without complying with specific requirements pertaining to nutrient content claims for that nutrient misbrands the product under section 403(r)(1)(A) of the Act.

Nutrient content claims that use the defined terms "rich in" or "high" may be used in the labeling of a food only if the food contains 20 percent or more of the daily value (DV) of that nutrient per reference amount customarily consumed (RACC), Title 21, Code of Federal Regulations (21 CFR), 101.54(b)(1). Such claims may not be made about a nutrient for which there is no established DV. However, your website bears "high" and "rich in" nutrient content claims about nutrients for which there are no established DV.

The following are examples of unauthorized "high" and "rich in" nutrient content claims on your website:

**Pu-erh Tea**
- "[R]ich in Tea Polyphenols and Theaflavins...rich in Thearubigin and Theabrownin...."

**Super Green, Organic Japanese Green Tea**
- "Super Green is...high in amino acids...."

**White Tea**
- "White Tea...contain[s] high concentrations of...L-Theanine Amino Acid."

Additionally, your website bears nutrient content claims using the term "antioxidant." Nutrient content claims using the term "antioxidant" must also comply with the requirements listed in 21 CFR 101.54(g). These requirements state, in part, that for a product to bear such a claim, a Recommended Daily Intake (RDI) must have been established for each of the nutrients that are the subject of the claim, 21 CFR 101.54(g)(1), and these nutrients must have recognized antioxidant activity, 21 CFR 101.54(g)(2). The level of each nutrient that is the subject of the claim must also be sufficient to qualify for the claim under 21 CFR 101.54(b), (c), or (e), 21 CFR 101.54(g)(3). Such a claim must also include the names of the nutrients that are the subject of the claim as part of the claim or, alternatively, the term "antioxidant" or "antioxidants" may be linked by a symbol (e.g., an asterisk) that refers to the same symbol that appears elsewhere on the same panel of the product label, followed by the name or names of the nutrients with recognized antioxidant activity, 21 CFR 101.54(g)(4). The use of a nutrient content claim that uses the term "antioxidant" but does not comply with the requirements of 21 CFR 101.54(g) misbrands a product under section 403(r)(2)(A)(i) of the Act.

The following are examples of nutrient content claims on your website that use the term "antioxidant" but do not include the names of the nutrients that are the subject of the claim as required under 21 CFR 101.54(g)(4):

**Yerba Maté Shade Grown, Organic Yerba Maté**
- "Yerba Maté is...rich in... antioxidants."

**Blueberry Rooibos, Organic Fair Trade Rooibos Blend**
- "Antioxidant-rich...."

**Green Rooibos (Green Bush), Organic Fair Trade Botanical**
- "Caffeine-free Green Rooibos...contain[s] high concentrations of antioxidants...."

Additionally, the following are examples of nutrient content claims on your website that use the term "antioxidant," but where the nutrients that are the subject of the claim do not have an established RDI as required under 21 CFR 101.54(g)(1):

**White Tea**
- "White Tea... contain[s] high concentrations of... antioxidant polyphenols (tea catechins)...."

**Matcha, 100% Premium Tea Powder**
- "Antioxidant rich...222mg polyphenols per serving!"

**Genmai Green Tea, 100% Premium Tealeaf Powder**
- "Antioxidant rich...65mg polyphenols per serving!"

**Green Oolong Tea, 100% Premium Tealeaf Powder**
- "Antioxidant rich...109mg polyphenols per serving!"
- "[R]ichest sources of flavonoid antioxidants...."

The above violations are not meant to be an all-inclusive list of deficiencies in your products and their labeling. It is your responsibility to ensure that products marketed by your firm comply with the Act and its implementing regulations. We urge you to review your website, product labels, and other labeling and promotional materials for your products to ensure that the claims you make for your products do not cause them to violate the Act. The Act authorizes the seizure of illegal products and injunctions against manufacturers and distributors of those products, 21 U.S.C. §§ 332 and 334. You should take prompt action to correct these violations and prevent their future recurrence. Failure to do so may result in enforcement action without further notice.

Please respond in writing within 15 working days from your receipt of this letter. Your response should outline the specific actions you are taking to correct these violations and to prevent similar violations. You should include in your response documentation such as revised labels or other useful information that would assist us in evaluating your corrections. If you cannot complete all corrections before you respond, we expect that you will explain the reason for the delay and state when you will correct any remaining violations.

Your reply should be sent to the attention of Compliance Officer Tyra S. Wisecup at the address on the letterhead.

Sincerely,

/s/

Gerald J. Berg
Director
Minneapolis District

## Close Out Letter

- Diaspora Tea & Herb Co., LLC - Close Out Letter 2/3/12[4]

---

**Links on this page:**