REDACTED VERSION OF DOCUMENT(S)
SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ALEX KHASIN, individually and on behalf of all others similarly situated,<br><br>             Plaintiff,<br><br>   v.<br><br>R. C. BIGELOW, INC.,<br><br>             Defendant. | Case No. 3:12-cv-02204-WHO |

**DECLARATION OF KEITH R. UGONE, PH.D.**

**November 9, 2015**

# DECLARATION OF KEITH R. UGONE, PH.D.

## November 9, 2015

I.      OVERVIEW OF ASSIGNMENT ................................................................ 1

II.     SUMMARY OF OPINIONS ...................................................................... 3

    A. Individual Inquiry Is Required To Determine Whether And To What Extent Putative Class Members Suffered Injury Attributable To The Challenged Claims...... 4

    B. Dr. Hooker's Proposed Calculation Does Not Provide A Relevant Or Reliable Method For Evaluating Economic Harm On A Class-Wide Basis Using Common Proof.......................................................................................................... 6

III.    QUALIFICATIONS AND EXPERIENCE ....................................................... 8

IV.     FACTS, DATA, AND INFORMATION RECEIVED................................................. 10

V.      OVERVIEW OF PARTIES ....................................................................... 11

    A. Named Plaintiff .......................................................................................... 11

    B. R. C. Bigelow, Inc.................................................................................... 11

VI.     OVERVIEW OF THE CHALLENGED PRODUCTS .................................................. 12

VII.    DETERMINING WHETHER AND TO WHAT EXTENT A PUTATIVE CLASS MEMBER WAS INJURED AS A RESULT OF THE CHALLENGED CLAIMS REQUIRES INDIVIDUALIZED INQUIRY ............................................. 13

    A. Individual Inquiry Is Required To Determine The Price(s) Each Putative Class Member Paid For The Challenged Product(s) ............................................. 14

        1. Retail Prices Vary By Sales Channel................................................. 15

        2. Retail Prices Vary By Retailer ....................................................... 17

        3. Retail Prices Vary Depending Upon Time Of Purchase........................ 18

        4. Retail Prices Vary By Geographic Location........................................ 19

        5. Retail Prices Vary By Package Size ................................................. 20

        6. Summary Of Variation In Retail Prices ............................................. 22

    B. Individual Inquiry Is Required To Determine Putative Class Members' Reasons For Purchasing The Challenged Products................................................... 22

    C. Individual Inquiry Is Required To Determine Putative Class Members' Knowledge And Perceptions Relating To The Challenged Claims ................................. 25

VIII.   LACK OF ECONOMIC EVIDENCE TO DETERMINE INDIVIDUAL PUTATIVE CLASS MEMBERS' ALLEGED ECONOMIC INJURY ................... 27

IX.     OVERVIEW OF DR. HOOKER'S PROPOSED CALCULATION ......................... 28

X.      DR. HOOKER'S PROPOSED CALCULATION DOES NOT PROVIDE A RELEVANT OR RELIABLE METHOD FOR EVALUATING ECONOMIC HARM ON A CLASS-WIDE BASIS USING COMMON PROOF .......................... 29

    A. Failure To Account For Value Received By Putative Class Members...................... 29

HIGHLY CONFIDENTIAL

B.  Ignores Individualized Issues That Must Be Considered To Determine Economic Injury.................................................................................................. 30

C.  Ignores Significant Variation In Prices Paid............................................... 31

D.  No Attempt To Demonstrate That Prices Paid Were Affected By The Challenged Claims .................................................................................................................. 32

E.  No Method For Allocating Claimed Damages To Individual Class Members........... 34

F.  Summary ....................................................................................................... 34

## DECLARATION OF KEITH R. UGONE, PH.D.

### November 9, 2015

I, Keith R. Ugone, declare as follows:

## I.    OVERVIEW OF ASSIGNMENT

1.    I am an economist and have been retained by R. C. Bigelow, Inc. ("Bigelow" or "Defendant") to offer my opinions regarding various economic and associated class certification issues relevant to the matter of *Alex Khasin v. R. C. Bigelow, Inc.*  I understand Mr. Alex Khasin ("Named Plaintiff" or "Mr. Khasin") alleges that Bigelow has engaged in false, deceptive, and misleading marketing, advertising, and labeling relating to Bigelow's green tea products (the "Challenged Products").[1]  Generally, Mr. Khasin alleges that Bigelow made false health claims by promoting the presence of antioxidants in its green tea products and claiming associated health benefits (the "Challenged Claims").[2]  I understand Mr. Khasin seeks certification of a putative Class of all individuals in California who purchased the Challenged Products for personal or household use from May 2, 2008 to the present.[3]

2.    Dr. Neal Hooker submitted a declaration on September 14, 2015 in support of class certification in this matter (the "Hooker Declaration").  Dr. Hooker acknowledged that the Court stated, "[t]he proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled

---

[1]  *See* Fourth Amended Complaint for Damages, Equitable and Injunctive Relief ("Fourth Amended Complaint") and Plaintiff's Motion for Class Certification, for Appointment of Class Representatives, and for Appointment of Class Counsel ("Motion for Class Certification").

[2]  Motion for Class Certification, pp. 2 – 6.   *See also* Order Regarding Dispute over Discovery of Profits dated August 12, 2015.

[3]  Motion for Class Certification, p. ii.

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015

_____

and the product as received, not the full purchase price or all profits."[4]  Dr. Hooker

stated that he was asked to opine only on "the first prong," which he described as "the

purchase price ('product as labeled')."[5]  Dr. Hooker proposed to calculate an average

retail purchase price by dividing "dollar sales" by "quantity of product sold during [the]

relevant period" using "sales data … from a third-party service such as IRI."[6]  He opined

that "[c]alculating the average retail sales price does not require an analysis of any

particular consumer's transaction."[7]

3.　　Dr. Hooker stated that he was not asked to opine on "the second prong of the Court's

formula – the value of the product as received."[8]  According to Dr. Hooker, he was

instructed by the Named Plaintiff's counsel that the Challenged Products are "legally

worthless."[9]

_____

[4] Declaration of Neil H. Hooker in Support of Plaintiff's Motion for Class Certification, for Appointment of Class Representatives, and for Appointment of Class Counsel ("Hooker Declaration"), pp. 1 – 2.  *See also* Order Regarding Dispute over Discovery of Profits dated August 12, 2015.

[5] Hooker Declaration, p. 2.

[6] Hooker Declaration, p. 2.   (Bracketed text added for clarification.)

[7] Hooker Declaration, p. 2.

[8] Hooker Declaration, p. 2.

[9] Hooker Declaration, p. 2.   I understand the Named Plaintiff contends that "the product has no value because it is legally worthless" and "[u]sing the Court's formula, the measure of restitution is the average retail purchase price minus $0."   (Motion for Class Certification, pp. 21 – 22.)   Dr. Hooker stated, "[i]f Defendant establishes a value for the product as received, I may be asked to opine on Defendant's methodology and conclusion regarding value." (Hooker Declaration, p. 2.)   It appears as though Dr. Hooker does not view as part of his assignment in this matter to opine (or analyze) whether Named Plaintiff's assertion is accurate that putative Class members received zero value from their purchases of the Challenged Products.   From an economic perspective, Named Plaintiff's theory implies that if the products had been properly labeled, their value would have been zero (with an implication being that such products would not have been provided to the market place).   Of course, the provision to the market place of tea products that do not contain the alleged misleading labeling would contradict Named Plaintiff's assertion and the assumption Named Plaintiff is asking Dr. Hooker to make.   I assume that Dr. Hooker would not be willing to make an assumption he does not agree with, but it would appear that the Named Plaintiff's assumption is untenable.   For example, Bigelow removed the antioxidant claims from the labeling for its black tea products in late 2012 and early 2013, and Bigelow continues to provide those products to the market place without the alleged misleading labeling.   (*See* Deposition of John McCraw taken on March 19, 2015 ("McCraw Deposition"), pp. 22 – 24 and Defendant's Response to Plaintiff Adam Victor's Interrogatories, Set One, p. 5 (McCraw Deposition, Exhibit 6).)

HIGHLY CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

4.    I have been requested by counsel for Bigelow to independently evaluate from an

economic perspective:

   a.  whether standard economic analysis can be used to quantify reliably the claimed
       damages in this matter on a Class-wide basis using common proof; and

   b.  whether Dr. Hooker (or the Named Plaintiff) has proposed a reliable method for
       evaluating claimed damages on a Class-wide basis using common proof (given the
       allegations asserted in this matter).

## II.    SUMMARY OF OPINIONS[10]

5.    My evaluation of the Named Plaintiff's assertion that claimed damages can be quantified

reliably on a Class-wide basis using common proof is based upon (a) my economics and

damage quantification training and experience, (b) documentary evidence, (c) deposition

testimony, (d) retail sales and pricing data collected by The Nielsen Company

("Nielsen"), and (e) my review of the other materials identified herein.   Based upon a

detailed analysis, I have concluded that:

   a.  the claimed injury and/or claimed damages allegedly suffered by the putative Class
       members as a result of the Challenged Claims cannot be evaluated reliably on a
       Class-wide basis using common proof; and

   b.  Dr. Hooker's proposed calculation does not provide a relevant or reliable method for
       evaluating or quantifying the economic injury (if any) suffered by putative Class
       members as a result of the Challenged Claims.

6.    As presented throughout my declaration (and summarized here), individual inquiry is

required to evaluate the claimed injury and/or claimed damages suffered by the putative

Class members.

_____

[10] This Summary of Opinions is intended to be an overview.   A full description of my opinions is contained
throughout my declaration (i.e., narrative and associated exhibits).

HIGHLY CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

**A. Individual Inquiry Is Required To Determine Whether And To What Extent Putative Class Members Suffered Injury Attributable To The Challenged Claims**

7.    In this matter, determining whether and to what extent any putative Class member was injured as a result of the Challenged Claims is not amenable to common proof on a Class-wide basis. Proof of alleged injury, if any, would depend upon individualized inquiry into the facts and circumstances associated with each putative Class member's purchase of the Challenged Products for at least the following reasons.

a.    Individual Inquiry Is Required To Determine The Specific Prices Paid For The Challenged Products By Each Putative Class Member. Analysis of retail pricing data indicates that the prices putative Class members paid for the Challenged Products vary substantially depending upon the circumstances surrounding their purchases, including the sales channel, particular retailer, time of purchase, geographic location, and package size purchased, among other factors. Therefore, individualized inquiry is required to determine the specific price(s) an individual putative Class member paid for the Challenged Product(s) and/or the extent to which the value paid may have been greater than the value received by that individual, if at all.

i.    As an example, annual average retail prices of Bigelow Green Tea (20-count) were ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████.

ii.    Even within a particular retailer, there can be significant variation in average retail prices over time (e.g., due to promotions such as temporary price reductions). For example, from approximately July 2008 to June 2014, average retail prices of Bigelow Green Tea (20-count) at Vons grocery stores ranged ████ ████████████████████████████████████████████████████.

The significant variation in individual actual prices paid by putative Class members negates the ability of a Class-wide, common-proof damages approach to yield a reliable and accurate estimate of claimed damages. Any methodology that attempts to aggregate expenditures on the Challenged Products and then redistribute those total expenditures back down to putative Class members (without individual inquiry) would by definition overcompensate putative Class members who purchased the Challenged Products at relatively low prices and undercompensate putative Class members who purchased the Challenged Products at relatively high prices. As presented later in my declaration, the differences in prices paid by putative Class members are significant. (**Section VII.A.**)

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

b. <u>Individual Inquiry Is Required To Determine Putative Class Members' Reasons For Purchasing The Challenged Products</u>.  Many putative Class members purchased the Challenged Products and/or received benefits from their purchases for reasons unrelated to the Challenged Claims.  These reasons include (i) flavor, freshness, and aroma; (ii) quality; (iii) refreshment; (iv) caffeine content; (v) premium packaging, and (vi) price, *inter alia*.  Consumers who purchased the Challenged Products for the aforementioned reasons (solely or in part) were not injured (or were not injured to the same degree) as consumers who purchased solely or in substantial part due to the Challenged Claims.  Individual inquiry would be required to evaluate each putative Class member's reasons for purchasing the Challenged Products and whether a corresponding claimed injury exists.  (**Section VII.B**.)

c. <u>Individual Inquiry Is Required To Determine Putative Class Members' Knowledge And Perceptions Relating To The Challenged Claims</u>.  Individual putative Class members' knowledge and perceptions relating to the Challenged Claims may affect the determination of whether an individual purchaser suffered injury attributable to the Challenged Claims.  For example, different putative Class members may have different knowledge and perceptions relating to the presence of antioxidants in green tea products (including the Challenged Products) and associated health benefits.  From an economic perspective, even if the Named Plaintiff could prove that the Challenged Products do not comply with certain regulations relating to antioxidant claims (as discussed in the Fourth Amended Complaint), putative Class members who were not misled by the Challenged Claims were not harmed by the Challenged Claims.  Such putative Class members received the value that was paid for and a common proof approach would not isolate these putative Class members from the claimed damages calculation.  (**Section VII.C**.)

8. Any evaluation of claimed damages allegedly suffered by putative Class members absent the individualized analyses described above would not be reliable from an economic perspective.  Failure to conduct such individualized inquiry would result in (a) compensation to some consumers who were not injured, (b) over-compensation to some putative Class members, and (c) under-compensation to other putative Class members.[11]

---

[11]  Even on an individual putative Class member basis, there likely would be a lack of economic evidence to allow a reliable determination of the claimed economic injury.  Putative Class members are unlikely to (a) have kept all or any of the receipts from purchases of the Challenged Products, (b) remember the prices they paid for the Challenged Products, (c) be able to substantiate the quantity or the prices associated with their purchases, or (d) recall the reason(s) and timing for each purchase.  The Challenged Products have been sold through different sales channels, at different retailers, at different times, in different geographic areas, and in different package sizes.  Consequently, purchasers of the Challenged Products have paid a wide range of prices for their purchases.  Complicating this diversity in prices paid is the likelihood that putative Class members would not be able to produce documentary evidence to substantiate their purchases, including the quantity of purchase and the actual prices paid (or package

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

### B. Dr. Hooker's Proposed Calculation Does Not Provide A Relevant Or Reliable Method For Evaluating Economic Harm On A Class-Wide Basis Using Common Proof

9.    From an economic and claimed damages perspective, Dr. Hooker's proposed calculation does not provide a relevant or reliable method for evaluating or quantifying the economic injury (if any) suffered by putative Class members as a result of the Challenged Claims.

a.    <u>Failure To Account For Value Received</u>.    Accurately assessing economic injury suffered by putative Class members requires that the Named Plaintiff determine (a) the value paid versus value received by purchasers of the Challenged Products and (b) the extent to which that difference (if any) is attributable to the Challenged Claims. However, neither Dr. Hooker nor the Named Plaintiff has proposed a reliable method for doing so.  The Named Plaintiff's proposed approach ignores the value received by each putative Class member from the purchase of the Challenged Product(s) and does not provide a reliable or relevant estimate of the harm (if any) suffered by putative Class members.  (**Section X.A.**)  From an economic perspective, Dr. Hooker was asked to make a "zero value" offsetting assumption on a topic that is ripe for economic analysis.

b.    <u>Failure To Establish Economic Injury</u>.  Dr. Hooker's proposed calculation provides no method for determining whether individual putative Class members suffered economic injury.  The Named Plaintiff's proposed approach ignores individualized inquiry relating to such topics as (i) the reasons for purchase (and whether the reasons for purchase relate to the Challenged Claims) and (ii) the knowledge and perceptions of putative Class members relating to the Challenged Claims (which must be evaluated for a reliable determination of economic injury).   In light of the diversity in consumers' reasons for purchasing the Challenged Products and possible differences in their knowledge and perceptions relating to the Challenged Claims, neither Dr. Hooker nor the Named Plaintiff has proposed a method to reliably determine whether putative Class members suffered economic injury as a result of the Challenged Claims (i.e., were aware of the Challenged Claims and purchased the Challenged Products anyway).   (**Section X.B**.)

c.    <u>Ignores Variation In Purchase Prices</u>.    There are significant variations in the prices paid for the Challenged Products by individual putative Class members.   Prices paid vary based upon a number of factors including the type of store where the purchase was made (i.e., sales channel), the particular retailer, the time of purchase, geographic

sizes).   In the absence of such evidence, it would not be possible to reliably determine the claimed damages allegedly suffered by individual putative Class members.   Also, in absence of such evidence, any attempt to provide an "average" monetary remedy to putative Class members (assuming they could be identified) again would result in (a) compensation to some consumers who were not injured, (b) over-compensation to some putative Class members, and (c) under-compensation to other putative Class members.   (**Section VIII**.)

HIGHLY CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

area, and the package size of Challenged Product purchased.  Therefore, there is not a single "purchase price" that can be determined or evaluated for all putative Class members on a Class-wide basis.  From an alternative vantage point (and as previously stated), aggregating expenditures on the Challenged Products and then redistributing those total expenditures back down to putative Class members (without individual inquiry) would by definition overcompensate putative Class members who purchased the Challenged Products at relatively low prices and undercompensate putative Class members who purchased the Challenged Products at relatively high prices  Individual inquiry is required to determine the prices paid by putative Class members and the extent to which the value paid may have been greater than the value received by an individual putative Class member, if at all.  (**Section X.C**.)

d.  <u>Failure To Demonstrate That Prices Paid Were Affected By The Challenged Claims</u>.  Neither Dr. Hooker nor the Named Plaintiff has proposed a methodology that would identify whether the Challenged Claims had an impact on the prices paid by putative Class members.  (**Section X.D**.)

   i.  <u>No Proposed Analysis Of Impact Of Challenged Claims On Prices Paid</u>.  The Named Plaintiff has not proposed a methodology that would allow him to determine what the price of a comparable product without the Challenged Claims would be (or whether it would be different than actual prices paid for the Challenged Products) – let alone explain how he would be able to make that determination on a Class-wide basis using common proof (especially in light of the significant variations in retail prices paid for the Challenged Products by putative Class members).

   ii.  <u>Failure To Consider Bigelow's Wholesale Pricing Strategy</u>.  Dr. Hooker failed to consider that with respect to wholesale pricing, Bigelow "line prices" its products (i.e., Bigelow's prices do not depend upon flavor, variety, or differences in label statements such as the Challenged Claims).  In particular, all Bigelow green teas are priced the same as all Bigelow black teas, which no longer are labeled with the Challenged Claims.  Bigelow's wholesale line pricing approach demonstrates a lack of any attempt to extract a higher price for products labeled with the Challenged Claims compared to those without the Challenged Claims. Bigelow's line pricing is inconsistent with the Named Plaintiff's assertion that "value paid" for the Challenged Products was greater than "value received" because of the Challenged Claims.  Viewing this observation from a different perspective, Named Plaintiff has provided no explanation (nor proposed an explanation) as to why (under Named Plaintiff's theory of liability) Bigelow would let the revenue benefits associated with the Challenged Claims (if any) accrue to retailers rather than Bigelow itself.

e.  <u>No Allocation Method Presented</u>.  Neither Dr. Hooker nor the Named Plaintiff has provided a mechanism for allocating to individual putative Class members the claimed damages associated with each individual putative Class member's

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015

_____

purchase(s).  Allocating claimed damages to individual putative Class members would require individualized inquiry and evidence (e.g., receipts).  (**Section X.E.**)

10.   For the above-stated reasons, assessing Class-wide damages using common proof in this matter as proposed by the Named Plaintiff would not be reliable.  The details of my analyses and the bases for my opinions are contained in the remainder of this declaration.

## III.   <u>QUALIFICATIONS AND EXPERIENCE</u>

11.   I am a Managing Principal at Analysis Group, Inc. ("AG").  AG provides economic, financial, and business strategy consulting to its clients and specializes in the interpretation of economic and financial data and the development of economic and financial models.  Internationally, AG consists of approximately 600 professionals who specialize in, among other things, the fields of economics, accounting, finance, statistics, and strategy consulting.

12.   My primary responsibility at AG is to provide economic, financial, and/or damages-related consulting services to clients.  Throughout my career I have provided these consulting services in class certification matters, antitrust cases, breach of contract cases, intellectual property cases, fraud-related cases, business tort cases, business interruption cases, and securities-related cases, among others.  I have worked on engagements (or submitted reports) relating to class certification issues numerous times, including but not limited to matters relating to beverages, fast food, non-stick cooking sprays, gas mileage, hand soap, facial cream, sunscreen, lipstick, foundation, and probiotics, among others.

13.   I specialize in the application of economic principles to complex commercial disputes, and I am generally retained in cases requiring economic, financial, and/or damages-related analyses.  Financial models I have constructed or evaluated in the past have contained as components revenue analyses, cost analyses, assessments of capacity,

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

assessments of profitability, assessments of reasonable royalties, and assessments of the competitive business environment. I also have evaluated various claims of economic value using peer group comparisons and/or discounted cash flow analyses relating to projected future earnings streams. During the course of my career, I have frequently performed economic analyses using large databases of information and complex computer models. I have provided expert testimony in deposition and trial settings numerous times.

14.    I received my B.A. in Economics from the University of Notre Dame in 1977, my M.A. in Economics from the University of Southern California in 1979, and my Ph.D. in Economics from Arizona State University in 1983. Attached as **Exhibit 1** is a true and correct copy of my current resume. A listing of publications I have authored is contained in my resume. Attached as **Exhibit 2** is a listing of my trial and deposition testimony during the time period from 2011 to present. My business address is Analysis Group, Inc., Park Place Center, 2911 Turtle Creek Blvd., Suite 600, Dallas, Texas, 75219.

15.    AG is being compensated based upon hours incurred and the hourly rates of the personnel involved. Payment to AG is not contingent upon my findings or the outcome of this matter. AG is being compensated at a rate of $600 per hour for my time. Hourly rates for other staff at AG assisting me with this matter range from $250 to $415 per hour, depending upon the level and experience of the staff involved.

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

## IV.    FACTS, DATA, AND INFORMATION RECEIVED

16.    The facts, data, and information available to me in forming my opinions are contained in

**Exhibit 3** or elsewhere in my declaration (including footnotes and exhibits).   Examples

of the types of information available to me include the following:

a. legal documents (e.g., Fourth Amended Complaint for Damages, Equitable and Injunctive Relief; Defendant's Answer to Plaintiff's Fourth Amended Complaint and Affirmative Defenses; Plaintiff's Motion for Class Certification, for Appointment of Class Representatives, and for Appointment of Class Counsel);

b. deposition transcripts (e.g., deposition of Alex Khasin taken on September 30, 2015 and associated exhibits; deposition of Chris Costello taken on March 19, 2015);

c. expert reports and declarations (e.g., Declaration of Neil H. Hooker in Support of Plaintiff's Motion for Class Certification, for Appointment of Class Representatives, and for Appointment of Class Counsel);

d. Nielsen retail sales and pricing data (e.g., retail unit sales, retail dollar sales, and average retail prices associated with various Bigelow tea products in various sales channels, geographic locations, and retailers); and

e. information independently obtained (e.g., information from Bigelow's website, information from Amazon.com).

17.    My analyses and opinions are based upon the information available, standard economic

theory, and my education and training.   The information I am relying upon is

information typically relied upon by experts in my field.   I reserve the ability to (a)

review documents, deposition transcripts, expert reports, or other information produced

by the parties to this dispute and (b) supplement my opinions based upon that review, if

appropriate.   I also reserve the ability to use demonstrative exhibits and/or other

information to explain and illustrate my opinions.

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

## V.    OVERVIEW OF PARTIES

### A.    Named Plaintiff

18.    Mr. Alex Khasin is a resident of Oakland, California.[12]   Mr. Khasin testified that he began drinking Bigelow teas around age 20 in approximately 1996.[13]   Mr. Khasin testified that he prefers green teas (rather than black teas) and primarily purchased Bigelow brand green teas prior to filing this lawsuit.[14, 15]   According to Mr. Khasin, he drank Bigelow tea "[a] few times a week" during the 2008 – 2012 time period.[16]   Mr. Khasin testified that he searched for but could not find any receipts for his purchases of Bigelow tea products.[17]

### B.    R. C. Bigelow, Inc.

19.    Bigelow is a family-owned company headquartered in Fairfield, Connecticut.[18]   Bigelow was founded in 1945 by Mrs. Ruth Campbell Bigelow.[19]   Currently, Bigelow blends and markets more than 120 flavors of specialty teas.[20]   Bigelow primarily sells tea products

---

[12]  Deposition of Alex Khasin taken on September 30, 2015 ("Khasin Deposition"), p. 16.

[13]  Khasin Deposition, pp. 22 and 32 – 33.

[14]  Khasin Deposition, pp. 34 – 35.

[15]  Mr. Khasin testified that he also has purchased green teas made by Lipton, Twinings, and Celestial.   Mr. Khasin testified that the price points for those various brands and Bigelow tea products are "pretty similar" and he did not recall any particular brand as significantly more or less expensive than the others.   (Khasin Deposiiton, p. 37.)   Mr. Khasin testified that he thinks the Twinings product label "mentioned antioxidants," but he could not recall specific antioxidant statements on the Twinings label or whether the Lipton or Celestial labels contained antioxidant statements at all.   (Khasin Deposition, pp. 38 – 39.)

[16]  Khasin Deposition, p. 22.

[17]  Khasin Deposition, p. 23.   Mr. Khasin further testified that he regularly discards receipts from food purchases within approximately one week from the time of purchase.

[18]  Deposition of Chris Costello taken on March 19, 2015 ("Costello Deposition"), pp. 10 and 34.   *See also* Defendant's Answer to Plaintiff's Fourth Amended Complaint and Affirmative Defenses, p. 1.

[19]  "Mission Statement - Bigelow Tea."   (https://www.bigelowtea.com/Our-Family-Story/Mission-Statement, viewed on November 1, 2015.)

[20]  "Creating our Flavors - Bigelow Tea."   (https://www.bigelowtea.com/Our-Difference/Creating-our-Flavors, viewed on November 1, 2015.)

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

to wholesalers or distributors who sell to retailers.[21]   Bigelow also sells teas in the club

store sales channel, through direct marketing, and through its food service division (e.g.,

selling to restaurants).[22]

## VI.    OVERVIEW OF THE CHALLENGED PRODUCTS

20.    Mr. Khasin alleges that Bigelow has engaged in false, deceptive, and misleading

marketing, advertising, and labeling relating to Bigelow green tea products (i.e., the

Challenged Products).[23]   It is my understanding that Mr. Khasin alleges that Bigelow

made false health claims by promoting the presence of antioxidants in its green tea

products and claiming associated health benefits.[24]   The Fourth Amended Complaint

identifies the following varieties of Bigelow green tea as among the Challenged Products.

---

[21]  Costello Deposition, p. 25.

[22]  Costello Deposition, pp. 7 – 9.

[23]  *See* Fourth Amended Complaint, pp. 1 – 3 and Motion for Class Certification, pp. 1 – 6.

[24]  Motion for Class Certification, pp. 2 – 6.   *See also* Order Regarding Dispute over Discovery of Profits dated
August 12, 2015.

HIGHLY CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

**Table 1**
**Challenged Products Identified In Fourth Amended Complaint[25]**

| Bigelow Green Tea Products |
|---|
| 1.  Green Tea |
| 2.  Green Tea Decaffeinated |
| 3.  Green Tea with Mint |
| 4.  Green Tea with Lemon |
| 5.  Green Tea with Lemon Decaffeinated |
| 6.  Green Tea with Pomegranate |
| 7.  Green Tea with Pomegranate Decaffeinated |
| 8.  Green Tea with Pomegranate (Iced Tea) |
| 9.  Green Tea with Peach |
| 10.  Green Tea with Wild Blueberry and Acai |
| 11.  Green Tea with Wild Blueberry and Acai Decaffeinated |
| 12.  Green Tea with Mango |

## VII.  DETERMINING WHETHER AND TO WHAT EXTENT A PUTATIVE CLASS MEMBER WAS INJURED AS A RESULT OF THE CHALLENGED CLAIMS REQUIRES INDIVIDUALIZED INQUIRY

21.  From an economic and claimed damages perspective, accurately assessing whether and to what extent a putative Class member suffered economic injury as a result of the Challenged Claims requires an evaluation of (a) the value paid versus value received from purchase(s) of the Challenged Product(s) and (b) the extent to which that difference (if any) is attributable to the Challenged Claims.   In the present matter, performing such an evaluation requires individualized information specific to each putative Class member. This individualized information includes, *inter alia*:

a.  the price paid by the putative Class member for the Challenged Product(s);

b.  the putative Class member's reasons for purchasing the Challenged Product(s); and

c.  the putative Class member's knowledge and perceptions relating to the Challenged Claims.

_____

[25]  Fourth Amended Complaint, pp. 2 – 3.

HIGHLY CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

22.    The above-mentioned circumstances surrounding each putative Class member's purchasing decision must be considered in order to determine whether and to what extent the individual was injured as a result of the Challenged Claims.

### A.  Individual Inquiry Is Required To Determine The Price(s) Each Putative Class Member Paid For The Challenged Product(s)

23.    Knowing the prices paid by individual putative Class members is an important factor in evaluating whether (and to what extent) an individual Class member suffered economic harm.  However, analysis of retail pricing data indicates that there is not a single (i.e., uniform) purchase price that can be used to evaluate claimed damages on a Class-wide basis.  Rather, the data demonstrate that there are wide variations in retail prices associated with the Challenged Products.  Without individualized inquiry, one cannot determine the specific price(s) an individual putative Class member paid for the Challenged Product(s) or the extent to which the value paid may have been greater than the value received by that individual – rendering attempts to quantify claimed damages on a Class-wide basis inaccurate and unreliable.

24.    Analysis of retail pricing data indicates that the prices putative Class members paid for the Challenged Products differ depending upon the circumstances surrounding their purchases, including the sales channel, particular retailer, time of purchase, geographic location, and package size purchased, among other factors.  These pricing variations demonstrate that the price paid by one consumer in one place at one time for a Challenged Product is not indicative of the price paid by another consumer in a different location at the same or a different time.  Because of the wide variations in the Challenged Products' retail prices, putative Class members' claimed damages cannot be

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

evaluated and quantified reliably on a Class-wide basis using common proof (or using just one average price).[26]

25.     In conducting my analyses, I relied upon retail sales and pricing data collected by Nielsen.   The Nielsen data contain retail units sold, retail dollar sales, and average retail prices for Bigelow Green Tea 20-count and 40-count packages in the grocery store sales channel in various California cities (i.e., grocery stores in Los Angeles, Sacramento, San Diego, and San Francisco) and at various retailers (i.e., Ralphs, Vons, and Walmart). Generally, the Nielsen data are available for four-week periods beginning with the four weeks ended July 19, 2008 and ending with the four weeks ended June 13, 2015.[27]

### 1.   Retail Prices Vary By Sales Channel

26.     Analysis of the Nielsen data indicates that the price(s) paid for the Challenged Products by any particular putative Class member at any particular time would vary based upon the sales channel in which the purchase was made.   A comparison of average retail prices paid in California grocery stores (i.e., the food store sales channel) to those paid at Walmart (i.e., the only mass merchandiser or non-grocery retailer included in the Nielsen

_____

[26]   The Nielsen data includes retail sales and pricing information for Bigelow Earl Grey Black Tea before and after the removal of the Challenged Claims.   The Challenged Claims were not included on the packaging of Bigelow Earl Grey Black Tea printed on or after January 6, 2013.

[27]   Nielsen data.   ("CA data price comparisons Sept 2015.xlsx.")   (*See also* Costello Deposition, p. 35.)   Retail sales and pricing information for (a) Vons is available from the four weeks ended July 19, 2008 to the four weeks ended June 14, 2014 and (b) Walmart (Pacific division) is available from the four weeks ended July 16, 2011 to the four weeks ended June 13, 2015.

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

data) is presented in **Figure 1** for Bigelow Green Tea (20-count).   Over the 2011 to June

2015 time period, the percentage difference between <u>annual</u> average retail prices for

Bigelow Green Tea (20-count) ████████████████████[28]  (**Exhibit 4**.)   Comparing

average prices for each 4-week time period (rather than on an annual basis) yields price

differences ranging ████████████



_____

[28]  Percentage differences in average retail prices (here and elsewhere in my declaration) are calculated by dividing the price difference by the lower price.

[29]  Retail prices shown for California Grocery Stores represent weighted average retail prices at grocery stores in Los Angeles, Sacramento, San Diego, and San Francisco.   Walmart (Pacific division) is the only mass merchandiser or non-grocery retailer available in the Nielsen data.

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

### 2. **Retail Prices Vary By Retailer**

27.     Average retail prices for the Challenged Products vary by retailer.  I understand that different retailers make their own independent determinations regarding the retail selling prices of the Challenged Products.[30]   Therefore, it is reasonable to expect that the retail prices for the Challenged Products may differ across retailers.   The Nielsen data support this expectation.   Thus, the price(s) paid for the Challenged Products by any particular putative Class member at any particular time would depend upon the retailer from which the product was purchased.

28.     A comparison of average retail prices paid in Ralphs, Vons, and Walmart stores (i.e., the three retailers for which retail sales and pricing information is available in the Nielsen data) is presented in **Figure 2** for Bigelow Green Tea (20-count).   Over the 2011 to June 2015 time period, the percentage difference between lowest and highest <u>annual</u> average retail prices across retailers ranged from approximately ███████████.  (**Exhibit 5**.) Comparing average prices for each 4-week time period (rather than on an annual basis) yields price differences ranging ██████████████████████.

_____

[30]  *See* Costello Deposition, p. 25.

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015

_____



### 3.   Retail Prices Vary Depending Upon Time Of Purchase

29.    Analysis of the Nielsen data indicates that retail prices of the Challenged Products varied depending upon the time of purchase.  For retailers in the grocery store sales channel (i.e., Ralphs and Vons), the significant variations in average retail prices paid over time likely indicate that promotions such as temporary price reductions are offered on a regular basis.  An example of the variation in average retail prices at Vons stores over time is presented in **Figure 3** for Bigelow Green Tea (20-count).  From the four weeks ended July 19, 2008 to the four weeks ended June 14, 2014, average retail prices of Bigelow Green Tea (20-count) at Vons stores ranged ███████████████████ ██████████████████████████████ (**Exhibit 6**.)

HIGHLY CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015

_____



    **4.   <u>Retail Prices Vary By Geographic Location</u>**

30.    Analysis of the Nielsen data indicates that average retail prices of the Challenged Products vary across cities within California. A comparison of average retail prices across California cities is presented in **Figure 4** for Bigelow Green Tea (20-count). Over the 2011 to June 2015 time period, the percentage difference between <u>annual</u> average retail prices across California cities ranged ████████████████████ ███████████████████. (**Exhibit 7**.) Comparing average prices for each 4-week time period (rather than on an annual basis) yields price differences ranging ██████ ████████████████.

HIGHLY CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015

_____



5. **Retail Prices Vary By Package Size**

31. Analysis of Nielsen data indicates that prices paid for the Challenged Products vary based upon the package size of the product purchased (e.g., 20-count vs. 40-count). A comparison of average retail prices of 20-count and 40-count packages of Bigelow Green Tea in California grocery stores is presented in **Figure 5** on a per-package basis and in **Figure 6** on a per-tea bag basis. Annual average retail prices ███████████ between 20-count and 40-count package sizes of Bigelow Green Tea – both on a per-package basis and on a per-tea bag basis. (**Exhibit 8**.)

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015



Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

**6.  Summary Of Variation In Retail Prices**

32.    Analyses of the Nielsen retail sales and pricing data demonstrate that there were (and are)
wide variations in the retail prices of the Challenged Products and that many factors
affected the actual sales prices paid for Challenged Products during the putative Class
period.  These factors include at least (a) sales channel, (b) retailer, (c) time of purchase,
(d) geographic location, and (e) package size.  Under these varied conditions, to
determine the actual price paid by any particular putative Class member (and whether
there was any price premium paid that was caused by the Challenged Claims) would
require consideration of circumstances particular to that transaction (i.e., individual
inquiry).  There are many individual variables affecting prices and many individual
actual prices paid – all of which negate the ability of a common proof approach to yield a
reliable and accurate estimate of claimed damages on a Class-wide basis.  The above
conclusions also apply to any proposed monetary remedy using an aggregation of total
expenditures by putative Class members (with the implied thought that such an
aggregation would then be distributed back down to individual putative Class members).

**B.  Individual Inquiry Is Required To Determine Putative Class Members' Reasons
For Purchasing The Challenged Products**

33.    From an economic perspective, a person who purchased Bigelow green tea for a reason
or reasons other than the Challenged Claims (e.g., a person who bought because he or she
enjoyed the taste of the product) and who would have purchased the same product at the
same price regardless of the Challenged Claims did not suffer economic injury
attributable to the Challenged Claims.  In economic terms, that purchaser received the
value that was paid for.  Because the purchase of the Challenged Product(s) was not
motivated in a substantial way by the Challenged Claims, this consumer did not suffer

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

economic injury.  Therefore, inquiry and analyses regarding putative Class members'

motivations in purchasing the Challenged Products may be determinative of whether

individual putative Class members suffered economic injury attributable to the

Challenged Claims.

34.    Customer reviews for Bigelow green tea products indicate that many putative Class

members purchased the Challenged Products (and/or received benefits from their

purchases) for reasons unrelated to the Challenged Claims.[31]  These reasons include but

are not limited to: (a) flavor, freshness, and aroma; (b) quality; (c) refreshment; (d)

caffeine content; (e) premium packaging,[32] and (f) price.  In particular, based upon a

sample of 575 positive (i.e., 4-star or 5-star) online customer reviews for Bigelow green

tea products on Amazon.com, 38.6% of positive reviews mentioned the flavor, freshness,

and/or aroma of Bigelow green tea.   In contrast, only 1.2% of positive reviews (i.e., only

7 reviews) mentioned antioxidants.   These and other product attributes mentioned in

positive reviews are summarized in **Table 2** and described in detail in **Exhibit 9**.[33]   In

_____

[31] I recognize that care must be exercised when interpreting or analyzing consumer reviews contained on websites. I report and discuss the Amazon.com customer reviews within the context of considering (a) qualitative information relating to the attributes discussed of the Challenged Products, (b) whether inferences can be drawn as to why consumers may purchase and/or receive benefits from the Challenged Products, and (c) indicators of appropriate consideration in assessing damages.   While one may challenge the reliability of the online customer reviews (i.e., whether the online reviews are representative of the putative Class), it cannot be dismissed that the online reviews demonstrate the need for individual inquiry – namely, that some putative Class members derived value from the use of the Challenged Products.

[32] "Premium Packaging" is identified on Bigelow's website (along with flavors and ingredients) as a differentiating product attribute.   According to Bigelow, its tea bags are "individually wrapped in foil pouches to shield delicate tea leaves from air, moisture and surrounding aromas, locking in flavor and freshness."   ("Premium Packaging - Bigelow Tea."   (https://www.bigelowtea.com/Our-Difference/Packaging, viewed on November 2, 2015.))

[33] The data presented in **Table 2** provide an indication of the magnitude of the overstatement in claimed damages should Named Plaintiff continue to advocate a claimed damages approach that does not incorporate individual inquiry as to the reasons for purchase.   In addition, the data presented in Table 2 does not support Named Plaintiff's hypothesis that the Challenged Claims were drivers of value paid.

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

addition, selected examples of customer reviews discussing each of these product

attributes are provided in **Exhibit 10**.

**Table 2**
**Bigelow Green Tea Product Attributes Identified In Positive Online Customer Reviews**

| Product Attribute | No. of Positive Reviews That Mention Attribute | % of Positive Reviews That Mention Attribute |
|---|---|---|
| Flavor, Freshness, and/or Aroma | 222 | 38.6% |
| Price | 89 | 15.5% |
| Healthiness (General) | 37 | 6.4% |
| Packaging | 34 | 5.9% |
| Caffeine Content | 29 | 5.0% |
| Quality | 17 | 3.0% |
| Refreshment | 16 | 2.8% |
| Antioxidants | 7 | 1.2% |

35.    As shown in **Table 3**, customer reviews also indicate that the vast majority of reviewers

are satisfied with their purchases of Bigelow green tea products.   (**Exhibit 11**.)

**Table 3**
**Distribution Of Amazon Customer Ratings Of Bigelow Green Tea Products[34]**

| Star Rating | Green Tea | Green Tea with Peach | Green Tea with Lemon | Green Tea with Mint | Green Tea with Mango |
|---|---|---|---|---|---|
| 5 | 67% | 88% | 77% | 89% | 93% |
| 4 | 15% | 7% | 15% | 7% | 2% |
| 3 | 6% | 2% | 2% | 2% | 2% |
| 2 | 6% | 2% | 6% | 2% | 0% |
| 1 | 7% | 2% | 0% | 0% | 2% |
| Total Reviews | 284 | 60 | 47 | 46 | 46 |
| Overall Rating | 4.3 Stars | 4.8 Stars | 4.6 Stars | 4.8 Stars | 4.8 Stars |

_____

[34]  The Challenged Products included in this table represent those with the largest number of customer reviews on Amazon.com.   Additional products are included in **Exhibit 11**.

HIGHLY CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

36.    Consistent with online customer reviews indicating that flavor, freshness, and aroma are among the reasons consumers purchased and received benefits from Bigelow green tea products, Mr. Khasin testified that he enjoyed the taste of Bigelow green tea, found its quality to be consistently good, and preferred Bigelow over other brands.[35]  Mr. Khasin further testified that he still "may have" purchased Bigelow green tea if the "healthy antioxidants" statement had not been on the front label and "[p]robably" still would have purchased it if the back label had not contained a statement about antioxidants.[36]

37.    Because purchasers of Bigelow green tea products could and did make purchases for reasons other than the Challenged Claims, it would be necessary to examine why each putative Class member purchased Bigelow green tea in order to evaluate alleged injury, if any.  Consumers who purchased Bigelow green tea solely (or in part) for reasons other than the Challenged Claims were not injured (or were not injured to the same extent) as consumers who purchased solely or in substantial part due to the Challenged Claims. This aspect of the economic injury and causation analysis cannot be determined using common proof.

C.    **Individual Inquiry Is Required To Determine Putative Class Members' Knowledge And Perceptions Relating To The Challenged Claims**

38.    Individual putative Class members' knowledge and perceptions relating to the Challenged Claims may affect the determination of whether an individual purchaser suffered injury attributable to the Challenged Claims.  Different putative Class members may have different knowledge and perceptions relating to the presence of antioxidants in

---

[35]  Khasin Deposition, pp. 42 – 43, 58, and 107.

[36]  Khasin Deposition, pp. 70 – 71, 74 – 77, and 89.   To the extent that Mr. Khasin still would have purchased the Challenged Products if the Challenged Claims were not present on the label and to the extent that Mr. Khasin is viewed as a representative putative Class member, the price of the Challenged Products would not change as demand for the Challenged Products would not change (holding supply considerations constant).

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015

_____

green tea products, including the Challenged Products, and associated health benefits. For example, individual consumers' interpretations may vary with respect to whether the Challenged Claims suggest a greater level of antioxidants than that provided by the products. Mr. Khasin testified that the "healthy antioxidants" statement on the product label did not lead him to believe that any particular type of antioxidant was present in the product in any specific amount (except that there would be "a good amount" of antioxidants).[37] Mr. Khasin further testified that he has no understanding as to the different types of antioxidants.[38]

39.     From an economic perspective, even if the Named Plaintiff could prove that the Challenged Products do not comply with certain regulations relating to antioxidant claims (as discussed in the Fourth Amended Complaint[39]), putative Class members who were not misled by the Challenged Claims (i.e., those whose knowledge and perceptions relating to the Challenged Claims were in line with the actual product they received) were not harmed by the Challenged Claims. Hence, individual putative Class members' knowledge and perceptions relating to the Challenged Claims would be an important inquiry relevant to evaluating and quantifying claimed injury, if any. This information can be gathered only through individualized inquiry.[40]

_____

[37]  Khasin Deposition, pp. 73 – 74.

[38]  Khasin Deposition, p. 74.

[39]  *See*, *e.g.*, Fourth Amended Complaint, pp. 19 – 21.

[40]  Should the trier of fact determine that (a) the allegedly misleading labeling does not comply with certain regulations relating to antioxidant claims but (b) the Challenged Products do contain antioxidants and such antioxidants do provide health benefits, then from an economic and claimed damages perspective, the appropriate comparison of value paid versus value received would <u>not</u> be between a product labeled as containing antioxidants and a product received <u>without</u> antioxidants or associated health benefits. Rather, the appropriate comparison would be between the product with the allegedly non-compliant labeling versus the product labeled in compliance with applicable regulations. Evaluating such a comparison would require determining whether each putative Class member interpreted the allegedly non-compliant labeling to suggest a greater level of antioxidants or associated

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

## VIII.  LACK OF ECONOMIC EVIDENCE TO DETERMINE INDIVIDUAL PUTATIVE CLASS MEMBERS' ALLEGED ECONOMIC INJURY

40.    Even on an individual putative Class member basis, there likely would be a lack of economic evidence to allow a reliable determination of the claimed economic injury resulting from the Challenged Claims.   Putative Class members are <u>unlikely</u> to (a) have kept all or any of the receipts from purchases of the Challenged Products, (b) remember the prices they paid for the Challenged Products, (c) be able to substantiate the quantity or the prices associated with their purchases, or (d) recall the reason(s) and timing for each purchase.   For example, Mr. Khasin testified that he drank Bigelow tea "[a] few times a week" during the time period from 2008 – 2012, but he could not find any receipts for his purchases of Bigelow tea products.[41]   Mr. Khasin further testified that he regularly discards receipts from food purchases within approximately one week from the time of purchase.[42]

41.    The Challenged Products have been sold through different sales channels, at different retailers, at different times, in different geographic areas, and in different package sizes.   Consequently, purchasers of the Challenged Products have paid a wide range of prices for their purchases.   Complicating this diversity in prices paid is the likelihood that putative Class members would not be able to produce documentary evidence to substantiate their purchases, including the quantity of purchase and the actual prices paid.   In this matter, not only do the facts and circumstances indicate that analyses concerning alleged

_____

health benefits in comparison to how they would have interpreted labeling that complied with applicable regulations (and whether that difference had any impact on each individual's purchase decisions or prices paid).   Neither Named Plaintiff nor Dr. Hooker has addressed how they would approach such an analysis.

[41] Khasin Deposition, pp. 21 – 23.

[42] Khasin Deposition, p. 23.

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015

_____

economic injury are not amenable to Class-wide common proof, but this is compounded by a lack of evidence that would be needed to determine the alleged economic injury.  In the absence of such evidence, it would not be possible to reliably determine the claimed damages allegedly suffered by individual putative Class members using common proof.

## IX.   OVERVIEW OF DR. HOOKER'S PROPOSED CALCULATION

42.   Dr. Hooker acknowledged that the Court stated, "[t]he proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received, not the full purchase price or all profits."[43]  Dr. Hooker stated that he was asked to opine only on "the first prong," which he described as "the purchase price ('product as labeled')."[44]  Dr. Hooker proposed to calculate an average retail purchase price by dividing "dollar sales" by "quantity of product sold during [the] relevant period" using "sales data … from a third-party service such as IRI."[45]  He opined that "[c]alculating the average retail sales price does not require an analysis of any particular consumer's transaction."[46]  Dr. Hooker stated that he was not asked to opine on "the second prong of the Court's formula – the value of the product as received."[47]  According to Dr. Hooker, he was instructed by Plaintiff's counsel that the Challenged Products are "legally worthless."[48]

---

[43] Hooker Declaration, pp. 1 – 2.  *See also* Order Regarding Dispute over Discovery of Profits dated August 12, 2015.

[44] Hooker Declaration, p. 2.

[45] Hooker Declaration, p. 2.   (Bracketed text added for clarification.)

[46] Hooker Declaration, p. 2.  Dr. Hooker opined that "an average price per period per product ('average retail purchase price') provides the best indicator of a price a typical consumer paid for a particular product during a particular period."

[47] Hooker Declaration, p. 2.

[48] Hooker Declaration, p. 2.  Dr. Hooker stated, "[i]f Defendant establishes a value for the product as received, I may be asked to opine on Defendant's methodology and conclusion regarding value."

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

**X.    DR. HOOKER'S PROPOSED CALCULATION DOES NOT PROVIDE A RELEVANT OR RELIABLE METHOD FOR EVALUATING ECONOMIC HARM ON A CLASS-WIDE BASIS USING COMMON PROOF**

43.    From an economic and claimed damages perspective, Dr. Hooker's proposed calculation does not provide a relevant or reliable method for evaluating or quantifying the economic injury (if any) suffered by putative Class members as a result of the Challenged Claims for at least the reasons presented in the remainder of my declaration.[49]

**A.    Failure To Account For Value Received By Putative Class Members**

44.    From an economic and claimed damages perspective, accurately assessing economic injury suffered by putative Class members requires that the Named Plaintiff determine (a) the value paid versus value received by purchasers of the Challenged Products and (b) the extent to which that difference (if any) is attributable to the Challenged Claims. However, neither Dr. Hooker nor the Named Plaintiff has proposed a reliable method for evaluating these requirements.  Dr. Hooker acknowledged that the Court stated, "[t]he proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received, not the full purchase price or all profits."[50]  However, Dr. Hooker stated that he was asked to address only "the first prong," which he described as "the purchase price ('product as labeled')."[51]  Dr. Hooker's proposed calculation does not account for the value of "the product as received" and does not provide a relevant or reliable measure of

_____

[49]  The observations I made earlier in my declaration are incorporated here by reference.

[50]  Hooker Declaration, pp. 1 – 2.  *See also* Order Regarding Dispute over Discovery of Profits dated August 12, 2015.

[51]  Hooker Declaration, p. 2.

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

economic injury (if any) suffered by putative Class members as a result of the Challenged Claims.

45.    The Named Plaintiff contends that "the product has no value because it is legally worthless" and "[u]sing the Court's formula, the measure of restitution is the average retail purchase price minus $0."[52]    However, as discussed earlier in my declaration, numerous individuals purchased the Challenged Products for reasons unrelated to the Challenged Claims (e.g., flavor, freshness, and aroma), and many consumers are satisfied with their purchases of the Challenged Products.    The Named Plaintiff's proposed approach (i.e., calculating claimed damages as "average retail purchase price minus $0") ignores the value received by each putative Class member from the purchase of the Challenged Product(s) (e.g., the value of consuming a tea drink that tastes good, *inter alia*[53]) and does not provide a relevant or reliable estimate of the harm (if any) suffered by putative Class members.

**B.    Ignores Individualized Issues That Must Be Considered To Determine Economic Injury**

46.    Dr. Hooker's proposed calculation provides no method for determining whether individual putative Class members suffered economic injury.    As discussed earlier in my declaration, the circumstances surrounding each individual putative Class member's purchasing decision must be considered in order to determine whether or not the individual was injured as a result of the Challenged Claims.    Dr. Hooker's proposed calculation ignores individualized information such as (a) reasons for purchase (and

_____

[52]  Motion for Class Certification, pp. 21 – 22.

[53]  For example, Mr. Khasin testified that he enjoyed the taste of Bigelow green tea, found its quality to be consistently good, and preferred Bigelow over other brands.    (Khasin Deposition, pp. 42 – 43, 58, and 107.)

HIGHLY CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

whether the reasons for purchase relate to the Challenged Claims) and (b) knowledge and perceptions relating to the Challenged Claims, which must be evaluated for a reliable determination of economic injury.

47.    Neither Dr. Hooker nor the Named Plaintiff has proposed a method for determining whether individual putative Class members purchased the Challenged Products because of the Challenged Claims (and if so, whether each individual was misled by the Challenged Claims), let alone explain how such a determination could be made without individualized inquiry.   As discussed previously, many consumers chose (and choose) to purchase the Challenged Products based upon considerations unrelated to the Challenged Claims.   These considerations include flavor, freshness, and aroma, *inter alia*.

48.    In light of the diversity in consumers' reasons for purchasing the Challenged Products and possible differences in knowledge and perceptions relating to the Challenged Claims, neither Dr. Hooker nor the Named Plaintiff has proposed a method to reliably determine whether putative Class members suffered economic injury as a result of the Challenged Claims.   Awarding a refund of average retail purchase price to putative Class members whose purchases were not motivated by the Challenged Claims and who would have purchased the same product at the same price regardless of the Challenged Claims would overcompensate them for any harm allegedly suffered.

**C.  Ignores Significant Variation In Prices Paid**

49.    Dr. Hooker opined that "an average price per period per product ('average retail purchase price') provides the best indicator of a price a typical consumer paid for a particular product during a particular period."[54]   However, as demonstrated earlier in my

_____

[54]  Hooker Declaration, p. 2.

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

declaration (and incorporated here by reference), there are significant variations in the prices paid for the Challenged Products by individual putative Class members based upon a number of factors including the sales channel and particular retailer where the purchase was made, the time of purchase, the geographic area, and the package size of the Challenged Product purchased.   Therefore, there is not a single "purchase price" for the Challenged Products that can be determined for all putative Class members on a Class-wide basis.   From an alternative vantage point (and as previously stated), aggregating expenditures on the Challenged Products and then redistributing those total expenditures back down to putative Class members (without individual inquiry) would by definition overcompensate putative Class members who purchased the Challenged Products at relatively low prices and undercompensate putative Class members who purchased the Challenged Products at relatively high prices  Individual inquiry is required to identify the prices paid by putative Class members and the extent to which the value paid may have been greater than the value received by an individual putative Class member, if at all.

### D. No Attempt To Demonstrate That Prices Paid Were Affected By The Challenged Claims

50.     Neither Dr. Hooker nor the Named Plaintiff has attempted to determine whether the Challenged Claims had an impact on the price paid by putative Class members.   In other words, the Named Plaintiff has not demonstrated (or proposed how he would be able to demonstrate) that the Challenged Products were sold at prices above those of comparable products not marketed with the Challenged Claims.   The Named Plaintiff has not proposed a methodology that would allow him to determine what the price of a comparable product without the Challenged Claims would be (or whether it would be

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015

_____

different than actual prices paid for the Challenged Products) – let alone explain how he would be able to make that determination on a Class-wide basis using common proof (especially in light of the significant variations in retail prices paid for the Challenged Products by putative Class members).

51.    In addition, Dr. Hooker failed to consider economic evidence indicating that Bigelow does not extract a higher price for products labeled with the Challenged Claims compared to products not labeled with the Challenged Claims.   Bigelow primarily sells tea products to wholesalers or distributors who sell to retailers.[55]   With respect to wholesale pricing, Bigelow "line prices" its products.  Mr. Chris Costello, director of sales for Bigelow's retail channel business, testified that Bigelow ███████████████████████ ████████████████████████████████████████████████████████████████████ ████████[56]  Mr. Costello further testified that Bigelow's black tea products no longer are labeled with the Challenged Claims, whereas I understand that Bigelow's green tea products continue to have the "healthy antioxidants" statement on the label.[57]

52.    If the Named Plaintiff's assertion were true that "value paid" for the Challenged Products has been greater than "value received" because of the Challenged Claims, then one would expect Bigelow to charge a higher price for products labeled with the Challenged Claims than for products not labeled with the Challenged Claims.  However, based upon Mr. Costello's deposition testimony, Bigelow's prices are not affected by differences in label statements such as the Challenged Claims.   In particular, ███████████████████ ████████████████████████████ which no longer are labeled with the Challenged

_____

[55] Costello Deposition, p. 25.

[56] Costello Deposition, p. 25.

[57] Costello Deposition, p. 39.   *See also* McCraw Deposition, pp. 22 – 23.

HIGHLY CONFIDENTIAL

_____

Claims. Bigelow's wholesale line pricing approach demonstrates a lack of any attempt by Bigelow to extract a higher price for products labeled with the Challenged Claims compared to products not labeled with the Challenged Claims. Viewing this observation from a different perspective, Named Plaintiff has provided no explanation (nor proposed an explanation) as to why (under Named Plaintiff's theory of liability) Bigelow would let the revenue benefits associated with the Challenged Claims (if any) accrue to retailers rather than Bigelow itself.

### E.  No Method For Allocating Claimed Damages To Individual Class Members

53.     Neither Dr. Hooker nor the Named Plaintiff has provided a mechanism for allocating to individual putative Class members the claimed damages associated with each individual putative Class member's purchase(s). As discussed throughout my declaration, the purchase price paid by any particular Class member will vary based upon numerous factors. In light of the wide variations in actual prices paid by putative Class members, allocating claimed damages to individual putative Class members would require individualized inquiry and evidence (e.g., receipts). Awarding an average retail price to putative Class members would overcompensate some putative Class members (e.g., Class members who purchased a Challenged Product with a promotional discount) and undercompensate others.

### F.  Summary

54.     Based upon the above considerations, Dr. Hooker's proposed calculation does not provide a relevant or reliable method for evaluating or quantifying the economic injury (if any) suffered by putative Class members as a result of the Challenged Claims. Neither Dr. Hooker nor the Named Plaintiff has demonstrated that the alleged injury to

Declaration of Keith R. Ugone, Ph.D.
November 9, 2015
_____

putative Class members resulting from the alleged wrongful conduct can be reliably or accurately determined on a Class-wide basis using common proof. As discussed throughout my declaration, evaluating the economic losses (if any) suffered by putative Class members requires individualized inquiry into the circumstances of each putative Class member's purchase. The Named Plaintiff's proposed approach (i.e., calculating claimed damages as "average retail purchase price minus $0") does not appropriately take into account the many individualized issues identified in my declaration that must be considered to determine whether any Class member was injured as a result of the Challenged Claims and the extent of such injury if it exists.

\* \* \* \* \* \*

55.    My analyses, observations, and opinions contained in this declaration are based upon information available to date. I reserve the ability to review documents, deposition transcripts, or other information still to be produced by the Parties to this dispute and to supplement my opinions based upon that review.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed in Grand Saline, Texas on November 9, 2015.

_____
Keith R. Ugone, Ph.D.

# Exhibit 1

**ANALYSIS GROUP**
ECONOMIC, FINANCIAL and STRATEGY CONSULTANTS

Main 1 214 523 1400   Fax 1 214 523 1401   www.analysisgroup.com
2911 Turtle Creek Boulevard   Suite 600   Dallas, TX   75219

## KEITH R. UGONE, PH.D.
### Managing Principal
Phone: (214) 523-1405
keith.ugone@analysisgroup.com

Dr. Keith R. Ugone has provided economic and damages consulting services in antitrust cases, breach of contract cases, business interruption cases, employment / loss of earnings cases, intellectual property cases, lender liability cases, professional negligence cases, and securities-related cases, among others.   He specializes in the application of economic principles to complex business disputes and is generally retained in cases requiring economic analyses and/or damages-related analyses.   Damage models constructed or evaluated by Dr. Ugone have had as components revenue analyses, lost sales analyses, cost analyses, assessments of the capacity to produce additional units, assessments of profitability, the competitive business environment in which the damages claim was being made, claimed lost profits, claimed lost business value, and claimed reasonable royalties.   During the course of Dr. Ugone's career, he has frequently evaluated lost profits and valuation-related damages using large databases of information and complex computer models.   Dr. Ugone also has performed economic liability analyses in antitrust matters including defining relevant markets, assessing market power, and evaluating alleged anticompetitive behavior.  Dr. Ugone has testified at trial and in deposition over 300 times.

Dr. Ugone has a PhD in Economics from Arizona State University, an MA in Economics from the University of Southern California, and a BA in Economics from the University of Notre Dame.   Subject areas of expertise include microeconomics, macroeconomics, industrial organization, antitrust/regulation, and econometrics.   He is a member of the American Economic Association, the American Statistical Association, the National Association of Forensic Economists, and the Western Economics Association.

## EDUCATION

| | |
|---|---|
| 1983 | Ph.D., Economics, Arizona State University. |
| 1979 | M.A., Economics, University of Southern California. |
| 1977 | B.A., Economics, University of Notre Dame. |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2004 - Present | Analysis Group, Dallas, Texas – Managing Principal. |
| 1985 – 2003 | PricewaterhouseCoopers LLP (and legacy firms) – Partner (Principal) 1992 – 2003; Senior Manager 1989 – 1992; Manager 1987 – 1989; Senior Consultant 1985 – 1987.  Member of United States Admissions Committee (2003).   Chairman of PricewaterhouseCoopers Intellectual Property Leadership Forum (2000 – 2003). |
| 1983 – 1985 | California State University, Northridge - Assistant Professor/Lecturer in Department of Economics, Full-time:  1983 – 1985, Part-time:  1986 – 1992. |
| 1979 – 1983 | Arizona State University - Faculty Associate/Teaching Assistant in Department of Economics. |
| 1977 – 1979 | Jet Propulsion Laboratory - Economic/Energy Analyst. |

HIGHLY CONFIDENTIAL

**PROFESSIONAL AND BUSINESS AFFILIATIONS**

American Economic Association
American Statistical Association
National Association of Forensic Economists
Western Economics Association

**SELECTED LITIGATION CONSULTING EXPERIENCE (by Nature of Suit)**

<u>Securities:  10b-5 / Section 11 Cases</u>

- Evaluated the economic damages being asserted by shareholders and debt holders of a bankrupt energy trading company against a brokerage firm.  Plaintiffs alleged the brokerage firm recommended the stock and debt securities associated with the company even though it knew or should have known the deteriorating pre-bankruptcy financial condition of the company.  Analyzed the trading patterns of the brokerage account customers and the stock price movements of the company upon issuance of analyst reports, and researched confounding events contributing to investors' trading of the securities-in-question.  Demonstrated an economic causal link did not exist between the alleged wrongful conduct and the claimed trading patterns.  Also evaluated the event study conducted by Plaintiffs' damages expert and the claimed inflation component embedded in the company's stock price.  Demonstrated Plaintiffs' damages expert failed to remove the economic impact of confounding events.  Performed an alternative damages evaluation.

- Evaluated shareholder and debt holder claimed damages against a major accounting firm relating to the issuance of allegedly false and misleading financial statements that did not identify certain assets of a communications company as impaired.  Researched industry reports and analyst reports regarding the company's common stock and debt securities, evaluated an event study conducted by Plaintiff's damages expert, analyzed loss causation in accordance with *Dura*, studied the company's stock price movements before and during the claimed class period, and analyzed the company's stock price movement on the day of the alleged corrective disclosure.  Demonstrated Plaintiffs' event study did not appropriately isolate the stock price movement associated solely with the alleged corrective disclosure as confounding events were not removed from the analysis.  Performed an alternative damages calculation.

- Evaluated Plaintiffs' damages claim in a shareholder suit relating to the manufacturer of decoding equipment used in the wireless cable industry.  Analysis demonstrated Plaintiffs' financial expert did not consider market speculation related to the wireless cable industry or Defendant's higher-than-expected earnings when calculating claimed damages.  Additional errors included aggregating into claimed damages stock price increases unrelated to Plaintiffs' allegations and on "no announcement days".

- Evaluated damages claim against a major investment banking/underwriting firm relating to an aborted initial public offering in the temporary staffing industry.  Analysis demonstrated methodological and conceptual errors in Plaintiff's econometrically-based claim that the projected post-IPO stock price of the company justified proceeding with the IPO.  Also evaluated various components of Plaintiff's damages claim, including the profitability of Plaintiff's business, projected use of funds raised, ownership percentages in the company, and the funds that would have inured to the original owners of the company.

- Evaluated Plaintiffs' damages claim in a shareholder suit involving an international airline carrier.  At issue were alleged misrepresentations concerning the airline's ability to reduce its maintenance costs.  Demonstrated that the fifty percent decline in the company's stock price over a one-month period was for reasons unrelated to corrective disclosures concerning maintenance costs.  Also reconstructed Plaintiffs' trading history, comparing the trading pattern to public announcements concerning the airline, and demonstrating a trading pattern inconsistent with Plaintiffs' theory of reliance on the alleged misrepresentations.

- <u>General Overview</u>.  Performed an "event study" and/or evaluated claimed damages in various securities litigation cases involving firms in industries such as:  airlines, biotechnology, computer software, commodities, banking, real estate development, life insurance, entertainment, communications, energy trading, investment banking, computer printers, health care, medical equipment, hotels, non-traditional automotive insurance, information technology services, workmen's compensation insurance, computer hardware, camera and photo finishing, intelligent disk drives, market research, trucking, temporary staffing, real estate investment trusts, computer networking, specialty stores, skilled nursing facilities, wireless cable encoding devices, the provision of software computer services to insurance companies, and the provision of professional services to power plants and large scale industrial facilities.  Analyses included development of an appropriate peer group and isolation of economy-wide, industry-specific, and company-specific factors impacting the particular firm's stock price.  Company-specific events often included unfavorable news announcements unrelated to the alleged misrepresentations and the ending of potential takeover bids.  Also involved was a comparison of the firm's actual stock price to its "true value" line, the construction of a matrix to track ins-and-outs traders and retention shareholders, and an evaluation of damages under Section 10b-5 and Section 11 claims.

## Securities:  Merger/Takeover Related Cases

- Evaluated claimed damages against a major accounting firm by a transportation company that acquired another transportation company in alleged reliance upon the audited financial statements of the acquired company and its Mexican subsidiary.  Plaintiff wrote down its investment in the Mexican subsidiary after the acquisition and based its damages claim on a subsequent decline in its stock price.  Analyses included researching competing transportation companies, considerations associated with consummating the merger, analyst reports regarding the merger announcement and the investment write-down announcement, and earnings announcements from comparable companies.  Demonstrated Plaintiff's damages expert did not establish an economic causal link between the alleged wrongful conduct of the Defendant and the claimed economic damages suffered by the Plaintiff and that confounding events were not taken into account appropriately.

- Evaluated Plaintiffs' damages claim relating to a merger in the banking industry.  At issue was whether material adverse changes regarding loan loss reserves had occurred but were not disclosed.  Analyzed whether the complained of events were related to conditions and circumstances in the banking industry.  Also analyzed the value of alternative offers for the target bank and the pre-merger volatility in the acquiring bank's stock price.

- Evaluated Plaintiffs' claimed damages in a breach of contract matter involving the aborted sale of assisted living facilities.  Analyzed current trends in the assisted living industry, the financial condition of the target company, the projected financial results of certain to-be-constructed properties, and the target company's performance relative to projections.  Also at issue was whether a material adverse change had occurred in the target company's operations and business.  Lost profit damages, interest-related damages, lost contract fees, and diminution-in-value damages were evaluated.

- Evaluated Plaintiffs' damages claim in a merger/acquisition-for-stock litigation in the information technology services industry.  At issue was whether material adverse changes had occurred in the business condition of the acquiring company prior to the closing of the merger.  Damages issues included investigating the nature of the agreed upon warranties and representations contained in the merger agreement, the stock price performance of similarly-situated firms, the length of the alleged damages period, the appropriate length of certain event windows, industry downturns, and the failure to account for the proper mitigation of damages.

- Analyzed a major entertainment company's stock price movement to determine the takeover premium paid by an acquiring company.  Involved was quantifying the impact of takeover rumors prior to the takeover announcement to isolate that portion of the company's pre-acquisition increase in stock price due to takeover speculation as opposed to general industry trends.

- Served as financial advisor to a Special Litigation Committee ("SLC") investigating a shareholder approved merger vote in the telecommunications industry. The merger was not consummated, but the vote triggered the acceleration of vesting of options owned by the officers and directors of the target company. Assisted the SLC in analyzing the acceleration of options and various alternative settlement strategies.

### Securities/Commodities: Other Cases

- Evaluated Plaintiff's claimed lost enterprise value damages relating to Defendants' allegedly fraudulent conduct resulting in an artificial acceleration of income, restatement of income, and ultimate bankruptcy of a food distribution company. Analyses included isolating the dollar magnitude of the alleged artificial acceleration of income allegedly created by Defendant's actions compared to other artificial accelerations of income, an assessment of alternative reasons for Plaintiff's business decline and ultimate bankruptcy, and evaluation of Plaintiff's valuation approaches.

- Evaluated the spot price of a base metal in a major commodities-related market manipulation matter. Developed an econometric model to explain the spot price movements of the base metal in an un-impacted period. Used the econometric model to evaluate what the spot price of the base metal would have been in the absence of the alleged manipulation.

- Calculated short-swing trading profits under Section 16(b) of the Securities Exchange Act of 1934 relating to the stock trading activities of an officer of a long distance telecommunications company. Issues analyzed included allocating stock purchases to stock sales of differing numbers of shares and accounting for a 3-for-1 reverse stock split during the period under consideration.

- Evaluated damages in an alleged lack of suitability, lack of supervision, and failure to execute matter in the securities industry. At issue was an investment strategy of selling short the same stock in which a restricted long position was also held. Demonstrated errors in Plaintiff's damages claim, including the failure to recognize that the financial objectives stated at the time of the development of the investment strategy were in fact met.

- Evaluated the stock price performance of a major distiller over a forty-year period. At issue was whether a portion of the increase in the stock price could be attributed to the efforts of one senior official in the corporation. Company-specific, industry-specific, and economy-wide factors were investigated to determine the reasons for the stock price performance of the distilling company.

### Antitrust: Monopolization/Attempted Monopolization Cases

- Evaluated claimed antitrust damages asserted by a major airline company against a global distribution system ("GDS") operator for alleged anticompetitive behavior relating to the provision of booking services to travel agencies. Evaluated Plaintiff's claimed damages relating to claimed lost profits resulting from the Defendant's alleged actions to impede the rollout of a competing technology for booking services, contractual restrictions allegedly preventing the airline from offering targeted discounts to price-sensitive customers, allegedly imposing retaliatory booking fee increases, and allegedly biasing fare search results displayed to travel agencies.

- Analyzed Plaintiff's allegations that Defendant monopolized or attempted to monopolize the market for magnetic brakes for amusement park rides. Evaluated Plaintiff's assessment of the relevant product market, allegations of market power, and the impact of Defendant's alleged anti-competitive conduct. Also evaluated claimed damages, including assumptions underlying Plaintiff's claimed damages model and economic causal connection between the alleged wrongful conduct and claimed losses. Determined that Plaintiff's expert failed to account for alternative explanations for Plaintiff's claimed losses. Also demonstrated that Plaintiff's expert made inappropriate assumptions regarding growth in the claimed relevant product market and whether Plaintiff was damaged in perpetuity.

HIGHLY CONFIDENTIAL

- Evaluated Plaintiff's economic liability arguments in an antitrust matter relating to a restriction on the registration of cloned American Quarter Horses with the American Quarter Horse Association. Evaluated Plaintiff's expert's theoretical economic model. Demonstrated that there was no economic harm to the market as a result of the at-issue registration restriction. Also identified numerous flaws in Plaintiff's expert's assumptions regarding the supply and demand of high quality American Quarter horses (including excess breeding capacity). Evaluated Plaintiff's damages claim relating to lost sales of cloned American Quarter horses and lost breeding opportunities.

- Evaluated the claimed anticompetitive impact of an alleged conspiracy by a major oil and gas exploration company to monopolize the market for Helicopter Underwater Egress Training ("HUET"). Evaluated the relevant product and geographic markets and the alleged market power of the Defendant. Demonstrated that the Defendant lacked the market power necessary to monopolize the relevant market. Also demonstrated the flaws in Plaintiffs' damages claim, including but not limited to, loss of Plaintiffs' market share for reasons other than the alleged anticompetitive acts (e.g., self-imposed price increases and the loss of a large customer unrelated to the alleged wrongful conduct), failure to take into account the general economic downturn in the U.S. economy during the relevant period, the use of an inappropriate discount rate for quantifying claimed future damages, and the use of an inappropriate assumption relating to future claimed market shares in the absence of the alleged wrongful conduct.

- Evaluated the competitive impact of certain covenants not to compete associated with restricted stock unit awards issued to operations management employees by a major dairy processor. Evaluated the relevant product and geographic markets. Concluded that the covenants not to compete were overly broad and restrictive, outweighing any precompetitive benefits associated with the covenants. Concluded that the covenants did not contain reasonable limitations as to time frame and scope of activity. The covenants effectively restricted competition and raised rivals' costs in the relevant market.

- Evaluated Plaintiff's damages claim associated with the assertion that certain freight forwarders engaged in bid rigging, price fixing, group boycott, and illegal tying arrangements in a traffic channel for transporting military household goods. Demonstrated the flaws in Plaintiff's damages claim, including but not limited to, declines in revenues and profits prior to the alleged conspiracy period, alternative reasons for the Plaintiff's poor performance during the claimed damages period (e.g., the closing of military bases and increased competition in one leg of the channel), and the use of an inappropriate benchmark period for quantifying claimed damages.

- Evaluated the anticompetitive impact of an alleged conspiracy between a distributor and manufacturer whereby the manufacturer refused to ship certain aftermarket automotive exhaust systems and catalytic converters to a competing distributor in Washington and Oregon. Analyses included evaluating the relevant product and geographic markets for aftermarket automotive exhaust products and the damages suffered by the competing distributor. Also evaluated the competing distributor's direct and indirect price discrimination claims (including differential discounts in areas where shipments did occur) and associated claimed damages.

- Analyzed various monopolization allegations in an antitrust counterclaim to a patent infringement matter in the home lighting control systems industry. Analyzed the trade practices of the home lighting control system manufacturers (e.g., sales channels, advertising and promotion, etc.), product and geographical markets, and the potential substitutes to the products at issue. Analyses demonstrated counterclaim Defendant did not possess the ability to monopolize the relevant market for home lighting control products given the channels through which manufacturers made sales and the availability of close substitute products.

- Evaluated Plaintiff's economic liability arguments in an antitrust counterclaim relating to a supply agreement for an ingredient (i.e., larch arabinogalactan) contained in certain patented dietary and nutritional supplements for the promotion and maintenance of good health. Concluded that (a) the sales agreement in question did not constitute an unreasonable restraint on trade, (b) the Defendant did not possess monopoly power, and (c) the Defendant did not engaged in anticompetitive behavior in any properly defined relevant market. Observed that the prices of dietary supplements containing arabinogalactan did not increase since the signing of the sales agreement, the output of dietary supplements containing arabinogalactan did not decline since the signing of the sales agreement, (c) the capacity to produce additional arabinogalactan had been increasing, and (d) Plaintiff did not face a dangerous probability of being harmed by the supply agreement.

- Evaluated claimed antitrust damages asserted by the holder of certain common packet channel ("CPCH") technology patents against a group of handheld mobile device hardware and infrastructure manufacturers for an alleged conspiracy to deprive the patent holder of the value of its patented technology in the third generation partnership project ("3GPP"). The patent holder's technology had been removed as an optional standard. Damages-related analyses included conducting a *Georgia-Pacific* analysis and analyzing the licenses identified by Plaintiff's expert as comparable to the patents at issue. Also determined that Plaintiff's expert had not established an economic causal link between the alleged wrongful conduct and the damages being claimed.

- Evaluated the claimed anticompetitive activities of Defendant hospital's alleged exclusionary arrangements and practices relating to managed care contracts. Evaluated the relevant antitrust markets (product and geographic) for primary care services provided by physicians to managed care-covered patients in Smith County, Texas. Also evaluated the volume of commerce impacted by the claimed exclusionary practices and the impact of these claimed exclusionary practices on competition in the relevant markets. In addition, evaluated the economic damages suffered by the Plaintiff hospital as a result of Defendant's alleged anticompetitive activities.

- Evaluated Plaintiff's claim of antitrust injury in the markets for orthodontic brackets and orthodontic services allegedly due to the advertising guidelines promulgated by a national orthodontic trade association. Analysis demonstrated the advertising guidelines were efficiency enhancing (by lowering consumer search costs), promoted competition, and did not stifle innovation in the relevant markets. Also empirically demonstrated that legitimate advertising through a variety of media was not impacted by the advertising guidelines.

- Evaluated distributors' claims of past lost profits, future lost profits, and reductions in franchise values in a carbonated soft drink antitrust litigation. Defendants allegedly entered into a series of anti-competitive marketing agreements with retailers relative to the promotion and sale of national brand carbonated beverages. Analysis demonstrated Plaintiffs' expert did not take into account the brand composition of Plaintiffs' case sales, underestimated variable costs of distribution, did not adjust for increased competition from private-label brands and other drinks, and failed to account for the lack of advertising and other promotional support from the distributors' parent company.

- Analyzed the impact of a proposed merger of two insurance companies on the long term care and medicare supplement insurance markets in the state of Oklahoma. Evaluated whether the merger would substantially lessen competition or have a tendency to create a monopoly. Evaluated the number of competitors, the reasonable interchangeability of the insurance products offered, insurance company sizes, ease of entry, the impact of regulation, and the ability of consumers to acquire price information in a low-cost manner.

- Analyzed the alleged anticompetitive impact of an exclusive provider arrangement between a hospital and a group of anesthesiologists on the market for anesthesia services. Analyses included determining inpatient services market shares, anesthesia procedures market shares, and recent entry into the hospital service area. Also evaluated the damages claims being alleged by a group of Certified Registered Nurse Anesthetists.

- Conducted an economic analysis in a vertical non-price (advertising) restraint antitrust case dealing with tennis ball throwing machines. Analysis demonstrated the pro-competitive nature of the advertising restraint and that the termination of a non-complying dealer did not substantially reduce competition in the relevant market.

- General Overview. Provided economic analyses and developed damages models and/or critiqued the opposition's damages models in various antitrust cases involving the following industries and/or markets: anesthesia services, printed circuit boards, nutritional supplements, carbonated soft drinks, aftermarket automotive exhaust systems, telecommunications switching equipment, dairy processing, radio control model airplanes, local area networks, entertainment lighting, integrated casino bonusing software, home lighting control systems, medicare supplement/long term care insurance, commercial air conditioning units, disposable dust/mist respirators, immunodiagnostic tests, in-patient hospital services and managed care contracts, PBX systems, military freight forwarding, underground storage tanks, long distance telephone lines, tennis ball throwing machines, check processing readers/sorters, local television advertising, personal watercraft, automobile refinishing paint, Christian music, subsea horizontal extraction wells, orthodontic braces, DRAM microcomputer chips, women's designer clothes, single point of contact telecommunication services, non-prescription reading glasses, and the provision of temporary electrical services to convention centers. Damages models were constructed or critiqued that involved lost sales analyses, incremental cost analyses, and assessments of capacity increases. Also investigated were economic forces external to the company that may have impacted the company's performance. Economic analyses included defining the relevant market, assessing the presence or absence of market power, evaluating whether a business activity was pro-competitive or anti-competitive, and/or evaluating the level of competition in a particular market.

## Antitrust: Price Fixing Cases

- Evaluated Plaintiffs' claimed damages relating to allegations of an industry-wide price fixing conspiracy among the defendant manufacturers of polyether polyol products. At issue were the alleged overcharges relating to sales of TDI, MDI, and polyether polyols during the alleged conspiracy period. Analyses included evaluating Direct Action Plaintiffs' and Class Plaintiffs' econometric pricing models which purported to show alleged overcharges (and the unreasonableness of the claimed overcharges in light of existing profitability levels). Also assessed indicators of competition in the relevant market, including evidence of supplier switching by Plaintiffs, changes in defendants' market shares, and pricing patterns of the at-issue products.

- Evaluated allegations of price-fixing among freight companies relating to bids to ship the household goods of U.S. Armed Forces' members and civilian employees of the U.S. Department of Defense between Germany and the U.S. Analyses included an investigation of the efficiency-enhancing economic benefits provided by the at-issue "landed rate" pricing system. Also evaluated Plaintiff's claimed damages allegedly associated with elevated rates and alternative factors contributing to claimed elevated rates unrelated to claimed conspiracy. Evaluated Plaintiff's econometric model used to purportedly identify claimed overcharges.

## Antitrust: Predatory Pricing/Price Discrimination Cases

- Evaluated differences in prices paid by a plaintiff distributor relative to those paid by a competitor in a price discrimination case involving the distribution of aftermarket exhaust systems. Analyses included an evaluation of the relevant product and geographic market for the at-issue products as well as damages caused by the alleged anticompetitive behavior.

- Evaluated the relevant product and geographic markets and impact on competition in a price discrimination case involving a manufacturer of lighting products and the prices charged to various distributors. Analyses included an investigation of the primary-line market (i.e., competition among manufacturers of lighting products) and the secondary-line market (i.e., competition among distributors). The impact on competition among the distributors of lighting products was investigated (and whether a substantial lessening of competition occurred) given the pricing policies of the manufacturer.

- Reviewed the newly proposed pricing structure of a major magazine distributor to identify the efficiency enhancing attributes of the proposed pricing structure as well as potential discriminatory effects. The proposed pricing structure was a major change from industry practices and included per copy distribution fees and excess return fees.

- Evaluated the economic and damages-related claims made in a major price discrimination case in the pharmaceutical industry. At issue were the additional sales and profits that would have been made by grocery drug stores and retail drug chains in the absence of the alleged price discrimination.

- Conducted various industry and firm-specific analyses in a major wholesale bread predatory pricing case. Bread industry studies included analyses of industry profitability rates, the changing size distribution of firms in the industry, and general trends in wholesale bread prices. Firm-specific studies included analyses of advertising rates, "cripple" (i.e., reject) rates, and "stale" (i.e., return) rates. Also involved was a critique of Plaintiff's calculation of Defendant's average variable cost of producing and distributing a loaf of bread.

- Calculated the average cost of servicing a three-yard bin of trash in a solid waste disposal predatory pricing case. Also included was an analysis of number of routes and bin pickups per route.

### Antitrust:  Tying Cases

- Evaluated certain economic and damages claims made by a local television station against a television program syndicator. At issue was an alleged unlawful tying arrangement relating to the claimed requirement to license *Becker* in order to license *Judge Judy* and *Judge Joe Brown*. Demonstrated the syndicator did not possess market power in a properly defined market since substitution existed between different genre of television programs, between different syndicators, between different demographic groups, and between different types of syndicated programming (i.e., first-run, off-network, and evergreen programming). Also demonstrated that the pricing patterns of the syndicator were inconsistent with the antitrust claims being made.

- Evaluated an unlawful tying claim brought by a pizza franchisee against its franchisor. Franchisees were required to purchase equipment and supplies from an approved supplier owned by the pizza franchisor. Plaintiff alleged the claimed unlawful tying arrangement was enforced through threats of termination of the franchise agreement. Demonstrated that the pizza franchisor did not possess market power in the consumer market for pizza, in the provision of equipment and supplies to franchisees, or in the market for pizza franchises. Also demonstrated the economic justifications for the requirement (i.e., maintaining quality standards, uniformity of operations, and protection of brand name).

- Critiqued Plaintiff's damage model in an alleged tying case dealing with automotive CAD/CAM design software (the "tying" good) and mainframe timesharing (the "tied" good). At issue was the total size of the market, the likelihood of entry, and the market share of the Plaintiff in the absence of the alleged tie. Also investigated was the likelihood that design vendors would place the software on their own mainframes rather than timeshare.

- Analyzed the fast food point-of-sale ("POS") equipment and software industry in an alleged tying case. Demonstrated that a particular POS product was not a relevant market based on the reasonable interchangeability of various brands of fast food POS equipment from the perspective of the consumer (fast food restaurants). Also analyzed the degree of price competition, non-price competition, ease of entry, and relative market shares of fast food POS equipment manufacturers.

### Business Interruption/Interference Cases

- Evaluated Plaintiffs' claimed damages in a tortious interference, business disparagement, and breach of contract matter dealing with the licensing of testing equipment in the petrochemical piping inspection industry. Demonstrated Plaintiff's expert committed errors relating to the duration of the contracts in dispute, system license fees, cost of replacement systems, pricing of services, utilization of the test systems, and mitigation of future damages.

- Evaluated Plaintiff's claimed damages from a lost bid to retrofit a refinery in Pakistan. Analyzed Plaintiff's allegations that Defendants made untrue statements to the bid evaluation team concerning Plaintiff's net worth, working capital, and profitability trends. Evaluated Plaintiff's claimed damages using as a benchmark prior engineering projects completed by Plaintiff.

- Calculated damages suffered by the owner of numerous mobile home parks due to the actions of a Defendant in a case involving alleged intentional interference with contractual relations. Involved was an analysis of occupancy rates, a projection of park revenues in the absence of the alleged interference, and an analysis of mobile home park incremental profitability rates.

- Evaluated the damages sustained by a cosmetic company as a result of defective decorated glass containers being furnished for its new therapy products. Evaluated and/or verified product retrieval costs, retrieval program administration costs, customer goodwill replacement gift costs, waste disposal costs, and lost profits on the therapy products. The lost profits analysis included assessing the life cycle sales pattern of new cosmetic products introduced by the company.

- Evaluated damages relating to the introduction of a new popcorn product line in a business interruption dispute. The introduction of the new popcorn product line was aborted due to defective containers. Analyses undertaken included determining the cost of popcorn, the cost of popcorn bags, freight costs, as well as the projected revenues associated with popcorn sales. An assessment was also made of the supermarket outlets and territories in which the popcorn would have been sold.

- Evaluated Plaintiffs' damages claim relating to the installation of an allegedly defective computer software system at an automobile dealership. Plaintiffs contended the software had defects adversely affecting the accounting system and day-to-day operations of the dealership, and submitted an "increased cost" damages claim. Analysis demonstrated Plaintiffs' expert used an inappropriate methodology for measuring damages and submitted cost increases unrelated to the allegedly defective software.

- <u>Other Matters.</u>  Provided deposition questions, economic analyses, and a critique of opposing economists' damage models in various business interruption cases resulting from (e.g.) fires, "lockouts", electrical outages, defective products, and/or injuries to key personnel. Businesses evaluated included a workout facility (gym), a pediatric practice, a balloon manufacturing plant, a radiology practice, and a packaging machine manufacturer.

## Intellectual Property:  Patent Infringement and Patent-Related Cases

- Evaluated the claimed royalty damages the owners of a patent related to the processing of documents with arbitrary XML elements were asserting against a major software manufacturer for allegedly incorporating the patented technology into its software applications. Based upon an evaluation of the historical financial performance of the Plaintiffs before and after the time of the hypothetical negotiation, market demand for and supply of products similar to the allegedly embodying products, the respective economic contributions of the Parties to the successful commercialization of the accused products, and the *Georgia-Pacific* factors, opined to an alternative royalty damages estimate. Also evaluated the four factors outlined in *eBay Inc. v. Mercexchange L.L.C.* and opined that based upon economic considerations an injunction against the accused products was not warranted.

- Analyzed Plaintiff's lost profits and reasonable royalty damages in two separate patent infringement matters relating to scanning, counting, and counterfeit detection technologies in currency discriminators. In both matters, analyzed the *Panduit* and *Georgia-Pacific* factors, constructed a hypothetical negotiation framework, conducted market and industry research, and compiled an accused product sales database. With respect to Plaintiff's lost profits-related damages, performed incremental profit analyses on lost unit sales and ancillary sales. Evaluated Plaintiff's reasonable royalty-related damages taking into account the economics associated with currency discriminator sales. Evaluated damages under a variety of scenarios based upon potential findings of infringement on patents and claims contained in these patents.

- Evaluated the claimed damages of a foam ear sleeve manufacturer who brought suit against a high-performance professional and personal audio earphone manufacturer alleging patent infringement relating to ear pieces having disposable compressible polymeric foam sleeves. Evaluated Plaintiff claimed royalty damages using market and industry data, a *Georgia-Pacific* factor analysis, and the changing licensing policies of the patent holder over time. Provided an alternative royalty damages analysis. Also analyzed from an economic perspective Defendant's countersuit of alleged patent misuse. Reviewed the patent holder's licensing strategy and certain provisions contained in the licenses into which the patent holder entered. Analyses demonstrated the patent holder's licensing strategy and the provisions contained in its licenses were consistent with the allegation of patent misuse.

- Evaluated Plaintiffs' claimed royalty damages in two separate patent infringement matters relating to video game controllers. The first matter related to six degrees of freedom video controller technology; the second matter related to controller-to-processor voltage technology. In both matters, conducted market and industry research, performed a *Georgia-Pacific* analysis, and evaluated company-specific and controller-related licenses. Also evaluated the key drivers of Defendant's sales including its brand name, innovative products and games, and installed base of gaming console owners. Provided an alternative royalty damages figure.

- Evaluated Plaintiff's lost profits and price erosion damages in a patent infringement matter relating to a method for delivering internet content from a network of content delivery network ("CDN") servers. The suit was brought by a CDN services provider. Evaluated Plaintiff's lost profits-related damages using market share data, adjusting for customer and market segment differences and the likelihood of supplemental sales. Evaluated Plaintiff's price erosion-related damages for selected customers for whom Plaintiff was required to lower rates and/or renegotiate contracts based upon the alleged unlawful competition of the Defendant.

- Analyzed Plaintiff's lost profits and reasonable royalty damages in two separate patent infringement matters relating to status feedback in home lighting control systems. Performed analyses on a large database of invoices relating to sales of the accused products, analyzed end-user surveys, and identified ancillary sales based upon consumer purchasing patterns. Conducted *Panduit* and *Georgia-Pacific* analyses. Calculated Plaintiff's lost sales based upon market share data reflected in industry surveys. Calculated Plaintiff's royalty damages based upon comparable license analyses.

- In a patent infringement matter relating to the air interface protocol of UMTS/WCDMA cellular phone technology, evaluated whether the Plaintiff had offered Defendant a license to the patents-in-suit on fair, reasonable, and non-discriminatory ("FRAND") terms (as required by the European Telecommunications Standards Institute's intellectual property rights policy). Analyzed the economic benefits associated with patents, the economic benefits associated with standard setting organizations, and the economic evidence related to the FRAND principles. Concluded that none of Plaintiff's licensing offers comported with FRAND principles.

- Evaluated Plaintiff's claimed lost profits in a patent infringement suit against a medical device manufacturer producing trocars with floating septum seals. Analyzed market data relating to trocar products, competitors, and market share information. Also analyzed hospital data with respect to product use and conversion between different manufacturers. Demonstrated that Plaintiff had not demonstrated Defendant would have lost sales and Plaintiff would have gained sales in the absence of the alleged infringement. Concluded a claim for lost profits was not warranted.

- Evaluated Plaintiff's claimed royalty damages asserted against a major software manufacturer in a patent infringement matter relating to a pre-fetch concept allowing for the faster loading of operating systems and software applications. Analyzed the financial performance of the patent holder at the time of the hypothetical negotiation, the drivers of demand for the products allegedly embodying the patent-in-suit, the Parties' respective contributions to the successful commercialization of the accused products, the Parties patent licensing approaches, and the relevant *Georgia-Pacific* factors. Opined to an alternative royalty damages estimate.

- Evaluated the joint venture lost profits and reasonable royalty damages in a patent infringement suit brought by a natural gas producer against an energy producer relating to a system for producing natural gas from unconventional reservoirs. Constructed an economic model incorporating complex technical and economic relationships to determine the value of the natural gas likely to be captured from the reservoirs in question. Conducted a *Panduit* factor and a *Georgia-Pacific* factor analysis.

- Evaluated claimed royalty damages in a patent infringement suit against a nutritional supplement manufacturer and distributor for the alleged infringement of two patents relating to hydrosoluble organic salts and certain compositions and methods for enhancing muscle performance and recovery from fatigue in humans. Concluded Plaintiff's expert inappropriately constructed the hypothetical negotiation framework, failed to consider non-infringing alternative compositions, and overstated the claimed reasonable royalty rate in light of licensing evidence.

- Evaluated claimed damages in a patent infringement matter relating to course management system ("CSM") products and services using the Internet to facilitate the interaction of students and instructors. Conducted a *Panduit* and a *Georgia-Pacific* factor analysis. Calculated lost profits and reasonable royalty damages. Also analyzed Plaintiff's business model and revenue types, Defendant's infringing sales based upon customer licensing agreements and contracts, Plaintiff's prior relationship with Defendant's customers, and Plaintiff's incremental profitability.

- Evaluated Plaintiff's royalty damages claim in a suit brought by a patent holding company against a major software manufacturer relating to certain pivot table functionalities in software. Opined to an alternative royalty damages figure based upon an analysis of the *Georgia-Pacific* factors, the demand for the products allegedly embodying the patent-in-suit, the failed licensing attempts by the former owners of the patent-in-suit, and the relative contributions of the Parties to the commercialization of the accused products.

- Evaluated the royalty damages allegedly suffered by a patent holder against a major internet services provider relating to a method for streaming media over the internet (which facilitated the transmission of real-time, high-quality audio information over a communications network to multiple users simultaneously). Demonstrated that the patent holder's economic expert overstated the claimed reasonable royalty rate, overstated the claimed royalty base, and reached conclusions that failed numerous reliability tests. Also demonstrated that the patent holder's economic expert failed to properly recognize the economics associated with internet radio, leading to an incorrect conclusion as to the proper royalty base that would have been agreed upon at the hypothetical negotiation.

- Evaluated claimed damages in a patent infringement matter filed by an operator of a web-based market place against a competing company relating to the submission of automobile purchase requests over the internet. Analyzed market and industry data relating to Plaintiff's line of business, Plaintiff's and Defendant's financial performance, and Plaintiff's and Defendant's respective market shares. Estimated Plaintiff's lost profits damages.

- Evaluated claimed reasonable royalty damages in a patent infringement matter involving 5 defendants relating to congestion management in ATM networks. Analysis included an assessment of sales of ATM network products allegedly containing the patented feature, an analysis of the price of the integrated circuits embodying the accused functionality relative to the price of the entire ATM product, and a review of industry license agreements. Provided alternative reasonable royalty damages based upon the *Georgia-Pacific* factors in addition to a determining the important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated claimed reasonable royalty damages in a patent infringement matter relating to implantable rate responsive pacemakers and implantable cardioverter devices ("ICDs"). Analysis included an assessment of alleged infringing sales of pacemakers and ICDs, a review of license agreements, and an analysis of the defendant's cost savings associated with the allegedly infringing technology as compared to its next best alternative. Determined reasonable royalty damages based upon the *Georgia-Pacific* factors, and the important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated Plaintiff's lost profits and reasonable royalty damages in a patent infringement matter relating to DVR technology. Analysis included an assessment of Plaintiff's sales of DVR products and monthly subscriptions in the absence of the alleged infringement and an incremental revenue and cost analysis. Determined reasonable royalty damages based upon the *Georgia-Pacific* factors and a determination of important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated lost profit damages in a patent infringement matter involving blasting hole drilling rigs. At issue were the lost profits stemming from lost rig sales and lost replacement part sales. With respect to lost rig sales, evaluated the model types, geographic sales coverage, and model prices of the entities involved. Also evaluated the capacity of the Plaintiff to make the additional claimed sales. With respect to lost replacement part damages, evaluated the likely stream of replacement part sales over the life of the drilling rig. Royalty calculations were performed on sales not subject to lost profit calculations.

## Intellectual Property: Theft of Trade Secrets Cases

- Evaluated Plaintiff's claimed damages in a trade secret theft case in the golf equipment industry. Plaintiff claimed disgorgement of global profits and other unjust enrichment due to the alleged misappropriation of certain golf club design trade secrets through the Defendant's sale of the company and assets to a large sporting goods company. Analysis included calculating net profits from the sale of the accused golf clubs and evaluating claimed reasonable royalty damages.

- Evaluated Defendant's assessment of the incremental costs associated with a contract to provide integrated bonusing software to a casino. The contract allegedly was won through the use of misappropriated trade secrets from the Plaintiff. At issue was the allocation of development and common costs to the contract in dispute. Also evaluated Plaintiff's antitrust counterclaim to Defendant's patent infringement suit relating to the technology used as a foundation for the integrated bonusing software.

- Evaluated damages in a theft of trade secrets matter dealing with next generation switching equipment in the telecommunications industry. At issue was the alleged theft of trade secrets when the Defendant firm hired nine employees of the Plaintiff firm. Analyzed Plaintiff's claimed inability to maintain its projected market share, the alleged accelerated entry of the Defendant firm into the next generation switching equipment market, disgorgement measures of damages, and reasonable royalty measures of damages.

- Evaluated damages suffered by a Plaintiff in the business of installing systems delivering ultra-high purity air, water, gas and chemicals to companies manufacturing integrated circuits. Plaintiff alleged a former managerial employee breached his fiduciary duty by engaging in wrongful use of trade secrets, wrongful solicitation of employees and customers, and unfair competition with the original employer. Analysis involved estimating the lost sales and lost profits to the original employer by estimating the number of bid opportunities missed because of the alleged actions of the former employee, adjusting for changing industry conditions.

- Critiqued Plaintiff's damage model in a trade secrets case in the printed circuit board industry. Plaintiff was claiming lost profits due to the misappropriation of trade secrets through Defendant's hiring of four key management personnel from the Plaintiff's company. Issues evaluated included the appropriateness of the "proxy/yardstick" approach undertaken to estimate lost revenues, and the incremental profit rates used to translate lost revenues into lost profits.

## Intellectual Property: Copyright/Trademark/Trade Dress Infringement/False Advertising Cases

- Evaluated Plaintiff's claimed damages relating to the alleged failure of a TV station to deliver contracted gross rating points over a 6-year period. Plaintiff was claiming lost sales and lost profits based upon a regression analysis used to isolate a relationship between sales revenues and advertising. Demonstrated Plaintiff's regression omitted important explanatory variables (e.g., consumer income, promotions, discounts, competitors' prices, and other print and TV advertising conducted by the Plaintiff). Also demonstrated a failure to account for diminishing returns to advertising. Each of these errors served to increase the magnitude of the claimed relationship between sales revenues and advertising.

- Evaluated Plaintiff's unjust enrichment damages claims in a copyright infringement matter brought against a hospital and a construction company relating to a medical building design. Compared budgeted construction costs to actual construction costs and analyzed the revenues received by the construction company associated with the copyrighted attributes of the building design as opposed to unrelated construction costs. Also analyzed the likely demand-related reasons for revenues that would accrue to the hospital unrelated to the design of the hospital.

- Evaluated claimed damages in a false advertising matter involving tooth-whitening products between two large consumer product companies. At issue were allegedly false, misleading, and disparaging statements about Plaintiff's tooth-whitening products in comparative advertisements shown on television. Plaintiff sought to recover lost profits damages associated with reduced sales resulting from the alleged false advertising. Analyses included an evaluation and critique of Plaintiff's expert's claimed damages model including analysis of A.C. Nielsen scanner data and CMR media data. Analysis demonstrated that Plaintiff's expert did not measure properly the impact of the alleged misleading content, failed to account for alternative reasons for Plaintiff's sales declines, and implemented an incorrectly specified econometric model.

- Provided economic analysis relating to claims of unfair competition and misleading advertising in the pizza industry. Using economic indicia such as dollar sales revenue, trends in market share, growth in number of stores opened, same-store sales data, and store closure rates, evaluated whether the commercial success of a particular pizza company was due to customer acceptance of its pizza product or allegedly deceptive advertising. Also investigated the buying patterns of pizza consumers with respect to cross-chain patronage.

- Critiqued Plaintiff's damage claim in a matter involving alleged tortious interference with business relations and allegations of trade dress infringement. At issue was the projected sales and profitability of Plaintiff's tape dispensing machines during a period of alleged tortious interference by the Defendant and Plaintiff's simultaneous alleged trade dress infringement.

- Analyzed the lost profits of a Plaintiff in a trademark infringement case involving a law enforcement product sold through a mail-order catalog. Also analyzed the profits of the alleged infringer and the cost of remedial advertising.

- Assessed damages resulting from the alleged infringement of copyrighted training manuals. Analysis included identifying the corporate clients of the Plaintiff and Defendant firms and the reasons for customer switching unrelated to the use of the proprietary training manuals.

## Intellectual Property: Commercial Success Cases

- Evaluated indicators of commercial success relating to a surgical hernia mesh fixation device employing a patented helical tacker design. Demonstrated that the patented device had achieved significant and sustained sales and sales growth. Also demonstrated that the sales of the patented device had grown faster than the sales of other hernia mesh fixation devices and achieved a majority share of sales when compared to staplers and other hernia mesh fixation products.

- Submitted a rebuttal declaration to the U.S. Patent and Trademark Office relating to the claimed commercial success of intrusion prevention system ("IPS") products asserted to practice a patent undergoing an *Inter Partes* reexamination. Opined that an economic nexus had not been established between the claimed teachings of the patent and the commercial success of stand-alone IPS products. The patent holder had not demonstrated that the claimed teachings of the patent were commercially successful separate and apart from (a) features not claimed by the patent, (b) economic factors extraneous to the claimed invention, or (c) features covered by other patents present in the IPS products.

HIGHLY CONFIDENTIAL

- Evaluated Plaintiff's analysis regarding the claimed nexus between a patented technology and the commercial success of the accused devices in this patent infringement matter relating to text messaging using a limited keypad such as those found on cell phones.  Analyses demonstrated Plaintiff's failed to consider many factors that lead to the commercial success of the accused devices unrelated to the patent in dispute.

## Breach of Contract / Breach of Fiduciary Duty Cases

- Evaluated Counter-Plaintiff's claimed damages arising from Counter-Defendant's failure to honor a most-favored licensee provision in a licensing agreement relating to a semiconductor patent portfolio. Opined as to the economic interpretation of certain licensing terms and the differences and similarities between lump sum, per unit, and percentage of revenue royalty payments.  Compared the licensing terms between the Counter-Defendant and another party with the licensing terms between Counter-Defendant and Counter-Plaintiff.

- Evaluated Plaintiffs' claimed damages arising from an alleged breach of contract related to the sale of a community club house and other recreational facilities in an age-restricted residential neighborhood. Plaintiffs' claimed that since they were not given the opportunity to exercise their right-of-first refusal to purchase the contested real estate assets, they lost the value of the equity associated with the real estate assets and they were required to make excessive operating expense payments.  Determined that Plaintiffs' expert failed to properly consider the economic factors driving the value of the real estate assets in question.

- Evaluated Plaintiff's breach of contract damages claim relating to the use of a national brand name and other support for the development of a time share resort.  Concluded Plaintiff had not demonstrated an economic causal link between Plaintiff's allegations and the quantum of damages being claimed. Adjusted Plaintiff's claimed damages for various conceptual and computational errors, including alternative actions that might have been undertaken by the Plaintiff in the absence of the alleged wrongful conduct.

- Evaluated claimed damages in an alleged breach of fiduciary duty matter between a franchisee and a major fast food franchisor relating to the development and managing of fast-food franchises.  Plaintiff claimed economic harm due to franchisor's refusal to grant certain additional franchisees to Plaintiff that Plaintiff claimed would otherwise be in competition with the Plaintiff's existing franchises.  Concluded Plaintiff's impact analysis failed to take into account many factors affecting the performance of the Plaintiff's existing franchises that were unrelated to the alleged wrongful conduct.

- Evaluated claimed breach of contract and misrepresentation damages in a suit brought by a global information technology company against a global professional services company relating to a joint venture agreement under which a human resources outsourcing company was formed.  Analysis included conducting a client-by-client analysis regarding the specific wrongful conduct associated with each client of the joint venture and estimated the associated economic damages.  Based upon certain parameters contained in the contract, also calculated the purchase price overpayment had certain performance issues come to light prior to the closing of the joint venture agreement.

- Evaluated a developer's/franchisee's damages claim against a major sandwich franchisor for the alleged breach of a five-state area development agreement.  Reviewed the area development agreement, analyzed the revenues, costs, and profitability associated with franchised outlets, and estimated the Plaintiff's lost franchise fees and lost royalty income based upon various alternative scenarios discussed by the Parties.

- Evaluated the claimed damages of a calling card distribution company due to Defendant's alleged breach of a contract relating to the servicing of the calling cards.  Conducted market research on the calling card industry, analyzed alternative reasons for the alleged decline in calling card sales, and evaluated Plaintiff's damages expert's report.

- Evaluated Plaintiff's damages claim concerning the alleged failure of a call center to properly process inquiries relating to the newspaper and television marketing of a collectible doll in the likeness of a recently deceased public figure. Analyzed advertising expenditures, response rates across cities, major news announcements related to the marketing of such merchandise, and contributing problems caused by Plaintiff's actions. Estimated damages by comparing sales in an unimpacted period with sales in the alleged impacted period.

- Evaluated Plaintiffs' damages claim relating to the underwriting and loan servicing of subprime automobile loans. Plaintiffs' contended the servicing company did not properly administer the portfolio of subprime automobile loans thereby causing excessive loan losses. Analysis demonstrated that Plaintiffs' financial experts failed to take into account alternative reasons for Plaintiffs' performance. Analysis of Plaintiffs' loan volume, interest income, loan loss rate, and deteriorating industry conditions also demonstrated that Plaintiffs' business plan did not provide a reasonable basis from which to calculate claimed damages.

- Evaluated Plaintiff's claim of lost profits relating to the collection of ballots for a Mexican telecommunication company in Mexico's Equal Access program. Analyzed a database of telephone customers, including statistics such as the length of service, average monthly consumption patterns, current billing status, and differences between residential and commercial customers. Developed an alternative claimed damages model taking into account consumption patterns and the turnover rate of customers, among other factors.

- Evaluated Plaintiffs' claim of lost success fees, lost closing fees, and underpayment of value relating to Defendant's acquisition of an oncology laboratory and the alleged failure to consummate additional acquisitions. Analysis demonstrated Plaintiffs' projections regarding the profitability of the proposed acquisitions were not reasonable given the historical financial performance of the targets. Also demonstrated Plaintiffs were not underpaid for the assets of the acquired laboratory since no investor or buyer was willing to provide funds to Plaintiffs pre-acquisition and since Plaintiffs in their valuation approach inappropriately assigned all post-acquisition synergies and gains to the Plaintiffs.

- Evaluated Plaintiff's damage claim arising from an alleged misappropriated opportunity to develop a computer superstore franchise in Mexico based on the equivalent U. S. concept. Demonstrated Plaintiffs overstated per store revenue, understated store-level costs, and used inappropriate financial and strategic assumptions regarding the number of stores opened, the amount of capital required, outside investor contribution, equity shares, and strategic acquisitions. Plaintiffs also conducted a valuation based on companies bearing little or no resemblance to a computer superstore.

- Evaluated Plaintiff's claim of lost profits arising from an alleged breach of contract involving two tubular inspection equipment manufacturing companies. Analyses demonstrated that Plaintiff's expert overstated the projected utilization rate of the company's equipment and associated revenue and understated the projected incremental costs that would have been incurred by Plaintiff. Analyses demonstrated market demand would not support the equipment utilization rate projected by Plaintiff's expert.

- Evaluated Plaintiff's claim of damages in a breach of contract matter in the magazine publishing and distribution industry. Plaintiff claimed Defendants breached a distribution agreement by suspending distribution pending the resolution of a trademark infringement dispute. Plaintiff abandoned the magazine, claiming lost profits and the estimated lost value of the magazine had it been sold after its fourth year of publication. Analysis demonstrated Plaintiff's expert overstated subscription-based revenues, distorted the cost/revenue structure that would have existed for the magazine, and overstated the likelihood of success by ignoring the failure of similar genre magazines.

HIGHLY CONFIDENTIAL

- Evaluated the damages sustained by the public safety division of an information technology services firm due to the early termination a ten-year services agreement to provide enhanced 9-1-1 services to a governmental agency. One-time up-front implementation costs in setting up the 9-1-1 system and ongoing operational costs were compiled in constructing a cost reimbursement damage claim. Also evaluated the reasonableness of an early termination charge schedule designed to represent the one-time buyout total if the governmental entity opted to terminate the contract before the ten-year term expired.

- Evaluated the damage claim of a bank arising from an allegedly defective conversion of the bank's data processing system. Areas investigated included the softening macroeconomic environment surrounding the bank during the relevant time period, the changing financial services market, internal bank ratios, and technical flaws contained in Plaintiff's damage calculations.

- Estimated lost sales and lost royalty payments to a "thick" potato chip producer due to a breach of contract. Involved was the construction of a damage model, analyses of the market for potato chips and per capita potato chip consumption, and projecting the rate of introduction of a new potato chip into regional markets.

- Calculated damages and provided other economic analyses in a "lack of best efforts" breach of contract case in the carbonated soft drink industry. At issue was the impact on sales due to the "lack of best efforts" vs. the impact on sales from contemporaneous new entrants into the market.

- Calculated damages in a breach of contract matter involving an association of nephrologists and a management company operating 12 kidney dialysis clinics. Areas of investigation included the "profitability available for distribution" from the clinics, the projected rate of growth in patients, the rate of introduction of new clinics, and the costs associated with running the clinics. A damage model was developed which projected the profits that would have been distributed to the management company over the life of the contract in the absence of the breach.

- Evaluated claimed damages against a hospital for allegedly breaching a contract allowing hyperbaric oxygen services on hospital premises. Investigations included assessing the local market for hyperbaric services, evaluating Plaintiff's business growth potential given the physical space constraints at the hospital, and demonstrating Plaintiff had fully mitigated claimed future damages through the establishment of an alter ego firm at a nearby local hospital.

**Class Certification Engagements**

- Evaluated Plaintiff's position that the claimed economic injury suffered by putative Class members could be quantified on a Class-wide basis in a class action matter relating to anti-aging skin care products marketed as preventing and repairing signs of aging "in just one week." Demonstrated that the approaches proposed by the opposing expert to calculate Class-wide damages would not yield reliable or relevant estimates of the alleged harm suffered by individual Class members. Arguments presented included that the large number of repeat buyers, the wide variations in the retail prices associated with the accused products, and the wide variations in the retail price differences relative to other anti-aging products would prevent a reliable calculation of putative Class members' damages on a Class-wide basis.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a Class-wide basis in a matter brought by an institutional investor against a bank associated with the bank's securities lending program. Demonstrated that a class-wide approach would obfuscate important differences among putative Class members' individual investment expectations and tolerances. Differences requiring individualized inquiry included the variability in maturity guidelines, credit-quality guidelines, prohibited investments, and diversification requirements.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a Class-wide basis in a matter where a beverages company marketed certain beverages as containing beneficial vitamins and allegedly failed to disclose the sugar content of the beverages. Evaluated the wide variations in the beverages' retail prices across distribution outlets, across geographic areas, and across the time periods considered. A comparison of the average retail prices of the at-issue beverages relative to identified benchmark products did not support the allegation that the at-issue beverages possessed a systematic price premium as a result of the company's allegedly misleading marketing campaign.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a class-wide basis in a matter where an automobile company allegedly did not inform purchasers that actual vehicle miles per gallon performance could vary from the 40 miles per gallon EPA estimated fuel efficiency. Demonstrated that individualized inquiry would be required to ascertain consumers' valuation of vehicle characteristics (including their expected fuel economy) when purchasing an accused vehicle, actual prices paid, driving patterns, driving conditions, and whether putative Class members' expectations were influenced by the company's alleged wrongful conduct. Evaluated Plaintiffs' class certification expert's opinion that alleged damages could be evaluated on a class-wide basis using a hedonic regression methodology.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a class-wide basis in a matter relating to the issuance of a special assessment fee by a timeshare vacation club. Demonstrated that potential damages-related conflicts were likely to arise among putative Class members (including among the Named Plaintiffs) – making Class-wide proof an unreliable measure of economic injury for each putative Class member. Also demonstrated that evaluating claimed damages on a Class-wide basis would result in potentially awarding damages to putative Class members who suffered no injury.

- Evaluated Plaintiffs' position that the economic injury allegedly suffered by putative class members could be quantified on a class-wide basis in a matter where a beverages company marketed certain beverages as "All Natural" when they contained high fructose corn syrup ("HFCS"). Demonstrated that wide variations existed in the beverages' retail prices across distribution outlets, across geographic areas, and across the time periods considered. Also demonstrated that wide variations existed in the beverages' retail prices because of promotional discounts and coupons and because the company did not sell directly to consumers. Consequently, whether consumers paid a price premium because of the "All Natural" labeling (and how much, if any) could not be determined by proof common to the proposed class. A comparison of the average retail prices of the "All Natural" beverages in dispute to identified benchmark products did not support the allegation that the "All Natural" beverages possessed a systematic price premium as a result of the "All Natural" labeling.

- Evaluated the commonality of purchasing circumstances of proposed Class members in a class action matter against a national quick service restaurant ("QSR") chain. Plaintiffs alleged the QSR misrepresented the trans fat levels contained in the QSR's french fries. Plaintiffs also alleged the proposed Class paid a price premium for certain food products based upon the alleged misrepresentations. After reviewing survey data, marketing materials, and pricing data, concluded that individual inquiries were required to establish different customer's awareness of the alleged misrepresentations, different customer's reliance upon the alleged misrepresentations in their purchasing decisions, and other important economic factors impacting each customer's purchase decision.

- Evaluated Plaintiffs' claim that Class members' alleged damages could be "mechanically calculated" in a class action matter against a payphone company's auditor. The payphone company had filed bankruptcy and the Class members alleged the auditor misrepresented the company's financial statements, upon which the Class members allegedly relied. Conducted economic and market research and identified factors that caused a general decline in the payphone industry which contributed to the bankruptcy of the company. Analyzed the claimholders' database and identified issues relating to the database that precluded Plaintiffs' expert from mechanically calculating the damages allegedly suffered by class members.

## Lender Liability Cases

- Evaluated Plaintiff's allegations that it was capital constrained and consequently economically damaged as a result of its loans being placed into the special assets department of its lender. Analyzed the Plaintiff's unused cash, credit, and other available funds. Also analyzed Plaintiff's successful access to the capital markets, acquisition spending, R & D spending, sales performance, and profitability relative to peer companies.

- Analyzed Plaintiffs' damage claim in a lender liability suit relating to Defendant's alleged failure to fund certain residential housing development and construction loans. Evaluated Plaintiffs' changing five-year business plan projections, including revenue growth, geographic expansion, market share, salesmen coverage, cost structure, and profitability assumptions. Also evaluated Plaintiffs' strategy for "exiting" the business and the alleged value of their ownership at that time.

- Evaluated damages in a lender liability case involving the bankruptcy of a gear manufacturing company. The bankruptcy was allegedly due to the failure of a bank to fully fund a previously committed loan. Investigations included researching alternative market-related reasons for the decline in the gear manufacturer's business as well as evidence of internal mismanagement on the part of the company's owners.

- <u>Other Matters</u>. Evaluated damages, causation issues, and liability issues in various lender liability cases involving the calling in of loans, the failure to fund previously committed loans, the failure to release collateral, and the misappropriation of loan payments. Cases involved firms in the wire and cable, drywall/construction, PVC piping, and auto dealership industries, among others.

## Professional Negligence (Non-Securities / Non-Merger) Cases

- In an alleged professional negligence matter, a lender to distressed companies sought $40 million in damages from an auditor in connection with a $130 million credit facility extended to an HDTV company. The lender failed to collect when the borrower filed for bankruptcy. The auditor was alleged to have made negligent misrepresentations associated with the borrower's financial statements; the lender asserted it had relied upon the borrower's financial statements when entering into the credit facility. Performed economic causation and damages-related analyses. Identified the known or knowable risks associated with providing a credit facility to the borrower, including certain accounts receivable collection risks and market softness risks. Opined that it was the materialization of these known and knowable risks that caused the lender's claimed losses.

- Evaluated claimed damages against a major law firm for alleged professional negligence when filing a patent for the treatment of septic shock. Researched (among other things) the FDA approval process, associated statistics regarding the product category allegedly covered by Plaintiff's patent, and various industry projections regarding the category growth. Performed a discounted cash flow analysis, an incremental profitability analysis, a licensing analysis, and provided an alternative calculation of claimed damages.

- Evaluated Plaintiffs' claimed damages relating to an alleged failure by a law firm to properly file certain patent applications relating to a video processor recorder. Plaintiffs' business opportunities and licensing fees in the United States and Europe were allegedly lost due to the ensuing delays. Analyzed Plaintiffs' causation linkages to claimed damages, length of the claimed damages period, forecasted units sold, forecasted market share, forecasted costs of production, and claimed licensing rate.

- Evaluated claims by a Department of Insurance appointed liquidator that alleged the auditor of a bankrupt insurance company breached its fiduciary duty, resulting in a $100 million deficit on the insurance company's books. Conducted various analyses of a claims register database, including a comparison of indemnity payments and reserves per claim before and after the appointed liquidator took control of the liquidation process. Analyses demonstrated both the indemnity payments and reserves per claim were higher after the appointed liquidator took over the liquidation process, implying the liquidator over-paid and over-reserved claims.

## Entertainment/Sports-Related Engagements

- Evaluated the claimed damages of a movie production company against a major home video rental company. At issue was the claim that the refusal of the home video rental company to commit to carry a particular movie in its stores caused the movie production company to suffer lost profits when its distributor then refused to release the movie theatrically. Demonstrated that Plaintiff's methodology for estimating lost box office revenues was inappropriate and failed to account for important determinants of movie attendance.

- Analyzed Plaintiffs' lost profits and reasonable royalty damages in a patent infringement matter relating to offset head lacrosse sticks. Analysis included an assessment of Plaintiffs' sales in the absence of the infringement, the distribution of the lost sales to the models that would have been sold in the absence of the infringement, and an incremental revenue and cost analysis. Also analyzed Plaintiffs' competitors, pricing patterns, productive capacity, and geographic coverage in support of the lost profits claim. Reasonable royalty damages were assessed using the *Georgia-Pacific* factors and a determination of important negotiating points in a hypothetical licensor / licensee negotiation.

- Estimated the diminished box office revenues suffered by a theatrical release due to the breach of a quick service restaurant promotional tie-in arrangement with a major pizza chain. Developed a database of recently released films and related film characteristics such as genre, rating, critics review, box office revenues, media spending, production budget, season of release, and talent. A regression model was then developed to quantify the relationship between media spending and box office revenue. An industry review of quick service restaurant promotional tie-in arrangements was also conducted.

- Evaluated Plaintiffs' claimed damages in a breach of contract matter involving the sale of certain minority interests in a National Basketball Association team. At issue were Plaintiffs' tag-along rights whereby limited partnership interests could be included in any sale by the general partner on the same terms and conditions. Damages were calculated as the difference between the formulaic value of the minority interests versus the market value of the minority interests when sold separately. Discounts for lack of control and reduced marketability were analyzed.

- Evaluated Plaintiff's damages claim relating to a NASCAR racing team sponsorship agreement. Plaintiff contended the Internet service provider sponsor interfered with the racing team's ability to sell advertising banners that were part of the sponsorship agreement. Analyses included assessing the appropriate methodology for valuing a NASCAR race team and assessing comparable transactions. Also analyzed the financial performance of the race team, the economic terms of the sponsorship agreement, and the risks associated with a barter arrangement.

- Estimated damages arising from a breach of contract claim between an electronic retailer and a local television station. At issue was the lost profits to the electronic retailer when the local television station discontinued broadcasting the electronic retailer's programming.

- Analyzed the market and evaluated damages on behalf of a television station denied access to a cable system. At issue was whether the cable operator was attempting to monopolize the market for local television advertising. Analysis included an estimation of the advertising revenues that would have been received by the local television station had it been allocated a channel on the cable system.

- Estimated damages arising from a breach of contract claim between a video-cassette manufacture/distributor and a theatrical motion picture producer/distributor. At issue was whether the motion picture distributor manipulated the theatrical release of certain titles distorting the films the video-cassette producer could distribute under the terms of the agreement.

## Tax-Related Engagements

- Participated in an analysis of the impact on tax revenues to the State of Texas from a change in tax laws relating to pension fund managers. Helped demonstrate that changing the apportionment rule from "location in which the investment services were performed" to "residence of the investment beneficiaries" would not result in a negative fiscal impact.

- Served as consulting partner on an engagement estimating qualifying research and expenditure costs in response to certain expenses disallowed by the IRS. Analysis included developing a methodology to estimate qualifying hours and qualifying costs for groupings of employees with missing data.

- Analyzed whether the salaries paid to the owners/managers of a heavy and highway construction company were reasonable in a matter before the IRS. Areas investigated included the cyclical nature of the construction industry, the resulting cyclical nature of compensation paid to construction industry executives, and the 50th and 75th percentile salaries paid to various types of executives in the construction industry.

- Participated in an analysis of the tax benefit versus detriment to a Plaintiff as a result of ownership in certain partnership interests over the 1982-1998 time period. Also involved was an analysis of cumulative suspended tax losses, partnership income available for distribution, and changing tax rates over time.

- Quantified the net out-of-pocket cash position of investors who purchased limited partnership interests in nine real estate partnerships in an alleged non-disclosure matter. Also quantified the impact caused by changes in the Federal income tax laws. Supporting analyses included comparing the actual and projected performance of the partnerships taking into account restructurings, refinancings, and dissolutions.

## Personal Injury and Wrongful Death Cases

- General Overview (Personal Injury). Assessed damages and lost earnings in various personal injury cases involving movie production workers, management consultants, financial consultants, nurses, medical doctors, chiropractors, secretaries, truck drivers, airline stewardesses, mechanics, engineers, maintenance personnel, carpenters, masonry workers, crane operators, machine operators, actresses, military aircraft production workers, tankermen, teachers, film editors, portfolio managers, hair stylists, automobile assemblers, landscape architects, sole proprietors, and real estate agents (among others). In each case, issues investigated included an assessment of the projected undamaged income, damaged income, expected work life of the individual, and appropriate discount rate to use. Assistance to the attorney included the preparation of deposition questions, economic analyses, and a critique of the opposing economist's damage model.

- General Overview (Wrongful Death). Developed numerous damage models in wrongful death cases. Issues investigated included the projection of lost earnings, the projected personal consumption expenditures of the decedent, and projected lost pension benefits. Professions of the decedents included various types of entrepreneurs (e.g., boat store owners, etc.), white-collar workers (e.g. attorneys, architects, etc.), and blue-collar workers (e.g., demolition contractors, grocery store clerks, etc.). Ages of the decedents ranged from adults to teenagers to children.

HIGHLY CONFIDENTIAL

- Evaluated claims of damages submitted by the family members of 88 decedents from an airplane crash. Family members were seeking damages in state and federal courts against the airline and certain parts manufacturers. Most of the decedents resided and worked in Asian countries. Researched various data sources for information regarding social security benefits, interest rates, and the relevant economic statistics for workers in these countries. Evaluated four Plaintiff damages experts' reports and testimonies, summarized our evaluation of these damage models, and calculated alternative damages figures. Analysis included evaluating lost earnings, lost business value, lost non-salary benefits, lost retirement funds, and lost savings.

## Wrongful Termination Cases

- Evaluated Plaintiff's alleged lost earnings and lost future earnings capacity in a matter against a major shipping company in which the Plaintiff claimed to have resigned his legal counsel position due to the Defendant's alleged criminal conduct and its refusal to conduct an independent investigation. Analyzed various employee benefits offered by the Defendant including but not limited to the salaries of similarly-situated employees, long term incentive plans, 401(k) plan, paid vacation, stock options, and retirement benefits. Also analyzed promotion criteria, similar benefits received by the Plaintiff at alternative employment, and the lower cost of living associated with the geographical location of the alternative employment.

- Evaluated Plaintiff's claimed economic harm in a wrongful termination / negligent misrepresentation matter. Plaintiff claimed that pre-termination certain representations by the company dissuaded him from resigning and selling his stock holdings, thereby causing economic harm from the subsequent decline in the company's stock price. Analysis included quantifying the salary, bonuses, pension benefits, and severance pay the Plaintiff received during the additional time spent with the company as compared to the stock price declines that formed the basis of Plaintiff's damages claim.

- Evaluated Plaintiff's loss of earnings claim in an alleged wrongful termination matter in the long distance telecommunications industry. Plaintiff was an independent representative with a "downline" working for a company using a multilevel marketing sales approach. Analyzed the Plaintiff's historical earnings, business expenses, and the earnings of Plaintiff's peers to evaluate Plaintiff's net earnings in the absence of the alleged wrongful termination.

- Evaluated Plaintiff's damage claim in a wrongful termination matter involving an insurance broker/branch manager. Evaluated Plaintiff's alleged damage period, earnings in the absence of the termination, fringe benefits, business expenses, and offsetting earnings. The sales patterns of the relevant insurance products at the state and national level were incorporated into the analysis. Also analyzed trends within the company with respect to branch manager positions.

- Evaluated the damages suffered by the manager of an over-the-counter trading department in an alleged wrongful termination action. Since the compensation of the manager was based on the profitability of the department, one issue investigated was the reason for the decline in the post-termination performance of the department.

- Other Matters. Assessed damages and lost earnings in other wrongful termination cases involving internal medicine specialists, neurosurgeons, anesthesiologists, entertainment company executives, brokers/traders, secretaries, accountants, attorneys, quality assurance managers, company presidents, real estate brokers, property managers, insurance brokers/managers, and military aircraft production workers. Areas investigated include many of the same items as described in personal injury cases.

**Other Economic Engagements**

- Conducted an economic analysis of historical and projected lost revenues due to SEC-related independence constraints for an information technology consulting entity. The analysis demonstrated that SEC rules requiring SEC registrants to disclose the amount of non-audit fees paid to its auditor, as well as constraints on the consulting entity's ability to perform outsourcing or managed application services for audit clients significantly impacted business growth relative to the market and its closest competitors. The analysis also demonstrated that certain revenue projections assuming independence relief were appropriate in light of market conditions and the independence constraints.

- Conducted an economic cost/benefit analysis of the SEC's proposed rule changes relating to non-audit services performed by auditing firms for audit clients. Analyses demonstrated that public accounting firms have an incentive to protect their brand name capital and that purchasers of non-audit services have an incentive to maintain investor confidence in the reliability of the audited financial statements.

- Performed an economic impact analysis on behalf of a major pipeline corporation seeking to gain regulatory approval for the construction of an oil pipeline in the Pacific Northwest. Evaluated the net economic impact of the project on employment, income, and consumer expenditures in the region. New employment opportunities resulting from construction and maintenance of the pipeline were compared to the potential lost jobs associated with the alternative means of transporting the petroleum.

- Participated in a major antitrust risk assessment exercise for a large industrial corporation. Work performed included evaluating the major litigation risks in the areas of monopolization, price discrimination, price fixing, illegal tying, and exclusive dealing. A detailed questionnaire designed to collect relevant economic data and identify potential risks was constructed and sent to the corporation's division managers.

- Evaluated revenue projections relating to an electronic toll collection system. The system was designed to recover lost toll revenue and other administrative fees from toll violators traveling along a consortium of tollways in New York, New Jersey, and Delaware. Analyzed four critical revenue drivers in the projections (number of transactions, violation rates, citation rates, and collections rates) and the potential variability of certain components of the projections by compiling comparative data through interviews with industry participants. Analysis was used in assisting lenders evaluating the economic viability of the project.

- In a bankruptcy matter, analyzed the expected rate of return that could be earned on a portfolio of assets. Included in the analysis was determining the investment portfolio of a prudent pension fund manager and the historical risk premiums earned on each category of assets in the portfolio. The assets were being held to meet future pension plan liabilities.

- Conducted an analysis of low-cost housing in Los Angeles County (CA) to determine whether sufficient housing was available to house the County's general relief recipient population. In separate engagements, conducted similar studies for San Bernardino County (CA) and Alameda County (CA). The Alameda County study also analyzed earned income incentives and food stamp allotments as a source of income in addition to the County's monthly general relief assistance. An affordable housing analysis was also conducted for the State of New Jersey's Department of Health relating to the state's child exclusion policy and AFDC recipients.

- Conducted an economic analysis on behalf of the California Public Utilities Commission. Tasks included incorporating elasticities into alternative rate design and pricing models, analyzing subsidies accruing to various residential consumer groups under alternative rate designs, and estimating the relative welfare loss associated with each alternative rate design.

HIGHLY CONFIDENTIAL

**Fraud/Criminal-Related Engagements**

- Evaluated claimed damages in a suit brought by Plaintiff relators against a major information technology company for allegedly submitting false and fraudulent claims to the U.S. government under a Medicaid program providing health-cost reimbursements to school districts. Conducted various benchmarking analyses including analyzing a "claimed amount" versus "paid" pattern analysis and a reimbursement rate analysis across Defendant-administered school districts and non-Defendant-administered school districts. Also conducted a reimbursement rate benchmarking analysis associated with school districts before and after administration by the Defendant. Concluded there was no economic evidence of a systematic effort to defraud the U.S. government.

- Evaluated Plaintiff's claim of damages stemming from the alleged embezzlement of funds and falsification of income statements by a bank official relating to a mortgage lending division of a bank. Analysis identified errors made by the bank in specifying the length of the damage period and not properly accounting for accounts receivable collections made post-discovery of the alleged illegal acts.

- Analyzed skilled nursing facility nursing ratios in a criminal health care fraud matter relating to Medicare reimbursements. At issue was Defendant's ratio of skilled nursing costs to unskilled nursing costs alleged to be outside of governmental guidelines. Analyzed facility-level ratios by establishing peer groups of facilities based upon size of facility, number of participating beds, skilled utilization percentage, state location, average length of stay, and facilities with similar levels of acuteness.

- Estimated freight overcharge damages on behalf of a major multinational information technology services firm. Analysis required the utilization of a database of all freight shipments made over a five-year period, including incorporating subsequent credit memos, discounts, and dimensional weight charges. Analysis compared actual freight charges to rates charged by alternative carriers for shipments of identical ship method (e.g., ground, next day, two day), weight, and destination.

- Performed economic analysis relating to a health care criminal matter in which a group of doctors and a hospital were alleged to have conspired to receive remuneration in return for the referral of Medicare-eligible patients. Analyze included evaluating the savings from reduced admissions rates and from reduced average length of stays. Also analyzed the profitability of certain laboratory-related work.

## TEACHING EXPERIENCE

**Macroeconomic Principles and Intermediate Macroeconomics**

Topics covered included unemployment/full employment, inflation/price stability, economic growth/gross domestic product, determination of national income, and monetary and fiscal policies.

**Microeconomic Principles and Intermediate Price Theory**

Topics covered included functioning of markets (demand and supply analysis), elasticities, theory of the firm (profit maximization), industry performance, allocation of resources, and government regulation.

**Companies In Crisis**

Topics covered included companies, markets, and industries in contemporary crisis situations from external or internal changes in the operating environment or significant conflict. Topics included case studies focusing on solutions for companies facing competitive issues, management issues, or litigation-related issues.

## PUBLICATIONS

"An Economic Framework for Analyzing Covenants Not to Compete" (with Elaine Fleming and Steven Herscovici), Expert Witnesses, ABA Section of Litigation, Spring/Summer 2011, Vol. 7 No. 1.

"Financial Expert Witness Challenges and Exclusions: Results and Trends in Federal and State Cases Since Kumho Tire" (with Lawrence F. Ranallo), Accountants' Handbook, Tenth Edition 2004 Supplement, *forthcoming*, edited by D.R. Carmichael, New York: John Wiley & Jones, Inc., 2004.

HIGHLY CONFIDENTIAL

"Accounting for Damages in Intellectual Property Litigation" (with Tony Samuel and John Davis), Building and Enforcing Intellectual Property Value – an International Guide for the Boardroom 2003.

"Challenges to the Admissibility of Financial Expert Witness Testimony" (with Lawrence F. Ranallo), Litigation Services Handbook, 2002 Supplement, edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, 2A.1 – 2A.17, New York: John Wiley & Sons, Inc., 2001.

"Calculation of Lost Earnings" (with Carlyn R. Taylor and Randi L. Firus), Litigation Services Handbook, edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, 11.1 – 11.16, New York: John Wiley & Sons, Inc., 2001.

"Preparing the Financial Expert or Economist" (with George G. Strong, Jr.), Witness Preparation, V. Hale Starr, 13.4 – 13.4.1, New York: Aspen Law & Business, A Division of Aspen Publishers, Inc., 1998.

"The Effect of Institutional Setting on Behavior in Public Enterprises: Irrigation Districts in the Western States" (with John M. McDowell), Arizona State Law Journal, Vol. 1982, No. 2, 453 – 496.

## SELECTED CLIENTS OVER THE PAST FIVE YEARS

Selected clients over approximately the past five years include but are not limited to: Abbott Laboratories; Akamai Technologies, Inc.; America Online, Inc.; Apple Inc; Autobytel Inc.; Blackboard Inc.; Blackstone Group; Blockbuster Inc.; Bioengineered Supplements & Nutrition, Inc.; CDX Gas; Chrysler; Cigna; Coca Cola Company; Covidien; Crane Co.; Cummins-Allison Corp.; DirecTV, Inc.; Dow Chemical Company; Electronic Data Systems; Ernst & Young LLP; GoDaddy.com, Inc.; Google; Gorlick Distribution Centers; Haggar; Halliburton; Hyundai Motor America; Idearc; Ingenico Inc.; Juniper; LG Electronics, Inc.; Lutron Electronics Co., Inc.; McDonald's Corporation; Medtronic, Inc.; Merial Limited; Microsoft Corporation; National Dairy Holdings, L.P.; New York Times, Company; Nike, Inc.; Nintendo; Nortel Networks Inc.; Research in Motion; Rohm Co. Ltd.; Sabre Inc.; Samsung; Shure, Inc.; Shell Exploration & Production Company; SIGA Technologies; Snapple Beverage Corporation; St. Jude Medical, Inc.; Stolt Nielson; TiVo Inc; T-Mobile USA, Inc.; Tyco Heathcare; UBS; United States Surgical Corporation; VeriFone Systems, Corp.; Verizon; Versata (f/n/a Trilogy); Volkswagen Group of America, Inc.; Waste Management; Wachovia Corporation; Wells Fargo & Company; Wendy's; Wyndham International, Inc.; Yahoo!

# Exhibit 2

HIGHLY CONFIDENTIAL

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

# KEITH R. UGONE, PH.D.
## TRIAL, HEARING, AND ARBITRATION TESTIMONY[1]

Promethean Insulation Technology LLC vs. Sealed Air Corporation; **Reflectix, Inc.**; The Home Depot, Inc.; and Home Depot U.S.A., Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Cas4e No. 2:13-CV-1113) (2015)

**Merial, Inc. and Merial S.A.S** vs. Ceva Sante Animale S.A., Valley Generics, Inc., True Science Holdings, LLC, and TruRX LLC (In The Middle District Of Georgia, Athens Division, Civil Action No. 3:15-cv-00040-CDL) (injunction hearing: 2015)

**Georgetown Rail Equipment Company** vs. Holland L.P. (United States District Court, Eastern District Of Texas, Tyler Division, Case No. 6:13-cv-366-MHS-JDL) (2015)

**Bombardier Recreational Products Inc.** vs. Arctic Cat, Inc. and Arctic Cat Sales, Inc. (Federal Court, Montreal, Canada, Court File No.: T-2025-11) (2015)

Masakazu Ushijima vs. **Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.** (In The United States District Court For The Western District Of Texas, Austin Division, Civil Action No. 1:12-CV00318-LY) (2015)

Jean Melchior vs. **Hilite International, Inc.** (United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No.: 3:11-CV-03094-M) (2015)

Kawasaki Heavy Industries, Ltd., a/k/a Kawasaki Jukogyo Kabushiki Kaisha and Kawasaki Motors Manufacturing Corp., U.S.A. vs. **Bombardier Recreational Products, Inc., BRP U.S., Inc., and BRP-Rotax GmbH & Co. KG a/k/a BRP-Powertrain GmbH & Co.** (Private Arbitration, Case No. 26220 CAMG) (2015)

**Texas Advanced Optoelectronic Solutions, Inc.** vs. Intersil Corporation (In The United States District Court For The Eastern District Of Texas, Sherman Division, Civil Action No. 4:08-cv-451) (2015)

Ultratec, Inc. and CapTel, Inc. vs. **Sorenson Communications, Inc. and CaptionCall, LLC** (United States District Court, Western District Of Wisconsin, Case No.:3:13-cv-00346) (2014)

Personal Audio, LLC vs. **CBS Corporation** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:13-cv-00270-JRG-RSP) (2014)

United States of America *ex rel*. Kurt Bunk and Daniel Heuser v. Birkart Globistics GMBH & Co. Logistik Und Service KG, et al. and United States of America *ex rel*. Ray Ammons v. The Pasha Group, **Gosselin World Wide Moving, N.V., and Gosselin Group, N.V.** (In The United States District Court For The Eastern District Of Virginia, Alexandria Division, No. 1.02cv1168 (AJT/TRJ)) (2014)

---

[1] Trial, hearing, and arbitration testimony over the 1990-2015 time period. Case citations and dates subject to verification. **Clients bolded.** Deposition testimony begins on page 10.

HIGHLY CONFIDENTIAL

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

NuVasive, Inc. vs. **Laura Lewis** (In The United States District Court For the Western District Of Texas, Austin Division, Civil Action No. 1:12-CV-01156) (2014)

**Magnum Oil Tools International, Ltd.** vs. Tony D. McClinton, JayCar Energy Group. L.L.C., Surf Frac Wellhead Equipment Company, Inc., McClinton Energy Group, L.L.C., Motors Mills Snubbing, L.L.C., and Stan Keeling (In The United States District Court For The Southern District Of Texas, Corpus Christi Division, Civil Action No: 2-12-cv-00099) (2014: preliminary injunction hearing)

NXP B.V. vs. **Research In Motion, Ltd. and Research In Motion, Corp.** (United States District Court For The Middle District Of Florida, Orlando Division, Case 6:12-cv-498-ORL-22GJK) (2014)

In The Matter Of Certain Wireless Devices With 3G And/Or 4G Capabilities And Components Thereof (InterDigital Communications, Inc., InterDigital Technology Corporation, et al. vs. **Samsung Electronics Co., Ltd., Samsung Electronics American, Inc., and Samsung Telecommunications America, LLC**; United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-868) (2014)

Sabatino Bianco, M.D. vs. **Globus Medical, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:12-cv-147-JRG) (two testimonies: trial (2014) and evidentiary hearing on on-going royalties (2014))

SimpleAir, Inc. vs. Microsoft Corporation, **Motorola Mobility, Inc., Google Inc.**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:11-cv-00416) (two trials; 2014)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2013)

Brightstar Corp. and Flipswap Services, LLC vs. **Flipswap, Inc.** (Judicial Arbitration And Mediation Services, Case No. 1460000526) (2013)

Lake Cherokee Hard Drive Technologies, L.L.C. vs. Bass Computers, Inc., LSI Corporation, **Marvell Semiconductor, Inc.**, Samsung Semiconductor, Inc., and Tech Data Corporation (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:10-cv-216 (TJW-CE)) (2013)

Abraham & Veneklasen Joint Venture, Abraham Equine, Inc. and Jason Abraham vs. **American Quarter Horse Association** (In The United States District Court For The Northern District Of Texas, Amarillo Division, Civil Action No. 02:12-cv-00103-J) (2013)

Hitachi Consumer Electronics Co., Ltd. and Hitachi Advanced Digital, Inc. vs. **Top Victory Electronics (Taiwan) Co. Ltd., TPV Int'l (USA), Inc., Envision Peripherals, Inc., Top Victory Electronics (Fujian) Co. Ltd., TPV Electronics (Fujian) Co. Ltd., TPV Technology Ltd., and VIZIO, Inc.** (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:10-CV-260) (2013)

HIGHLY CONFIDENTIAL

*e*Plus Inc., vs. Lawson Software, Inc. (In The United States District Court For The Eastern District Of Virginia, Richmond Division, Civil Action No. 3:09-CV-620 (RFP)) (2013)

Alexsam, Inc. vs. **IDT Corporation** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:11-CV-362-RSP) (2013)

In Re: Urethanes Antitrust Litigation (Class) – Seegott Holdings, Inc., et al. vs. **The Dow Chemical Company** (In The United States District Court For The District Of Kansas, MDL-04-1616 (JWL/JPO), No. 05-2265-JWL) (2013)

**FLIR Systems, Inc.** vs. Sierra Media, Inc. and Fluke Corporation (The United States District Court, District Of Oregon, Portland Division, Case No. 3:10-CV-971-HU) (2012) (two trial testimonies: affirmative case and counterclaim)

I/P Engine, Inc. vs. **AOL, Inc., Google Inc., IAC Search & Media, Inc., Gannett Company, Inc., and Target Corporation** (In The United States District Court For The Eastern District Of Virginia, Norfolk Division, Civil Action No. 2:11-cv-512-RAJ) (2012)

DDR Holdings, LLC vs. **Hotels.com, L.P.**; **Expedia, Inc.**; **Travelocity.com, L.P.**; Site59.com, LLC; Internetwork Publishing Corporation d/b/a Lodging.com; Neat Group Corporation; Orbitz Worldwide, LLC; **International Cruise & Excursion Gallery, Inc.; OurVacationStore.com, Inc.**; **National Leisure Group, Inc. / World Travel Holdings, Inc.**; and **Digital River, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:06-CV-42-JRG) (2012)

**Tyco Healthcare Group LP and United States Surgical Corporation** vs. Ethicon Endo-Surgery, Inc. (In The United States District Court For The District Of Connecticut, Civil Action No: 3:10-cv-00060 (JBA)) (2012)

CardSoft, Inc. and CardSoft (Assignment For The Benefit Of Creditors), LLC vs. **VeriFone Systems Corporation; Hypercom Corporation; Ingenico S.A.; Ingenico Corp.; Ingenico Inc.**; Shera International Ltd.; and Blue Bamboo (UUSA), Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-00098) (2012)

**Merial Limited and Merial SAS** vs. Cipla Limited, Velcera, Inc., and FidoPharm, Inc. (In The United States District Court For The Middle District Of Georgia, Athens Division, Case No. 3:07-CV-125 (CDL)) (2012; injunction hearing)

Geoffrey L. Berman, Trustee of the SB Liquidation Trust vs. **Ernst & Young LLP** (International Institute For Conflict Prevention & Resolution, New York, NY) (2012)

CEATS, Inc. vs. **Continental Airlines, Inc.; Ticketmaster, L.L.C.; Tickets.com, Inc.; TicketNetwork, Inc.; TicketsNow.com, Inc.; AirTran Airways, Inc.; Alaska Airlines, Inc.; Delta Air Lines, Inc.; Jet Blue Airways Corporation; United Air Lines, Inc.; US Airways, Inc.; and Virgin America, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:10-cv-120 LED) (2012)

**Halliburton Energy Services, Inc.** vs. Weatherford International, Inc. and BJ Services Company (In The United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No. 307-cv-2144-K) (2012)

Convolve, Inc. vs. Dell, Inc., Western Digital Corporation, **Hitachi Global Storage Technologies, Inc., and Hitachi, Ltd.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-244) (2011)

Personal Audio, LLC vs. **Apple Inc.**; Sirius XM Radio, Inc.; XM Satellite Radio, Inc.; Coby Electronics, Corp.; Archos, Inc.  (United States District Court For The Eastern District Of Texas, Lufkin Division, Case 9:09-cv-00111-RC) (2011)

Bedrock Computer Technologies LLC vs. **Yahoo! Inc**.  (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:09-cv-269) (2011)

Bedrock Computer Technologies LLC vs. **Google Inc**. (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:09-cv-269) (2011)

Cheetah Omni LLC vs. **Verizon Services Corporation, Verizon Business Network Services Inc., and Verizon Enterprise Delivery LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:09-cv-260-LED) (2011)

Alexsam, Inc. vs. **IDT Corporation** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:07-CV-420-TJW) (2011)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2011)

**St. Jude Medical, Inc. and St. Jude Medical Puerto Rico LLC** vs. Access Closure, Inc.  (In The United States District Court For The Western District Of Arkansas, Texarkana Division, Case No. 4:08-cv-04101-HFB) (2010)

Affinity Labs of Texas, LLC vs. BMW North America, LLC; BMW Manufacturing Co., LLC; Hyundai Motor America, Inc.; Hyundia Motor Manufacturing Alabama, LLC; Kia Motors America, Inc.; Mercedes-Benz USA, LLC; Mercedes-Benz U.S. International, Inc.; **Volkswagen Group of America, Inc.** (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Civil Action No. 9:08-cv-164-RC) (2010)

Mirror Worlds, LLC vs. **Apple, Inc.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:08-CV-88-LED) (2010)

VirnetX Inc. and Science Applications International Corporation vs. **Microsoft Corporation** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 607CV80 (LED)) (2010)

Carpathia Hosting, Inc., Carpathia Hosting, Inc. as nominee and trustee, for Triumviri, Inc., and Triumviri, Inc. vs. **Electronic Data Systems, LLC**  (JAMS Arbitration, Washington, D.C., No. 1410005118) (2010)

HIGHLY CONFIDENTIAL

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

**Cummins-Allison Corp.** vs. Shinwoo Information & Telecommunications Co., Ltd., n/k/a SBM Co., Ltd., and Amro-Asian Trade, Inc. (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Civil Action No. 9:07cv196 and Civil Action No. 9:07cv228, Consolidated) (2009)

i4i Limited Partnership and Infrastructures for Information Inc. vs. **Microsoft Corporation** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:07-CV-113-LED) (2009)

**Paradox Security Systems, Ltd., Shmuel Hershkovitz, and Pinhas Shpater** vs. ADT Security Services, Inc., Digital Security Controls, Ltd., Monitronics International, Inc., and Protection One, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, C. A. No. 2:06-CV-462 (TJW)) (2009)

Hearing Components, Inc. vs. **Shure, Inc.** (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:07-cv-104 (RHC)) (2009)

Rambus, Inc. vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P.** (United States District Court, Northern District Of California – San Jose Division, Case No. 05 02298 RMW) (2008)

**Abbott Laboratories and TheraSense, Inc.** vs. Becton, Dickinson and Company and Nova Biomedical Corp. (In The United States District Court, Northern District of California, Civil Action No. C04-2123 WHA) (2008)

In the Matter of Certain 3G Wideband Code Division Multiple Access (WCDMA) Handsets and Components Thereof (InterDigital Communications Corporation and InterDigital Technology Corporation vs. **Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America LLC**; The United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-601) (2008)

**Bueno Conato, LLC** vs. Bajio LLC, Bajio National LLC, Bajio Franchising LLC, and Doctor's Associates, Inc. (American Arbitration Association, Western Case Management Center, Case No. 77 114 Y 00254 06 WYGI) (2008)

**Akamai Technologies, Inc. and Massachusetts Institute of Technology** vs. Limelight Networks, Inc. (In The United States District Court, District of Massachusetts, Civil Action No. 06 CA 11109 RWZ and Civil Action No. 06 CA 11585 RWZ) (2008)

**Blackboard Inc.** vs. Desire2Learn Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No 9:06CV155) (2008; trial and injunction hearing)

Applied Medical Resources Corp. vs. **United States Surgical Corporation** (In The United States District Court For The Central District Of California, Southern Division, Case No. SACV 03-1267 CJC (MLGx)) (2008)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

**Electronic Data Systems Corporation** vs. Towers, Perrin, Forster & Crosby, Inc. (American Arbitration Association Northeast Case Management Center, Case No. 13 489 Y 00146 07) (2007)

Computer Acceleration Corporation vs. **Microsoft Corporation** (In the United States District Court for the Eastern District of Texas, Lufkin Division, Civil Action No. 9:06-CV-140-RHC) (2007)

YC Partners, LTD. d/b/a Yantis Company vs. Zach Hall; **Rodman Excavation, Inc. d/b/a Rodman Companies, San Antonio Division; Rodman Utilities, L.P.; Rodman Power & Communications, LLC; Rodman Natural Resources, Inc.; Rodman Paving, Inc.** (In the District Court, Bexar County, Texas, 285th Judicial District, No. 2007-CI-03027).    (2007; hearing regarding Motion to Compel Plaintiff's Documents)

QPSX Developments 5 Pty Ltd vs. **Nortel Networks Inc.** (In the United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:05CV-268) (2007)

**AVID Identification Systems, Inc.** vs. Philips Electronics North America Corporation, Koninklijke Philips Electronics N.V., The Crystal Import Corporation, Medical Management International, Inc., and Datamars SA (In The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-183) (2006)

**TiVo Inc.** vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2006)

William Ziegler and DenLou, Inc. vs. **Synergistic International, LLC** (American Arbitration Association, Dallas, Case No.: 71 114 E 00733 04) (2005)

Dr. Phillips, Inc. vs. **Control Laser Corporation and Excel Technology, Inc.** (In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. 02-CA-000075, Division: 32, Business Court) (2005)

**William A. Wise** vs. El Paso Corporation (American Arbitration Association, Houston, Case No. 70-Y-116-00327-04) (2005)

**Aviall Services, Inc.** vs. Honeywell International, Inc. and Kelly Aerospace, Inc.  (American Arbitration Association, Los Angeles, Arbitration No. 71 Y 181 00717 03) (2005)

**MCI Worldcom Network Services, Inc.** vs. Twister Communications Network, Inc. (In the District Court of Montgomery County, Texas, 221st Judicial District, Civil Action No. 00-05-03124CV) (2005)

Kathleen C. Cailloux, Kenneth F. Cailloux, Paula L. Heilman, and Robert Stephen Andresakis vs. **Baker Botts, L.L.P.**, Wells Fargo Bank Texas, N.A., William R. Goertz, S. Stacy Eastland, and Stephen T. Dyer (In the 198th Judicial District Court of Kerr County, Texas, Civil Action No. 03-603-B) (2005)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

**Brooktrout, Inc.** vs. Eicon Networks Corporation, Eicon Networks, Inc. (In the United States District Court for the Eastern District of Texas, Marshall Division, Case Number 03-CV-59) (2004)

Colgate-Palmolive Company vs. **The Procter & Gamble Company** (In the United States District Court for the Southern District of New York, 03 Civ. 9348 (LLS) (DFE)) (2004)

**Electronic Data Systems Corp.** vs. Aspect Communications Corp. (American Arbitration Association, San Francisco, Case No. 74 Y 117 00586 03 GAP) (2004)

**PK Ventures, Inc. and Subsidiaries, PK Ventures Limited Partnership, and Robert M. Rose and Alice N. Rose** vs. Commissioner of Internal Revenue (United States Tax Court, Jacksonville, Florida, Docket Nos. 005836-99, 006395-99, and 10154-99) (2004)

**Brine, Inc. and Sports Licensing, Inc.** vs. STX, Inc. and STX, LLC (In the United States District Court for the District Massachusetts, Worchester Division, Civil Action No. 99-40167) (2003)

Teleplus, Inc., vs. **Avantel, S.A.** (In the United States District Court Western District of Texas, San Antonio Division, Civil Action No. SA-98-CA-0849 FB) (2003)

Cavalry Investments, L.L.C. vs. **Sunstar Acceptance Corporation and NationsCredit Commercial Corporation** (County Court at Law, Number 4, Dallas County, Texas, Cause No. 99-02296-D) (2003)

Steven R. Keene d/b/a Pagers Plus vs. **AT&T Wireless, Inc., a/k/a AWS National Accounts, L.L.C., and First Cellular Group of Shreveport, Inc. d/b/a AT&T Wireless Services** (Judicial Arbitration and Administration Services, Inc.) (2003)

**Poly-America, Inc.** vs. Serrot International, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:00CV1457-D) (2002)

Morgan Howard, L.L.C. vs. **Immedient, Inc.** (In the County Court at Law No. 3, Dallas County, Texas, Cause No. 01-899-C) (2002)

Andrew Cumming vs. **J. C. Penney Company, Inc.** (In the District Court of Dallas County, Texas, 160th Judicial District, Civil Action No. 71-160-00077-01) (2002)

Inter-Tel, Incorporated vs. **Bank of America, Arizona** (In the Superior Court of the State of Arizona in and for the County of Maricopa, Case No. CV 96-00867) (2002)

COC Services, Ltd. vs. **CompUSA, Inc., Grupo Carso S.A. de C.V., Grupo Sanborns S.A. de C.V., TPC Acquisition Corp., Carlos Slim Helu and James Halpin** (In the District Court 116th Judicial District of Dallas County, Texas, Case No. 0000023) (2001)

United States of America vs. **Dan Anderson** (In the United States District Court for the District of Kansas, Civil Action No. 2:99mc205 and 2:99mc207) (2000)

HIGHLY CONFIDENTIAL

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

Scott K. Ginsburg vs. **Goldman, Sachs & Co.** (Before the National Association of Securities Dealers, Inc., Dallas) (2000)

**TCP Holdings, LLC, Robert Neely, and David Thomas** vs. Tim Kirk (Before the American Arbitration Association, Dallas, Case No. 71 18000564 98) (2000)

United States of America vs. **Dan Anderson and Baptist Medical Center** (In the United States District Court for the District of Kansas, Civil Action No. 2:99mc205 and 2:99mc207) (1999; Sentencing Hearing)

In the Matter of Application No. 96-1, **Olympic Pipe Line Company**: Cross Cascade Pipeline Project (Before the State of Washington Energy Facility Site Evaluation Council) (1999)

Magnetic Technologies, S.P.R.L. vs. **Connectware, Inc.** (In the District Court Dallas County, Texas, 68th Judicial District) (1998; Daubert/Robinson Hearing Testimony and Trial Testimony)

Jeannean Heller, CRNA; Joanne Lewis, CRNA; Harold Newsom, CRNA; and Lola H. Wright, CRNA vs. **Raymond M. Dunning, Jr. and Columbia Medical Center of Lewisville Subsidiary L.P., d/b/a Columbia Medical Center of Lewisville, Dallas, Texas** (American Arbitration Association, Dallas, Texas Region) (1998)

Proposed Form A Acquisition of Control of Universal Fidelity Life Insurance Company, an Oklahoma Domestic stock insurer, by **Conseco, Inc.**, A Delaware Corporation (Before the Insurance Commissioner of the State of Oklahoma, Case No. 97-207-TRN) (1998)

Sledge W. Killion vs. **Metropolitan Life Insurance Company**, et al. (Before the National Association of Securities Dealers, Inc., Dallas, NASD Arbitration No. 95-05997) (1997)

**Reedrill Corporation** vs. Driltech, Inc. (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:95CV189) (1997)

Robert Tuck vs. **Westec Security, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC131221) (1996)

Exar Corporation vs. **SGS-Thomson Microelectronics Srl** (Court of International Arbitration of the International Chamber of Commerce, New York) (1996)

Nationwide Business Telephones and Team Centrex vs. **Introlink Communications System, Inc. and Pacific Bell, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC009783) (1996)

TriCom, Inc. vs. **Electronic Data Systems Corporation** (U.S. District Court for the Eastern District of Michigan, Southern Division, Civil Action No. 2:92CV76374) (1995)

**Rauscher, Pierce, Refsnes, Inc.** vs. Alfred W. Anderson, Jr. (Before the National Association of Securities Dealers, Inc., Dallas) (1995)

HIGHLY CONFIDENTIAL

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

**Ivy Goth** vs. City of Los Angeles and Department of Water and Power (Superior Court of the State of California for the County of Los Angeles, Case No. SC013502) (1995)

**Bio-Medical Applications Management Company, Inc.** vs. Dallas Nephrology Associates (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:94CV37) (1995)

Cybor Corporation vs. **FAS Technologies, Inc.** (U.S. District Court for the Northern District of California, San Jose, Civil Action No. 5:93CV20712) (1995)

Phillips Petroleum Company vs. **Rexene Corporation** (U.S. District Court for the District of Delaware, Civil Action No. 1:90CV208) (1994)

**Donald J. Dougher**, et al. vs. Gerard J. Dougher, Sr., et al. (Superior Court of the State of California for the County of Orange, Case No. 677451) (1994)

Texas State Bank, et al. vs. **Electronic Data Systems Corporation** (206th District Court of Hidalgo County, Texas) (1994)

**Union Oil Company of California** vs. International Insurance Company, et al. (Superior Court of the State of California) (1993)

Chroma Lighting and Charles T. Von Der Ahe vs. **GTE Products Corporation and Sylvania Lighting Services Corporation** (U.S. District Court for the Central District of California, Civil Case No. 2:91CV6424) (1993)

Arley Del Gado vs. **County of Los Angeles** (Superior Court of the State of California for the County of Los Angeles) (1993)

**Villarreal** vs. East Union High School District (Superior Court of the State of California) (1993)

**Sunbelt Television, Inc.** vs. Jones Intercable, Inc. (U.S. District Court for the Central District of California, Civil Case No. 2:91CV3506) (1992)

**Clayton Jacobson** vs. Kawasaki Heavy Industries, Ltd., Japan; Kawasaki Motors Corporation, USA; and Kawasaki Motors Manufacturing Corporation, USA (U.S. District Court for the Central District of California) (1991)

Advanced Building Maintenance, Inc. vs. **Premier Ventures, Inc., dba Premier Building Maintenance** (Superior Court of the State of California for the County of Los Angeles) (1990)

**Southwest Tank Liners** vs. Joor Manufacturing, Inc. (U.S. District Court for the Central District of California) (1990)

Deposition Testimony of Keith R. Ugone, Ph.D.

# KEITH R. UGONE, PH.D.
## DEPOSITION TESTIMONY[2]

Lorean Barrera, On Behalf Of Herself And All Others Similarly Situated And The General Public vs. **Pharmavite LLC** (United States District Court, Central District Of California, Case No. CV-11-4153 (AGRx) (2015)

Scott Miller, An Individual, On Behalf Of Himself, The General Public And Those Similarly Situated vs. **Fuhu, Inc. And Fuhu Holdings, Inc.** (United States District Court, Central District Of California, Western Division, Case No. 14-cv-6119 CAS (ASx)) (2015)

Heidi Langan, On Behalf Of Herself And All Others Similarly Situated vs. **Johnson & Johnson Consumer Companies, Inc.** (United States District Court, District Of Connecticut, Case No. 3:13-cv-01471-cv-RNC) (2015)

Mary Haley and Michael Haley, Leslie Banks and James Hal Banks, Annie Buinewicz and Brian Buinewicz, Terrence McIver and Jean Ann McIver, Susan Senyk and Christian Senyk, Mathew Deller and Renee Deller, Patricia Groome, Gary Samuels, and Marie Lohr On Behalf Of Themselves And All Others Similarly Situated vs. **Kolbe & Kolbe Millwork Co., Inc.** (United States District Court, Western District Of Wisconsin, Case Number: 14:-CV-99) (2015)

**Equistar Chemicals, LP and MSI Technology L.L.C.** vs. Westlake Chemical Corp. (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No: 6:14-cv-68) (2015)

ZiiLabs Inc., Ltd vs. **Samsung Electronics Co. Ltd., Samsung Electronics America, LLC, Samsung Telecommunications America, LLC, Samsung Austin Semiconductor, LLC**, and Apple Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:14-cv-00203) (2015)

Martin D. Schussel, Individually And On Behalf Of All Others Similarly Situated vs. **Lincoln Wood Products, Inc.** (In The United States District Court, District Of South Carolina, Charleston Division, Case No. 2:14-cv-01788-SB) (2015)

Noah Bradach, On Behalf Of Himself And All Others Similarly Situated vs. **Pharmavite LLC** (United States District Court, Central District Of California, Case No. 2:14-cv-03218-GHK (AGRx)) (2015)

ContentGuard Holdings, Inc. vs. **Amazon.com, Inc.**; Apple Inc.; Blackberry Limited (fka Research In Motion Corporation); Blackberry Corporation (fka Research In Motion Corporation); HTC Corporation; HTC America, Inc.; Huawei Technologies Co., Ltd.; Huawei Devices USA, Inc.; Motorola Mobility LLC; Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.; Samsung Telecommunications America, LLC (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:13-cv-01112-JRG) (2015)

Nathan Dapeer, on Behalf of Himself and All Others Similarly Situated vs. **Neutrogena Corporation** (United States District Court, Southern District Of Florida, No. 1:14-cv-22113-MGC) (2015)

---

[2] Deposition testimony over the 1990-2015 time period. Case citations and dates are subject to verification. **Clients bolded.**

Deposition Testimony of Keith R. Ugone, Ph.D.

Promethean Insulation Technology LLC vs. Sealed Air Corporation; **Reflectix, Inc.**; The Home Depot, Inc.; and Home Depot U.S.A., Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Cas4e No. 2:13-CV-1113) (2015)

Cardone Industries, Inc. vs. Joel Farina and **BBB Industries, LLC** (In The District Court Of Tarrant County, Texas, 17th Judicial District, Cause No. 017-271617-14) (2015)

Flo & Eddie, Inc. vs. **Sirius XM Radio Inc.** (United States District Court, Central District Of California, Case No. CV 13-05693 PSG (RZx)) (2015)

Commonwealth Scientific and Industrial Research Organisation vs. Mediatek, Inc.; Mediatek USA Inc.; Ralink Technology Corp. (USA); Ralink Technology Corp. (Taiwan); Realtek Semiconductor Corp.; Texas Instruments Inc.; Amazon.com, Inc.; **Barnes & Noble, Inc.**; Nokia Corp.; Nokia, Inc.; Samsung Electronics Co. Ltd.; Samsung Electronics America, LLC; Samsung Telecommunications America, LLC (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:12-cv-00578) (2015)

Audatex North America, Inc. vs. **Mitchell International, Inc.** (In The United States District Court For The Southern District Of California, Civil Action No. 3:13-cv-01523) (2015)

Invensys Systems, Inc. vs. **Emerson Electric Co. and Micro Motion, Inc.** (United States District Court, Eastern District Of Texas, Tyler Division, Case No.: 6:12-cv-00799-LED) (2015)

National Oilwell Varco, L.P. vs. **Omron Oilfield and Marine, Inc.** (In The United States District Court For The Western District Of Texas, Austin Division, Civil Action No. 1:12-cv-00773) (2014)

Kawasaki Heavy Industries, Ltd., a/k/a Kawasaki Jukogyo Kabushiki Kaisha and Kawasaki Motors Manufacturing Corp., U.S.A. vs. **Bombardier Recreational Products, Inc., BRP U.S., Inc., and BRP-Rotax GmbH & Co. KG a/k/a BRP-Powertrain GmbH & Co.** (Private Arbitration, Case No. 26220 CAMG) (2014)

Spherix Incorporated vs. **Verizon Services Corp.; Verizon South Inc.; Verizon Virginia LLC; Verizon Communications Inc.; Verizon Federal Inc.; Verizon Business Network Services Inc.; and MCI Communications Services, Inc.** (In The United States District Court For The Eastern District Of Virginia, Alexandria Division, Civil Action No. 1:14-cv-721-GBL-TCB) (2014)

Invue Security Products, Inc. vs. **Hangzhou Langhong Technology Co., Ltd. and Langhong Technology USA, Inc.** (In The United States District Court For The Northern District Of Texas, Fort Worth Division, Civil Action No.: 4:13-cv-457) (2014)

Smartflash LLC and Smartflash Technologies Limited vs. Apple Inc., Robot Entertainment, Inc., KingsIsle Entertainment, Inc., HTC Corporation, and **Game Circus LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-CV-447); Smartflash LLC and Smartflash Technologies Limited vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC,** HTC Corporation, HTC America, Inc., Exedea, Inc., and **Game Circus LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-CV-448) (2014)

Adaptix, Inc. vs, Alcatel-Lucent USA, Inc. and **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:12-cv-00122) (2014)

Adaptix, Inc. vs, Apple Inc. and **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Northern District Of California, San Jose Division, Civil Action No. 5:13-cv-01776-PSG); Adaptix, Inc. vs, HTC Corporation, HTC America, Inc., and **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Northern District Of California, San Jose Division, Civil Action No. 5:13-cv-01844-(PSG)); Adaptix, Inc. vs, LG Electronics, Inc., LG Electronics USA, Inc., and **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-cv-00120); Adaptix, Inc. vs, Pantech Wireless, Inc. and **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-cv-00020) (2014)

Transcenic, Inc. vs. **Google Inc.**, Microsoft Corporation, America Online, Inc., MapQuest, Inc. (In The United States District Court For The District Of Delaware, C.A. No. 11-582-LPS) (2014)

**Georgetown Rail Equipment Company** vs. Holland L.P. (United States District Court, Eastern District Of Texas, Tyler Division, Case No. 6:13-cv-366-MHS-JDL) (2014)

Uniloc USA, Inc. and Uniloc Luxembourg S.A. vs. **Activision Blizzard, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-cv-00256) (2014)

Ultratec, Inc. and CapTel, Inc. vs. **Sorenson Communications, Inc. and CaptionCall, LLC** (United States District Court, Western District Of Wisconsin, Case No.:3:13-cv-00346) (2014)

Personal Audio, LLC vs. **CBS Corporation, NBCUniversal Media, LLC, FOX Broadcasting Company, FOX Networks Group, Inc., Lotzi Digital, Inc. et al.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:13-cv-00270-JRG-RSP, 2:13-cv-00271-JRG-RSP, 2:13-cv-577-JRG-RSP, 2:13-cv-00014-JRG-RSP) (2014)

In Re **ConAgra Foods, Inc.** (Wesson Oil) (United States District Court, Central District Of California, Western District, Case No. CV 11-05379-MMM, MDL No. 2291) (2014: two depositions)

Optimize Technology Solutions, LLC vs. Staples, Inc., Dillard's, Inc., HSN, Inc., J.C.Penney Corporation, Inc., and **Recreational Equipment, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:11-CV-00419-JRG) (2014)

NuVasive, Inc. vs. **Laura Lewis** (In The United States District Court For the Western District Of Texas, Austin Division, Civil Action No. 1:12-CV-01156) (2014)

Connecticut Ironworkers Employers Association, Inc., et al. vs. **New England Regional Council of Carpenters** (United States District Court, District Of Connecticut, Docket No. 3:10-CV-165-SRU) (2014)

HIGHLY CONFIDENTIAL

**United Services Automobile Association** vs. Mitek Systems, Inc. (In The United States District Court For The Western District Of Texas, San Antonio Division, Case No. 5:12-cv-00282-FB) (2014)

Florida Atlantic University Research Corporation and Domaine Associates, LLC vs. **Acer Inc, ASUS Computer International, and TPV Technology Limited**, et al. (United States District Court, Southern District Of Florida, Case No.: 9:12-cv-80694-PAS, Case No.: 9:12-cv-80697, and Case No.: 9:12-cv-80701-PAS, respectively) (2014)

In Re: Urethanes Antitrust Litigation (Direct Action) − Carpenter Co., Woodbridge Foam Corporation, Dash Multi-Corp, Inc., et al. vs. Bayer AG, **The Dow Chemical Company**, Huntsman International LLC, Lyondell Chemical Company, BASF Corporation, et al. (In The United States District Court For The District Of Kansas, 04-MD-1616 (JWL), No. 08-2617, No. 09-2026, No. 10-2077) (2014)

Brightstar Corp. and Brightstar, US, Inc. vs. **e-Recycling, LLC** (In The Circuit Of The 11th Judicial Circuit In And For Miami-Date County, Florida, Case No. 12-08985 CA 40) (2014)

US Airways, Inc. vs. **Sabre Holdings Corporation, Sabre Inc., and Sabre Travel International Limited** (United States District Court, Southern District Of New York, Civil Action No. 1:11-cv-02725-MGC) (2014)

**ASUS Computer International** vs. Round Rock Research, LLC (United States District Court, Northern District Of California, Civil Action No. 3:12-CV-02099-JST) (2014)

Yanira Algarin and Patsy Murdock, on behalf of themselves and all others similarly situated vs. **Maybelline, LLC d/b/a Maybelline New York** (United States District Court, Southern District of California, Case No. 12CV3000 AJB DHB) (2014)

Jean Melchior vs. **Hilite International, Inc.** (United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No.: 3:11-CV-03094-M) (2014)

Becton, Dickinson and Company vs. **Insulet Corporation** (In The United States District Court For The District Of New Jersey, Case No. 2:10-cv-04371-PGS-ES) (2014)

NuVasive, Inc. vs. **Globus Medical, Inc.** (In The District Court Of Travis County, Texas, Cause No. D-1-GN-11-002134) (2013)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2013)

SimpleAir, Inc. vs. Microsoft Corporation, **Motorola Mobility, Inc., Google Inc.**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:11-cv-00416) (2013)

Ethicon Endo-Surgery, Inc. and Ethicon Endo-Surgery, LLC vs. **Covidien, Inc. and Covidien, LP** (In The United States District Court For The Southern District Of Ohio, Western Division, Civil Case No.: 1:11-cv-871) (2013)

Deposition Testimony of Keith R. Ugone, Ph.D.

Applied Medical Resources Corporation vs. **Tyco Healthcare Group LP d/b/a Covidien** (In The United States District Court For The Central District of California, Southern Division, Civil Action No.: SACV11-01406JVS (ANx)) (2013)

**Microsoft Corporation** vs. LBS Innovations LLC and LBS Innovations LLC, a Texas LLC (In the United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:12-cv-759-JRG) (2013)

**Magnum Oil Tools International, Ltd.** vs. Tony D. McClinton, JayCar Energy Group. L.L.C., Surf Frac Wellhead Equipment Company, Inc., McClinton Energy Group, L.L.C., Motors Mills Snubbing, L.L.C., and Stan Keeling (In The United States District Court For The Southern District Of Texas, Corpus Christi Division, Civil Action No: 2-12-cv-00099) (2013: two damages depositions; 2014: preliminary injunction deposition and damages deposition)

NeuStar, Inc. and Quova, Inc. vs. **F5 Networks, Inc.** (In The United States District Court For The Northern District Of California, San Jose Division, Case No. CV12-02574) (2013)

Sabatino Bianco, M.D. vs. **Globus Medical, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:12-cv-147-JRG) (2013)

**Swivelpole Group Pty Ltd. and Swivelpole Patent Pty Ltd** vs. Swivelpole USA, Ltd., Swivelpole Holdings, LLC, Swivelpole Canada Holdings, Inc., ILS Products, LLC, ILS Products Holdings, LLC, ILS Manufacturing, LLC, and Andrew Grant (In The District Court Of Harris County, Texas, 164th Judicial District, Cause No. 2012-42402) (2013)

In The Matter Of Certain Wireless Devices With 3G And/Or 4G Capabilities And Components Thereof (InterDigital Communications, Inc., InterDigital Technology Corporation, et al. vs. **Samsung Electronics Co., Ltd., Samsung Electronics American, Inc., and Samsung Telecommunications America, LLC**; United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-868) (2013)

Lodsys, LLC, et al. vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No.: 2:11-CV-90) (2013)

**One Technologies, L.P.** vs. Profinity, LLC and Chad D. Ertel (In The District Court Dallas County, Texas, 14th Judicial District, Cause No. 12-03980-A) (2013)

Eidos Display, LLC and Eidos III, LLC vs. AuOptronics Corporation, AU Optronics Corporation America, **Chimei Innolux Corporation, Chi Mei Optoelectronics USA, Inc.**, Chunghwa Picture Tubes, Ltd., Hannstar Display Corporation, and Hannspree North America, Inc. (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:11-cv-201) (2013)

Brightstar Corp. and Flipswap Services, LLC vs. **Flipswap, Inc.** (Judicial Arbitration And Mediation Services, Case No. 1460000526) (2013; three depositions)

SFA Systems, LLC vs. **Amazon.com, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:11-cv-00052) (2013)

Palomar Medical Technologies, Inc. and The General Hospital Corporation vs. **TRIA Beauty, Inc.** (In The United States District Court, District Of Massachusetts, Civil Action No. 09-CV-11081-RWZ) (2013)

Maureen Stewart, Kelly Lamicella, and Nicole Bello vs. **Beam Global Spirits & Wine, Inc., Jim Beam Brands Co., SGC Global, L.L.C., Skinny Girl Cocktails, L.L.C., and Bethenny Frankel** (United States District Court For The District Of New Jersey, Civil Action No. 1:11-cv-05149 (NLH) (KMW) (2013)

Securities and Exchange Commission vs. **Life Partners Holdings, Inc.,** Brian Pardo, R. Scott Peden, and David M. Martin (The United States District Court For The Western District of Texas, Austin Division, Civil Action No.: 1-12-cv-00033-JRN) (2013)

**St. Jude Medical, Cardiology Division, Inc., St. Jude Medical Systems AB, and St. Jude Medical S.C., Inc.** vs. Volcano Corporation (In The United States District Court For The District Of Delaware, C.A. No. 10-631-RGA) (2013)

In Re **Dial Complete** Marketing and Sales Litigation (MDL No. 2263) (United States District Court, District of New Hampshire, MDL Docket No. 11-md-2263-SM ALL CASES) (2013)

**Sound Design Technologies, Ltd.** vs. Oticon, Inc., SeboTech Hearing Systems, LLC, and Gennum Corp. (The United States District Court For The District Of Arizona, No. CV11-1375-PHX-SRB) (2013)

Lake Cherokee Hard Drive Technologies, L.L.C. vs. Bass Computers, Inc., LSI Corporation, **Marvell Semiconductor, Inc.,** Samsung Semiconductor, Inc., and Tech Data Corporation (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:10-cv-216 (TJW-CE)) (2013)

Abraham & Veneklasen Joint Venture, Abraham Equine, Inc. and Jason Abraham vs. **American Quarter Horse Association** (In The United States District Court For The Northern District Of Texas, Amarillo Division, Civil Action No. 02:12-cv-00103-J) (2013)

Hitachi Consumer Electronics Co., Ltd. and Hitachi Advanced Digital, Inc. vs. **Top Victory Electronics (Taiwan) Co. Ltd., TPV Int'l (USA), Inc., Envision Peripherals, Inc., Top Victory Electronics (Fujian) Co. Ltd., TPV Electronics (Fujian) Co. Ltd., TPV Technology Ltd., and VIZIO, Inc.** (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:10-CV-260) (2013)

SmartPhone Technologies, LLC vs. Research In Motion, Corp., **Apple, Inc.,** et al. (The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:10-CV-74-LED) (2013)

Deposition Testimony of Keith R. Ugone, Ph.D.

**Lutron Electronics Co., Inc.** vs. Crestron Electronics, Inc., Face Group, Inc. d/b/a Lifestyle Electronics, Lava Corp., Audio Vision Systems, LLC (In The United States District Court, District Of Utah, Central Division, Case: 2:09-cv-707) (2012)

Oasis Research, LLC vs. AT&T Corp., **Carbonite, Inc., EMC Corp., Decho Corp., IOMEGA Corp., GoDaddy.com, Inc., Iron Mountain Incorporated, Iron Mountain Information Management, Inc., Pro Softnet Corp.**, et al. (In The United States District Court For The Eastern District Of Texas, Sherman Division, Civil Action No. 4:10-cv-00435-MHS-ALM) (two depositions: 2012 and 2015)

Secure Axcess, LLC vs. Bank of America Corp., **Arvest Bank, Bank of the Ozarks, Inc., Compass Bancshares, Inc., First National Bank Texas, First National Bank of Omaha, Zions Bancorporation**, et al. (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:10-cv-00670) (2012)

Kehlie R. Espinosa, Lillian E. Levoff, Thomas Ganin, and Daniel Baldeschi vs. **Hyundai Motor America** (United States District Court, Central District Of California, Case No. 2:12-cv-00800 GW (FFMx)) (2012)

Axcess International, Inc. vs. **Savi Technology, Inc.** (In The United States District Court For The Northern District Of Texas, Dallas Division, Case No. 3:10-cv-01033-F) (2012)

American Airlines, Inc. vs. **Sabre Inc.**, et al. (In The Judicial District Of Tarrant County, Texas, 67th Judicial District, No. 067-249214-10) (2012)

I/P Engine, Inc. vs. AOL, Inc.; **Google Inc.**; IAC Search & Media, Inc.; Gannett Company, Inc.; and Target Corporation (In The United States District Court For The Eastern District Of Virginia, Norfolk Division, Civil Action No. 2:11-cv-512-RAJ) (2012)

Realtime Data, LLC d/b/a IXO vs. MetroPCS Texas, LLC; MetroPCS Communications, Inc.; MetroPCS Wireless, Inc.; AT&T, Inc.; AT&T Mobility LLC; **Cellco Partnership d/b/a Verizon Wireless International, Inc.**; Leap Wireless International, Inc.; Cricket Communications, Inc. a/k/a Cricket Wireless, Inc.; Sprint Nextel Corp.; and T-Mobile USA, Inc. (United States District Court, Eastern District of Texas, Tyler Division, Case No. 6:10-cv-00493-LED) (2012)

Realtime Data, LLC d/b/a IXO vs. MetroPCS Texas, LLC; MetroPCS Communications, Inc.; MetroPCS Wireless, Inc.; AT&T, Inc.; AT&T Mobility LLC; Cellco Partnership d/b/a Verizon Wireless International, Inc.; Leap Wireless International, Inc.; Cricket Communications, Inc. a/k/a Cricket Wireless, Inc.; Sprint Nextel Corp.; and **T-Mobile USA, Inc.** (United States District Court, Eastern District of Texas, Tyler Division, Case No. 6:10-cv-00493-LED) (two depositions: 2012 and 2013)

Technical Resource Services, Inc., et al. vs. **Shell Exploration & Production, Company** (In The United States District Court For The Eastern District Of Louisiana, Civil Action No. 09-7339) (2012)

U.S. Bank National Association, Litigation Trustee of the Idearc Inc.  et al. Litigation Trust vs. **Verizon Communications Inc., Verizon Financial Services, LLC, GTE Corporation**, and John W. Diercksen (In The United States District Court For The Northern District Of Texas, No. 3:10-CV-1842-G) (2012)

Eon Corp. IP Holdings, LLC vs. T-Mobile USA, Inc., Research In Motion Corporation, **Cellco Partnership d/b/a Verizon Wireless**, et al. (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:10-cv-00379-LED) (2012)

My485, Inc.  vs.  **Riverside Partners, LLC, d/b/a The Riverside Company and HealthcareFirst, Inc.** (In The District Court, 67th Judicial District, Tarrant County, Texas, Cause No. 067 251767 11) (2012)

In Re Glaceau Vitamin Water Marketing and Sales Practice Litigation (No. II): **The Coca Cola Company and Energy Brands, Inc.** (In The United States District Court, Eastern District Of New York, Case No. 1:11-md-02215-DLI-RML) (2012)

**FLIR Systems, Inc.** vs. Sierra Media, Inc. and Fluke Corporation (The United States District Court, District of Oregon, Portland Division, Case No. 3:10-CV-971-HU) (2012; two depositions)

In Re: Urethanes Antitrust Litigation (Direct Action) – Carpenter Co., Woodbridge Foam Corporation, Dash Multi-Corp, Inc., et al. vs. Bayer AG, **The Dow Chemical Company, Huntsman International LLC, Lyondell Chemical Company, BASF Corporation**, et al. (In The United States District Court For The District Of Kansas, 04-MD-1616 (JWL), No. 08-2617, No. 09-2026, No. 10-2077) (2012)

In Re: Urethanes Antitrust Litigation (Class) – Seegott Holdings, Inc., et al. vs. Bayer AG, **The Dow Chemical Company, Huntsman International LLC, Lyondell Chemical Company, BASF Corporation**, et al. (In The United States District Court For The District Of Kansas, MDL-04-1616 (JWL/JPO), No. 05-2265-JWL) (2012)

LSQ Funding Group, L.C. vs. **EDS Field Services n/k/a HP Enterprise Services, LLC** (United States District Court, Middle District Of Florida, Orlando Division, Case No.: 6:10-CV-1246-ORL-ACC-DAB) (2012)

*e*Plus Inc., vs. Lawson Software, Inc. (In The United States District Court For The Eastern District Of Virginia, Richmond Division, Civil Action No. 3:09-CV-620 (RFP)) (2012)

CardSoft, Inc. and CardSoft (Assignment For The Benefit Of Creditors), LLC vs. **VeriFone Systems Corporation; Hypercom Corporation; Ingenico S.A.; Ingenico Corp.; Ingenico Inc.**; Shera International Ltd.; and Blue Bamboo (UUSA), Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-00098) (2012)

**Mitsubishi Heavy Industries, Ltd.** vs. General Electric Co. (In The United States District Court, Middle District Of Florida, Orlando Division, Civil Action No. 6:10-cv-812) (2012)

HIGHLY CONFIDENTIAL

CEATS, Inc. vs. **Continental Airlines, Inc.; Ticketmaster, L.L.C.; Tickets.com, Inc.; TicketNetwork, Inc.; TicketsNow.com, Inc.; AirTran Airways, Inc.; Alaska Airlines, Inc.; Delta Air Lines, Inc.; Jet Blue Airways Corporation; United Air Lines, Inc.; US Airways, Inc.; and Virgin America, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:10-cv-120 LED) (2012)

W.L. Gore & Associates, Inc. vs. **GI Dynamics, Inc.** (United States District Court, District Of Arizona, No. CV 10-8088 PCT GMS) (2011)

LML Patent Corp. vs. JPMorgan Chase & Co.; **Wells Fargo Bank, N.A.; Wachovia Bank, N.A.**; Citigroup, Inc.; HSBC Bank USA, N.A.; Capital One National Association; Northern Trust Company; Deutsche Bank Trust Company; PayPal, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:08-cv-448 DF) (2011)

**Halliburton Energy Services, Inc.** vs. Weatherford International, Inc. and BJ Services Company (In The United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No. 307-cv-2144-K) (2011; two depositions)

**Tyco Healthcare Group LP and United States Surgical Corporation** vs. Ethicon Endo-Surgery, Inc. (In The United States District Court For The District Of Connecticut, Civil Action No: 3:10-cv-00060 (JBA)) (2011 and 2012; two depositions)

Curtis Berrien; Rose Huerta; Tina Musharbash; Fern Prosnitz; Michael Andler; Marcus Boness; Timothy Bonnell; Richard Buford; Elaine Cefola; Kenneth Davis; Jerome Garoutte vs. **New Raintree Resorts International, LLC; RVC Members, LLC; Douglas Y. Bech** (In The United States District Court For The Northern District Of California, Oakland Division, Case No. CV10-3125 CW) (2011)

Convolve, Inc. vs. Dell, Inc., Western Digital Corporation, **Hitachi Global Storage Technologies, Inc., and Hitachi, Ltd.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-244) (2011)

United States of America *ex rel*. Kurt Bunk and Daniel Heuser v. Birkart Globistics GMBH & Co. Logistik Und Service KG, et al. and United States of America *ex rel*. Ray Ammons v. The Pasha Group, **Gosselin World Wide Moving, N.V., and Gosselin Group, N.V.** (In The United States District Court For The Eastern District Of Virginia, Alexandria Division, No. 1.02cv1168 (AJT/TRJ)) (2011)

Cheetah Omni LLC vs. **Verizon Services Corporation, Verizon Business Network Services Inc., and Verizon Enterprise Delivery LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:09-cv-260-LED) (2011)

Eon Corp. IP Holdings, LLC vs. **Sensus USA Inc.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:09-cv-00116) (2011)

Bedrock Computer Technologies LLC vs. **SoftLayer Technologies, Inc.; CitiWare Technology Solutions, LLC; Google Inc.; Yahoo! Inc.; MySpace Inc.; Amazon.com Inc.; PayPal Inc.; Match.com, LLC; and AOL Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:09-cv-269) (2011)

Personal Audio, LLC vs. **Apple Inc.**; Sirius XM Radio, Inc.; XM Satellite Radio, Inc.; Coby Electronics, Corp.; Archos, Inc. (United States District Court For The Eastern District Of Texas, Lufkin Division, Case 9:09-cv-00111-RC) (2011)

Beneficial Innovations, Inc. vs. Blockdot, Inc.; CareerBuilder, LLC; CNET Networks, Inc.; Digg, Inc.; Ebaums's World, Inc.; Jabez Network, Inc.; **The New York Times Company**; The Washington Post Company; and The Weather Channel Interactive, Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:07-CV-263-TJW-CE) (2010)

**St. Jude Medical, Inc. and St. Jude Medical Puerto Rico LLC** vs. Access Closure, Inc. (In The United States District Court For The Western District Of Arkansas, Texarkana Division, Case No. 4:08-cv-04101-HFB) (2010)

Eon Corp. IP Holdings, LLC vs. **Verizon Clinton Center Drive Corp.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:08-cv-00385) (2010)

**Tyco Healthcare Group LP** vs. C.R. Bard, Inc. and Davol, Inc. (In The United States District Court For The District Of Delaware, C.A. No. 09-264 (SLR)(MPT)) (2010)

Affinity Labs of Texas, LLC vs. BMW North America, LLC; BMW Manufacturing Co., LLC; Hyundai Motor America, Inc.; Hyundia Motor Manufacturing Alabama, LLC; Kia Motors America, Inc.; Mercedes-Benz USA, LLC; Mercedes-Benz U.S. International, Inc.; and **Volkswagen Group of America, Inc.** (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Civil Action No. 9:08-cv-164-RC) (2010)

Mirror Worlds, LLC vs. **Apple Inc.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:08-CV-88-LED) (2010)

SP Syntax LLC and SP3 Syntax LLC vs. James Ching Hua Li, Man Kit (Thomas) Chow, Michael K. Chan, Vincent F. Sollitto, Jr, Wayne A. Pratt, John S. Hodgson, David P. Chavoustie, Christopher C. L. Liu, Alice Phang, **Ernst & Young LLP**, and Grobstein, Horwath & Company LLP (Superior Court Of The State Of California, County Of Los Angeles, Case No. BC402910) (2010)

**Gorlick Distribution Centers, LLC** vs. Car Sound Exhaust System, Inc. and Allied Exhaust Systems, Inc. (United States District Court, Western District of Washington at Seattle, Case No. C07-1076 RAJ) (2010)

Deposition Testimony of Keith R. Ugone, Ph.D.

Stacy Holk, on behalf of Herself and all others similarly situated vs. **Snapple Beverage Corporation** (United States District Court, District of New Jersey, Civil Action No. 3:07-cv-03018-MJC-JJH) and Evan Weiner and Timothy McCausland on behalf of themselves and all others similarly situated vs. Snapple Beverage Corporation (United States District Court For The Southern District Of New York, Civil Action No. 07-cv-08742) (2010)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2010; two depositions)

Good Sportsman Marketing, LLC and IP Holdings, Inc. vs. **Non Typical, Inc., Mark Cuddeback, and Richard Scales Advertising Associates, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 06:07-cv-00177-LED) (2010)

DataTreasury Corporation vs. **Wachovia Corporation, Wachovia Bank National Association**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2-06CV-072) (2009)

DataTreasury Corporation vs. **Wells Fargo & Company, Wells Fargo Bank, National Association**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2-06CV-072) (2009)

Carpathia Hosting, Inc., Carpathia Hosting, Inc. as nominee and trustee, for Triumviri, Inc., and Triumviri, Inc. vs. Brookshire Enterprises, LLC, Custom Computer Cable, Inc., Jackson Browne, LLC, Courtney Matthews, and **Electronic Data Systems, LLC** (Virginia: In The Circuit Court For Loudoun County, Civil Case No. CL 46964) (2009)

MHL Tek, LLC vs. Nissan Motor Co., Nissan North America, Inc., Nissan Technical Center North America, Inc., Hyundai Motor Co., Hyundai Motor America, Hyundai Motor Manufacturing Alabama, LLC, Kia Motors Corporation, Kia Motors America, Inc., Dr. Ing. H.C.F. Porsche AG, Porsche Cars North America, Inc., Bayerische Motoren Werke AG, BMW of North America LLC, BMW Manufacturing Co., LLC, Isuzu Motors Ltd., Isuzu Motors America, Inc., Subaru of America, Inc., Subaru of Indiana Automotive, Inc., **Audi AG, Volkswagen AG, and Volkswagen Group of America, Inc.** (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2:07-cv-289-TJW) (2009)

**Crane Co. and Dixie-Narco Inc.** vs. SandenVendo America, Inc. and Royal Vendors, Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2:07-cv-42) (2009)

**LG Electronics Inc.** vs. Hitachi, Ltd., Hitachi Automotive Products (USA), Inc., Clarion Co. Ltd., Clarion Corporation of America and Xanavi Informatics Corporation. (In The United States District Court, Eastern District Of Texas, Texarkana Division, Civil Action No. 5:07-CV-90) (2009)

**Paradox Security Systems, Ltd., Shmuel Hershkovitz, and Pinhas Shpater** vs. ADT Security Services, Inc., Digital Security Controls, Ltd., Monitronics International, Inc., and Protection One, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, C. A. No. 2:06-CV-462 (TJW)) (2009)

i4i Limited Partnership and Infrastructures for Information Inc. vs. **Microsoft Corporation** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:07-CV-113-LED) (2009)

**The Compliance Source, Inc. and Digital Docs, Inc.** vs. GreenPoint Mortgage Funding, Inc. (In The United States District Court, Northern District Of Texas, Dallas Division, Civil Action No. 3-06-cv1057-L (ECF)) (2008)

Hearing Components, Inc. vs. **Shure, Inc.** (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:07-cv-104 (RHC)) (2008)

**Lutron Electronics Co. Inc.** vs. Control4 Corporation (In The United States District Court For The District Of Utah, Central Division, Civil Action No. 2-03-CV-00401 DAK) (2008)

ELB Enterprises of Dallas, L.P. and Bai-Mac, Inc. vs. **McDonald's Corporation, McDonald's USA, LLC, and Golden Arch of Texas, Inc., and Ricardo Colon** (In The Court At Law, Court No. 4, Dallas County, Texas, Cause No. CC-06-17226-D) (2008)

Rambus, Inc. vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P.** (United States District Court, Northern District Of California – San Jose Division, Case No. 05 02298 RMW) (2008)

**TiVo Inc.** vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2008)

Iovate Health Sciences, Inc., University of Florida Research Foundation, Inc. and Flamma SpA vs. **Bio-Engineered Supplements & Nutrition, Inc., d/b/a BSN, Inc.** and Medical Research Institute (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Case No. 9:07-cv-46) (2008)

Ronald A. Katz Technology Licensing, L.P. vs. **The DIRECTV Group, Inc., DIRECTV, Inc., DIRECTV Holdings, LLC, DIRECTV Enterprises, LLC, and DIRECTV Customer Services, Inc.** (In The United States District Court, Central District of California, Case No. 2:07-CV2322 RGK (FFMx) and Case No. 2:07-ML-1816-B RGK (FFMx), originally filed in the Eastern District of Texas as Case No. 9:06-CV-00193-RHC) (2008)

Quantum Unlimited, LLC, Quantum of Troon North, LLC, and Redsky Resorts of Troon North, LLC n/k/a Redsky Resorts, LLC vs. **Wyndham International, Inc.**, Tempus Resorts International, Ltd, **The Blackstone Group L.P.**, et al. (In The District Court Of Dallas County, Texas, 298th Judicial District) (2008)

**Deposition Testimony of Keith R. Ugone, Ph.D.**

In the Matter of Certain 3G Wideband Code Division Multiple Access (WCDMA) Handsets and Components Thereof (InterDigital Communications Corporation and InterDigital Technology Corporation vs. **Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America LLC**; The United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-601) (2008; two depositions)

**Bueno Conato, LLC** vs. Bajio LLC, Bajio National LLC, Bajio Franchising LLC, and Doctor's Associates, Inc. (American Arbitration Association, Western Case Management Center, Case No. 77 114 Y 00254 06 WYGI) (2008)

O$_2$Micro International Limited vs. **Rohm Co. Ltd.**, Sony Corporation, Sony EMCS Corporation, Sony Corporation of America, and Sony Electronics Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Case No. 2-05-CV-00211-TJW) (2008)

**Blackboard Inc.** vs. Desire2Learn Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No 9:06CV155) (2008)

**Abbott Laboratories and Abbott Diabetes Care Inc.** vs. Roche Diagnostics Corporation, Roche Diagnostics Operations, Inc., and Bayer Healthcare LLC; Abbott Laboratories and TheraSense, Inc. vs. Becton, Dickinson and Company and Nova Biomedical Corp. (In The United States District Court, Northern District of California, Civil Action No. C04-2123 MJJ, Civil Action No. C04-3327 MJJ, Civil Action No. C04-3732 MJJ, and Civil Action No. C05-3117 MJJ) (2008; two depositions)

United States of America, ex rel Toni R. Barron and Vicky J. Scheel vs. Deloitte & Touche, LLP, Deloitte Touche Consulting Group, LLC, Deloitte & Touche Consulting Group Holding, LLC, Medicaid Solutions of Texas, and **National Heritage Insurance Company** (In The United States District Court, Western District of Texas, Civil Action No. SA-99-CV-1093FB) (2007)

**Akamai Technologies, Inc. and Massachusetts Institute of Technology** vs. Limelight Networks, Inc. (In The United States District Court, District of Massachusetts, Civil Action No. 06 CA 11109 RWZ and Civil Action No. 06 CA 11585 RWZ) (2007)

**Electronic Data Systems Corporation** vs. Towers, Perrin, Forster & Crosby, Inc. (American Arbitration Association Northeast Case Management Center, Case No. 13 489 Y 00146 07) (2007)

Computer Acceleration Corporation vs. **Microsoft Corporation** (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:06CV140-RHC) (2007)

**Tinkers & Chance** vs. LeapFrog Enterprises, Inc. (In The United States District Court, Eastern District of Texas, Marshall Division, Civil Action No. 2-05cv-349-TJW) (2007)

**DEJ Productions, Inc., Blockbuster Inc., and First Look Studios, Inc.** vs. Media 8 Entertainment and MDP Distribution, Inc. (In The District Court of Dallas County, Texas, M-298[th] Judicial District, Cause No. 06-01887) (2007)

Art International Forwarding, Inc. vs. **The Pasha Group and Gosselin Worldwide Moving, N.V.** (In The United States District Court, Eastern District of Missouri, Eastern Division, Case No. 4:05-CV-01410-RWS) (2007)

Applied Medical Resources Corp. vs. **United States Surgical Corporation** (In The United States District Court For The Central District Of California, Southern Division, Case No. SACV 03-1267 CJC (MLGx)) (2007)

**Nike, Inc.** vs. adidas Salomon North America, Inc., adidas America Inc. d/b/a adidas International, and adidas Promotional Retail Operations Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No. 9:06-cv-43-RHC) (2007)

**BIAX Corporation** vs. Intel Corporation and Analog Devices, Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2-05cv-184-TJW) (2007)

Two-Way Media, LLC vs. **America Online, Inc.** (In The United States District Court For The Southern District of Texas, Corpus Christi Division, Civil Action No. C-04-089) (2007)

In re Enron Corporation Securities Litigation; Kevin Lamkin, Janice Schuette, Robert Ferrell and Stephen Miller vs. **UBS Financial Services, Inc. and UBS Securities LLC** (Civil Action No. H:02-CV-0851; Consolidated MDL) and Samuel Giancarlo vs. **UBS Financial Services, Inc., UBS Securities LLC., and UBS AG** (Civil Action No. H-03-4359; Consolidated MDL) (In The United States District Court For The Southern District of Texas, Houston Division) (2007)

O$_2$Micro International Limited vs. **Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.** (In The United States District Court For The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-323 (Ward)) (2007)

CNX Gas Corporation and CNX Gas Company LLC vs. **CDX Gas Company LLC** vs. CONSOL Energy, Inc. (In The United States District Court For The Western District of Pennsylvania, Civil Action No. 05-CV-1574) (2007)

**Parkade Center, Inc.** vs. Simon Property Group (Texas), L.P. and Simon Property Group (Delaware), Inc. (In The District Court 398th Judicial District of Hildalgo County, Texas, Cause No. C-2584-06-1) (2007)

The Post Confirmation Trust (The Fleming Companies) vs. **Digital Exchange Systems, Inc.** (In The United States District Court for the Eastern District of Texas, Texarkana Division, No. 5:05-CV-165(TJW)) (2007)

Golden Bridge Technology, Inc. vs. **Nokia, Inc., Motorola, Inc., T-Mobile USA, Inc., Ericsson, Inc., Qualcomm Incorporated, and Lucent Technologies, Inc.** (In The United States District Court for the Eastern District of Texas, Tyler Division, Civil Action No: 6:06-cv-00163-LED) (2006)

John P. Rochon, Nick G. Bouras, Nu-Kote International, Inc., J.R. Investment Corporation, Richmont Corporation and Nu-Kote Acquisition Corporation vs. **Akin Gump Strauss Hauer & Feld, LLP and Alan Feld** (In The District Court of Dallas County, Texas, 192nd Judicial District, Cause No. 04-03311-K) (2006)

**Autobytel Inc.** vs. Dealix Corporation (United States District Court Eastern District of Texas, Marshall Division, Case No. 2:04-cv-338-LED) (2006)

**Electronic Data Systems Corporation and EDS Information Systems, L.L.C.** vs. MCI Communications Services, Inc. (Before the American Arbitration Association, Arbitration No. 13 181 00976 06) (2006)

Jeffrey A. Kozak vs. **Medtronic Sofamor Danek** (In The United States District Court for the Southern District of Texas, Houston Division, Civil Action Number H-03-4400) (2006)

Alcon Manufacturing, Ltd. and Alcon Laboratories, Inc. v. **Advanced Medical Optics, Inc.** (In The United States District Court for the Northern District of Texas, Fort Worth Division, Civil Action No. 4-05CV-496-A) (2006)

Eckhard U. Alt, MD vs. **Medtronic, Inc.** (In The United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:04CV370) (2006)

**AVID Identification Systems, Inc.** vs. Philips Electronics North America Corporation, Koninklijke Philips Electronics N.V., The Crystal Import Corporation, Medical Management International, Inc., and Datamars SA (In The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-183) (2006)

In re: **Williams** Securities Litigation (WCG Subclass) (In The United States District Court for the Northern District of Oklahoma, Case No. 02-CV-72H(M)) (2006)

Immunocept, LLC, Patrice Anne Lee, and James Reese Matson vs. **Fulbright & Jaworski, LLP** (United States District Court Western District of Texas, Austin Division, Cause No. A 05 CA 334 SS) (2006)

Children's Medical Center of Dallas vs. **Columbia Hospital at Medical Center Dallas Subsidiary L.P.** (In The United States District Court Northern District Of Texas, Dallas Division, Civil Action No. 3:04-CV-2436-BD) (2006)

Vantage Controls, Inc. vs. **Lutron Electronics Co., Inc.** (In The United States District Court for the District of Utah, Central Division, Case No. 2:03-CV-00488TC) (2006)

Blueberry Sales, L.P., f/k/a Blueberry Confections, Inc. vs. **ED&F Man Sugar, Inc.** (United States District Court for the Western District of Texas, El Paso Division, EP-04-CA0193) (2005)

**Cummins-Allison Corp.** vs. Glory LTD., Glory Shoji Co., LTD., and Glory (U.S.A.), Inc. (United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2-03-CV-358 (TJW)) (2005)

Deposition Testimony of Keith R. Ugone, Ph.D.

Gilbert R. Sada and Victor L. Hernandez vs. **Jack In The Box Inc.** (United States District Court for the Western District of Texas, San Antonio Division. Civil Action No. SA04CA0541 (OG)) (2005)

Trinity Mother Frances Health System and Mother Frances Hospital vs. **East Texas Medical Center Regional Healthcare System and East Texas Medical Center** (United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:03CV464) (2005)

**TiVo Inc.** vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2005; two depositions)

William Rutledge Scott, Individually and as Independent Executor of the Estate of Mozelle Rutledge Scott, Deceased vs. **Hughes & Luce, L.L.P., Kathryn G. Henkel, and Laurel Stephenson** (In the County Court of Tom Green County, Texas, Cause No. 02P211-L) (2005)

Junitha Bee, et al. vs. Kavilico Corporation, ITT Neodyne, **Parker Hannifin**, and the Boeing Company (Superior Court of the State of California, County of Los Angeles, Case No. C99-589C) (2005)

**William A. Wise** vs. El Paso Corporation (American Arbitration Association, Houston, Case No. 70-Y-116-00327-04) (2005)

Dr. Phillips, Inc. vs. **Control Laser Corporation and Excel Technology, Inc.** (In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. 02-CA-000075, Division: 32, Business Court) (2005)

MOSAID Technologies Incorporated vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P.** (In the United States District Court for the District of New Jersey, Civil Action No. 01-4340 (WJM)) (2004)

Kathleen C. Cailloux, Kenneth F. Cailloux, Paula L. Heilman, and Robert Stephen Andresakis vs. **Baker Botts, L.L.P.**, Wells Fargo Bank Texas, N.A., William R. Goertz, S. Stacy Eastland, and Stephen T. Dyer (In the 198th Judicial District Court of Kerr County, Texas, Civil Action No. 03-603-B) (2004)

**Brooktrout, Inc.** vs. Eicon Networks Corporation, Eicon Networks, Inc. (In the United States District Court for the Eastern District of Texas, Marshall Division, Case Number 03-CV-59) (2004)

**MCI Worldcom Network Services, Inc.** vs. Twister Communications Network, Inc. (In the District Court of Montgomery County, Texas, 221st Judicial District, Civil Action No. 00-05-03124CV) (2004)

Colgate-Palmolive Company vs. **The Procter & Gamble Company** (In the United States District Court for the Southern District of New York, 03 Civ. 9348 (LLS) (DFE)) (2004)

Deposition Testimony of Keith R. Ugone, Ph.D.

Airbel Wireless, Inc. and JAVS Telecom, Inc. vs. **AT&T Wireless Services, Inc.** (American Arbitration Association, New York, Case No. 13 Y 199 00709 03) (2004)

**Electronic Data Systems Corp.** vs. Aspect Communications Corp. (American Arbitration Association, San Francisco, Case No. 74 Y 117 00586 03 GAP) (2003 and 2004; two depositions)

Anthony Stella and Mary S. Stella, Individually and on Behalf of all Persons Similarly Situated in the State of Texas vs. **Grant Thorton, L.L.P.** (In the District Court of Galveston County, 212th Judicial District) (2003)

Administaff, Inc. and Administaff of Texas, Inc. vs. **Aetna Life Insurance Company** (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:01CV3802) (2003)

GATT Trading, Inc. vs. **Sears, Roebuck and Co.** (In the United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:01CV260) (2003)

**IEX Corporation** vs. Blue Pumpkin Software, Inc. (In the United States District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:01CV16) (2003 and 2005; two depositions)

Steven R. Keene d/b/a Pagers Plus vs. **AT&T Wireless, Inc., a/k/a AWS National Accounts, L.L.C., and First Cellular Group of Shreveport, Inc. d/b/a AT&T Wireless Services** (Judicial Arbitration and Administration Services, Inc.) (2003)

Teleplus, Inc., vs. **MCI Telecommunications Corporation, MCI International Telecommunications Corporation, MCI International Inc., MCI Communications Corporation, MCI Worldcom, Inc., MCI Global Support Corporation, MCI Global Access Corporation, and Avantel, S.A.** (In the United States District Court Western District of Texas, San Antonio Division, Civil Action No. SA-98-CA-0849 FB) (2003)

Cavalry Investments, L.L.C. vs. **Sunstar Acceptance Corporation and NationsCredit Commercial Corporation** (County Court at Law, Number 4, Dallas County, Texas, Cause No. 99-02296-D) (2002)

Customedia Technologies, LLC and William H. Lewis vs. Joby Hughes, Felsman, Bradley, Gunter & Dillon, Stephen Perkins, **Sidley & Austin**, Litigation Risk Management, Inc., and Granite Ventures, Inc. (In the District Court of Harris County, Texas, 125th Judicial District, Case No. 2000-26667) (2002 and 2003; two depositions)

Edward Ahearn vs. **Ernst & Young, L.L.P.** (Before the American Arbitration Association, Case No. 13-107-00136-01) (2002)

John H. Houser and Frederick A. Raffa vs. **Wachovia Corporation** (In the United States District Court, Middle District of Florida, Tampa Division, Case No. 8:01-CV1041-T-17MSS) (2002)

HIGHLY CONFIDENTIAL

Deposition Testimony of Keith R. Ugone, Ph.D.

**Brine, Inc. and Sports Licensing, Inc.** vs. STX, Inc. and STX, LLC (In the United States District Court for the District Massachusetts, Worchester Division, Civil Action No. 99-40167) (2002 and 2003; two depositions)

Morgan Howard, L.L.C. vs. **Immedient, Inc.** (In the County Court at Law No. 3, Dallas County, Texas, Cause No. 01-899-C) (2002)

**Poly-America, Inc.** vs. Serrot International, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:00CV1457-D) (2002)

Andrew Cumming vs. **J. C. Penney Company, Inc.** (In the District Court of Dallas County, Texas, 160th Judicial District, Civil Action No. 71-160-00077-01) (2002)

Inter-Tel, Incorporated vs. **Bank of America, Arizona** (In the Superior Court of the State of Arizona in and for the County of Maricopa, Case No. CV 96-00867) (2002)

Tyler Jet, L.L.C., TeamXtreme Racing, L.L.C., and Burl Outlaw vs. **Lycos, Inc.** (In the United States District Court for the Eastern District of Texas, Lufkin Division, Civil Action No. 9:00CV-179) (2001)

EPI Environmental Products, Inc. vs. **In-Line Plastics, L.C.** (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:98CV4209) (2001)

Health Laboratories of North America, Inc., et al. vs. **Neodata Services, Inc.** (In the Superior Court of the State of Arizona In and For the County of Maricopa, Civil Action No. CV1998-008143) (2001)

Acres Gaming Inc. vs. Mikohn Gaming Corporation and **Casino Data Systems** (In the United States District Court District of Nevada, Civil Action No. CV-S-01462-PMP (RJJ)) (2000)

COC Services, Ltd. vs. **CompUSA, Inc., Grupo Carso S.A. de C.V., Grupo Sanborns S.A. de C.V.**, et. al. (In the District Court 116th Judicial District of Dallas County, Texas, Case No. 0000023) (2000)

Healthtech Diagnostics, Corporation and Oncogenetics, Inc. vs. **Impath, Inc. and Impath-HDC, Inc.** (In the District Court of Dallas County, Texas, L-193[rd] Judicial District, Case No. 97-08552) (2000)

Pacific Southwest Bank and NAFCO Holding Company, LLC vs. **Electronic Data Systems Corporation** (In the District Court of Dallas County, Texas, 191st Judicial District, Cause No. 98-5954) (2000)

Anthony D. Viazis, et. al. vs. **American Association of Orthodontists**, et. al. (In the United States District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:98-CV-245) (2000)

**Kvaerner Oilfield Products, Inc.** vs. Cooper Cameron Corp. (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-98-3369) (2000)

**Deposition Testimony of Keith R. Ugone, Ph.D.**

J.V. Smith, et al. vs. Randyl Louis Harrell, **Enterprise Products Company**, et. al. (In the District Court of Liberty County, Texas, 75th Judicial District) (2000)

Norman Yourish, et. al. vs. **California Amplifier**, et. al. (Superior Court of the State of California for the County of Ventura, Civil Action No. CIV173569) (2000)

David Kimberly Hackett, individually and Samuel G. Swope, individually and as Assignees of Courtesy Auto Group, Inc. vs. **Electronic Data Systems, Inc.** (In the United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 98-1065-CIV-19-A) (2000)

County Council of Northampton County vs. **SHL Systemhouse Corp.** vs. Northampton County (In the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 98-CV-0088) (1999)

**Natural Reserves Group, Inc.** vs. Baker Hughes, Inc., et. al. (In the United States District Court for the Southern District of Texas, Harris County Division, Civil Action No. 96-31380) (1999)

**BeautiControl, Inc.** vs. Ryco Packaging Corp. vs. Arrowpak, Inc. and Custom Decorative Systems, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3-98CV1775-H) (1999)

Peoples National Bank, Peoples National Mortgage Corp., and Texas Peoples National Bancshares, Inc. vs. Russell A. McClendon, **St. Paul Mercury Insurance Company**, Smith-Reagan Life and Health Insurance Agency, Inc. and Gary Robertson (In the District Court Lamar County, Texas, 62nd Judicial District) (1999)

In the Matter of Application No. 96-1, **Olympic Pipe Line Company**: Cross Cascade Pipeline Project (Before the State of Washington Energy Facility Site Evaluation Council) (1999)

Petrofac, Inc. and Petrofac International, Ltd. vs. **Howe-Baker Engineers, Inc. and Omar J. Ghalayini** (In the County Court at Law; Smith County, Texas, Cause No. 39,839) (1998)

L & S Concrete Company, Inc., Gilliam Brothers, Inc., Webco, Inc., Charles T. Weaver, Gus Blass, III, Bob Townsell, Alex Lieblong, and Dr. Thomas Robinson vs. **Trans World Airlines, Inc.** (In the United States District Court for the Eastern District of Arkansas Western Division, Case No. Civ-97-378) (1998)

Magnetic Technologies, S.P.R.L. vs. **Connectware, Inc.** (In the District Court Dallas County, Texas, 68th Judicial District) (1998)

Jeannean Heller, CRNA; Joanne Lewis, CRNA; Harold Newsom, CRNA; and Lola H. Wright, CRNA vs. **Raymond M. Dunning, Jr. and Columbia Medical Center of Lewisville Subsidiary L.P., d/b/a Columbia Medical Center of Lewisville, Dallas, Texas** (American Arbitration Association, Dallas, Texas Region) (1998)

HIGHLY CONFIDENTIAL

Proposed Form A Acquisition of Control of Universal Fidelity Life Insurance Company, an Oklahoma Domestic stock insurer, by **Conseco, Inc.**, A Delaware Corporation (Before the Insurance Commissioner of the State of Oklahoma, Case No. 97-207-TRN) (1997)

**Excel Telecommunications, Inc., Excel Communications, Inc., Steve Smith, and Kenny Troutt** vs. Linden Wood, Brad Campbell, Candy Campbell, Jerry Szeszulski, and Team Excel of Independent Representatives (American Arbitration Association, Dallas, Texas Region) (1997)

**Gourmet Award Foods** vs. Continental Extrusion, Genpak Corporation, and Heartland Packaging Corporation (Judicial District Court of Dallas County, Texas, D-95[th] Judicial District) (1997)

L. Anne H. Frazier vs. **Owsley Brown Frazier** (Jefferson Family Court, Division Eight; Louisville, Kentucky, Case No. 94-FD-01957) (1997)

Dodee Frost Crockett vs. **Randy Miller and Gina Kaiser** (In the District Court of Dallas County, Texas; 192nd Judicial District) (1996)

**Reedrill Corporation** vs. Driltech, Inc. (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:95CV189) (1996)

Robert Tuck vs. **Westec Security, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC131221) (1996)

James Hylsky and Terri Hylsky vs. **Fruehauf Trailer Corporation**, et. al. (In the Circuit Court Twentieth Judicial Circuit St. Clair County, Illinois) (1996)

In Re: **CSC Industries, Inc.** and In Re: **Copperweld Steel Company** (In the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division, Civil Case No. 4:93bk41898) (1996)

Nationwide Business Telephones and Team Centrex vs. **Introlink Communications System, Inc. and Pacific Bell, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC009783) (1996)

TriCom, Inc. vs. **Electronic Data Systems Corporation** (U.S. District Court for the Eastern District of Michigan, Southern Division, Civil Action No. 2:92CV76374) (1995)

Lacerta Enterprises, Inc. dba Frontline Systems, Inc. vs. **Geac Computers, Inc. and Fasfax Corporation** (U.S. District Court for the District of Arizona, Case No. CIV 95-0649 PHX (ROS)) (1995)

Bluebonnet Savings Bank, et. al. vs. **Federal Deposit Insurance Corporation**, et. al. (U.S. District Court for the Northern District of Texas, Dallas, Civil Action No. 3:91CV1066) (1995)

Circo Craft Company, Inc. vs. **AMP-AKZO Corporation**, et. al. (Superior Court of the State of California for the County of San Diego, North County District) (1995)

Deposition Testimony of Keith R. Ugone, Ph.D.

BancTec USA, Inc. vs. **Advanced Financial Solutions**, et. al. (U.S. District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:93CV1277) (1994)

**Ivy Goth** vs. Datsun-Nissan Motor Company, Ltd., et. al. (Superior Court of the State of California for the County of Los Angeles, Case No. SC013502) (1994)

Cybor Corporation vs. **FAS Technologies and FAStar Ltd.** (U.S. District Court for the Northern District of California, San Jose, Civil Action No. 5:93CV20712) (1994)

Texas State Bank, et. al. vs. **Electronic Data Systems Corporation** (206th District Court of Hidalgo County, Texas) (1994; two depositions)

Auto Color Specialists, Inc. and Polly Chen vs. **BASF** (Superior Court of the State of California for the County of Orange, Case No. 677861) (1994)

**Tactical Edge, Inc.** vs. Gall's, Inc. (District Court of the Fourth Judicial District of the State of Idaho in and for the County of Ada) (1994)

Arley Del Gado vs. **County of Los Angeles** (Superior Court of the State of California for the County of Los Angeles) (1993)

Dominquez vs. **Holy Cross Hospital** (Superior Court of the State of California for the County of Los Angeles) (1993)

**Union Oil Company of California** vs. International Insurance Company, et. al. (Superior Court of the State of California) (1993)

Maranatha Music! vs. **Capital Cities, Inc./ABC, Inc., and Word, Inc.** (U.S. District Court for the Western District of Texas, Waco Division) (1993)

**Villarreal** vs. East Side Union High School District (Superior Court of the State of California) (1993)

Official Committee of Creditors Holding Unsecured Claims on behalf of First Capital Holdings Corporation vs. **Shearson Lehman Brothers Holdings Inc.**, et. al. (U.S. District Court for the Central District of California) (1993)

Chroma Lighting and Charles T. Von Der Ahe vs. **GTE Products Corporation and Sylvania Lighting Services Corporation** (U.S. District Court for the Central District of California, Civil Case No. 2:91CV6424) (1993; three depositions)

**Sunbelt Television, Inc.** vs. Jones Intercable, Inc. (U.S. District Court for the Central District of California, Civil Case No. 2:91CV3506) (1992)

Holabird Sports Discounters vs. **Tennis Tutor, Inc.** (U.S. District Court for the District of Maryland, Civil Action No. 1:91CV2208) (1992)

Expo-Tech Electrical & Plumbing Services vs. **Greyhound Exposition Services** (1992)

Deposition Testimony of Keith R. Ugone, Ph.D.

**De Laurentiis Entertainment Group, Inc.** Securities Litigation; **De Laurentiis Film Partners** Securities Litigation (U.S. District Court for the Central District of California) (1991; two depositions)

James T. Ryan vs. **Crowley Towing and Transportation and Shell Oil Company** (Superior Court of the State of California for the County of Los Angeles) (1991)

**Clayton Jacobson** vs. Kawasaki Heavy Industries, Ltd., Japan; Kawasaki Motors Corporation, USA; and Kawasaki Motors Manufacturing Corporation, USA (U.S. District Court for the Central District of California) (1991)

Advanced Building Maintenance, Inc., vs. **Premier Ventures, Inc., dba Premier Building Maintenance** (Superior Court of the State of California for the County of Los Angeles) (1990)

Frank V. and Gloria Lumbert vs. **Robert C. Skinner and Lillian R. Skinner**, et. al. (Superior Court of the State of California for the County of Los Angeles) (1990)

Plaintiff vs. **Valley Hunt Club**, Tournament of Roses, et. al. (Superior Court of the State of California) (1990)

Kippy Thomas vs. **Mary Lendo and Circle K**, (Superior Court of the State of California for the County of Riverside) (1990)

# Exhibit 3

HIGHLY CONFIDENTIAL

# Facts, Data, and Other Information Received (Khasin v. Bigelow)

| Description | Bates Prefix | Start | End |
|---|---|---|---|

## Legal Documents

Amended Civil Pretrial Order and Associated Exhibits in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District 12-cv-02204-WHO)

Amended Class Action and Representative Action Fourth Amended Complaint for Damages, Equitable and Injunctive Relief in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 3:12-cv-02204-JSW)

Amended Class Action and Representative Action Third Amended Complaint for Damages, Equitable and Injunctive Relief and Associated Exhibits in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 3:12-cv-02204-JSW)

Corrected Plaintiff's Motion for Class Certification, for Appointment of Class Counsel in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 3:12-cv-2204)

Declaration of Alex Khasin dated September 9, 2015 in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 3:12-cv-02204-WHO)

Declaration of Brian Herrington in Support of Plaintiff's Motion for Class Certification, for Appointment of Class Representatives, and for Appointment of Class Counsel in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 3:12-cv-2204)

Declaration of J. Price Coleman in Support of Plaintiff's Motion for Class Certification, for Appointment of Class Representatives, and for Appointment of Class Counsel in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 3:12-cv-02204-WHO)

Declaration of Pierce Gore in Support of Plaintiff's Motion for Class Certification, for Appointment of Class Representatives, and for Appointment of Class Counsel in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 3:12-cv-2204)

Defendant's Answer to Plaintiff's Fourth Amended Complaint and Affirmative Defenses in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division 3:12-cv-02204-WHO)

Defendant's Response to Plaintiff Alex in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court Northern District of California, San Francisco Division, cv12-02204-WHO)

Defendant's Response to Plaintiff Alex Khasin's Interrogatories, Set Two in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 12-cv-02204-WHO (lead), 13-cv-02976-WHO)

Defendant's Response to Plaintiff Alex Khasin's Request for Production, Set One in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, cv12-02204-WHO)

Order Regarding Dispute Over Discovery of Profits in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, 12-cv-02204-WHO)

Plaintiff's Declaration in Support of Motion for Class Certification in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 3:12-cv-02204-WHO)

Plaintiff's Motion for Class Certification, for Appointment of Class Representatives, and for Appointment of Class Counsel in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 3:12-cv-2204)

# Facts, Data, and Other Information Received (Khasin v. Bigelow)

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| Plaintiff's Response to First Set of Interrogatories Propounded by Defendant in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 3:12-cv-02204-WHO) | | | |
| Plaintiff's Response to First Set of Requests for Production of Documents Propounded by Defendant in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 3:12-cv-02204-WHO) | | | |
| Proposed Order Granting Plaintiff's Motion for Class Certification, for Appointment of Class Representatives, and for Appointment of Class Counsel in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 3:12-cv-2204) | | | |

### Deposition Transcripts and Associated Exhibits

| 30(b)(6) Deposition of R.C. Bigelow, Inc. by Chris Costello taken March 19, 2015 and Associated Exhibits | | | |
| 30(b)(6) Deposition of R.C. Bigelow, Inc. by John McCraw taken March 19, 2015 and Associated Exhibits | | | |
| Deposition of Alex Khasin taken September 30, 2015 and Associated Exhibits | | | |

### Expert Reports and Associated Documentation

| Corrected Declaration of F. Edward Scarbrough in Support of Plaintiff's Motion for Class Certification, for Appointment of Class Representatives, and for Appointment of Class Counsel in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 3:12-cv-2204) | | | |
| Declaration of F. Edward Scarbrough in Support of Plaintiff's Motion for Class Certification, for Appointment of Class Counsel in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 3:12-cv-2204) | | | |
| Declaration of Neal H. Hooker in Support of Plaintiff's Motion for Class Certification, for Appointment of Class Representatives, and for Appointment of Class Counsel in the Alex Khasin v. R.C. Bigelow, Inc. Matter (U.S. District Court, Northern District of California, San Francisco Division, 3:12-cv-2204) | | | |

### Documents Produced by Bigelow

| Nielsen Data (CA data price comparisons Sept 2015.xlsx) | | | |
| Bigelow Green Tea Sales for California Table (RCB-GT 000001.xlsx) | RCB-GT | 000001 | 000001 |
| Bigelow Product Labels | RCB-GT | 001722 | 001722 |
| Bigelow Product Labels | RCB-GT | 001753 | 001753 |
| Bigelow Product Labels | RCB-GT | 001754 | 001754 |
| Bigelow Product Labels | RCB-GT | 001755 | 001755 |
| Bigelow Product Labels | RCB-GT | 001756 | 001756 |
| Bigelow Product Labels | RCB-GT | 001757 | 001757 |
| Bigelow Product Labels | RCB-GT | 001758 | 001758 |
| Bigelow Product Labels | RCB-GT | 001759 | 001759 |

HIGHLY CONFIDENTIAL

# Facts, Data, and Other Information Received (Khasin v. Bigelow)

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| Bigelow Product Labels | RCB-GT | 001760 | 001760 |
| Bigelow Product Labels | RCB-GT | 001762 | 001762 |
| Bigelow Product Labels | RCB-GT | 001763 | 001763 |
| Bigelow Product Labels | RCB-GT | 001764 | 001764 |
| Bigelow Product Labels | RCB-GT | 001765 | 001765 |
| Bigelow Product Labels | RCB-GT | 001766 | 001766 |
| Bigelow Product Labels | RCB-GT | 001767 | 001767 |
| Bigelow Product Labels | RCB-GT | 001768 | 001768 |
| Bigelow Product Labels | RCB-GT | 001769 | 001769 |
| Bigelow Product Labels | RCB-GT | 001770 | 001770 |
| Bigelow Product Labels | RCB-GT | 001771 | 001771 |
| Bigelow Product Labels | RCB-GT | 001773 | 001773 |
| Bigelow Product Labels | RCB-GT | 001774 | 001774 |
| Bigelow Product Labels | RCB-GT | 001775 | 001775 |
| RCB-GT 001858.xlsx | RCB-GT | 001858 | 001858 |
| Shipment Calendar 2008 - 2013 (RCB-GT 010831.xlsx) | RCB-GT | 010831 | 010831 |
| Sales Revenue Table (RCB-GT 010832.xlsx) | RCB-GT | 010832 | 010832 |

## Documents Independently Obtained

"Amazon.com Customer Reviews: Bigelow Green Tea Decaffeinated" (http://www.amazon.com/product-reviews/B000GG5J18/?ie=UTF8&showViewpoints=0&pageNumber=1&sortBy=bySubmissionDateDescending&formatType=current_format, viewed on October 19, 2015)

"Amazon.com Customer Reviews: Bigelow Green Tea with Lemon Decaffeinated" (http://www.amazon.com/product-reviews/B000GG5J0Y/?ie=UTF8&showViewpoints=0&pageNumber=1&sortBy=bySubmissionDateDescending&formatType=current_format, viewed on October 19, 2015)

"Amazon.com Customer Reviews: Bigelow Green Tea with Lemon" (http://www.amazon.com/product-reviews/B000GG5IYQ/?ie=UTF8&showViewpoints=0&pageNumber=1&sortBy=bySubmissionDateDescending&formatType=current_format, viewed on October 19, 2015)

"Amazon.com Customer Reviews: Bigelow Green Tea with Mango" (http://www.amazon.com/product-reviews/B000GG0BNO/?ie=UTF8&showViewpoints=0&pageNumber=1&sortBy=bySubmissionDateDescending&formatType=current_format, viewed on October 19, 2015)

HIGHLY CONFIDENTIAL

# Facts, Data, and Other Information Received (Khasin v. Bigelow)

| Description | Bates Prefix | Start | End |
|---|---|---|---|

"Amazon.com Customer Reviews: Bigelow Green Tea with Mint" (http://www.amazon.com/product-reviews/B000GG1O8A/?ie=UTF8&showViewpoints=0&pageNumber=1&sortBy=bySubmissionDateDescending&formatType=current_format, viewed on October 19, 2015)

"Amazon.com Customer Reviews: Bigelow Green Tea with Peach" (http://www.amazon.com/product-reviews/B000GG1O80/?ie=UTF8&showViewpoints=0&pageNumber=1&sortBy=bySubmissionDateDescending&formatType=current_format, viewed on October 19, 2015)

"Amazon.com Customer Reviews: Bigelow Green Tea with Pomegranate (Iced Tea)" (http://www.amazon.com/product-reviews/B002BGBM5S/?ie=UTF8&showViewpoints=0&pageNumber=1&sortBy=bySubmissionDateDescending&formatType=current_format, viewed on October 19, 2015)

"Amazon.com Customer Reviews: Bigelow Green Tea with Pomegranate Decaffeinated" (http://www.amazon.com/product-reviews/B0052HX7YM/?ie=UTF8&showViewpoints=0&pageNumber=1&sortBy=bySubmissionDateDescending&formatType=current_format, viewed on October 19, 2015)

"Amazon.com Customer Reviews: Bigelow Green Tea with Pomegranate" (http://www.amazon.com/product-reviews/B0057625ZA/?ie=UTF8&showViewpoints=0&pageNumber=1&sortBy=bySubmissionDateDescending&formatType=current_format, viewed on October 19, 2015)

"Amazon.com Customer Reviews: Bigelow Green Tea with Wild Blueberry and Acai Decaffeinated" (http://www.amazon.com/product-reviews/B005SHNQW4/?ie=UTF8&showViewpoints=0&pageNumber=1&sortBy=bySubmissionDateDescending&formatType=current_format, viewed on October 19, 2015)

"Amazon.com Customer Reviews: Bigelow Green Tea with Wild Blueberry and Acai" (http://www.amazon.com/product-reviews/B000R4HQPG/?ie=UTF8&showViewpoints=0&pageNumber=1&sortBy=bySubmissionDateDescending&formatType=current_format, viewed on October 19, 2015)

"Amazon.com Customer Reviews: Bigelow Green Tea" (http://www.amazon.com/product-reviews/B000GG0BNE/?ie=UTF8&showViewpoints=0&pageNumber=1&sortBy=bySubmissionDateDescending&formatType=current_format, viewed on October 19, 2015)

"Creating our Flavors - Bigelow Tea" (https://www.bigelowtea.com/Our-Difference/Creating-our-Flavors, viewed on November 1, 2015)

"Mission Statement - Bigelow Tea" (https://www.bigelowtea.com/Our-Family-Story/Mission-Statement, viewed on November 1, 2015)

"Premium Packaging - Bigelow Tea" (https://www.bigelowtea.com/Our-Difference/Packaging, viewed on November 2, 2015)

HIGHLY CONFIDENTIAL

# Exhibit 4

HIGHLY CONFIDENTIAL

**Bigelow Green Tea (20-Count)**
**Average Retail Prices (2011 - June 13, 2015)**
*By Sales Channel*

HIGHLY CONFIDENTIAL

**Bigelow Green Tea (20-Count)**
**Average Retail Prices (2011 - June 13, 2015)**
***By Sales Channel***



HIGHLY CONFIDENTIAL

# Exhibit 5

HIGHLY CONFIDENTIAL

**Bigelow Green Tea (20-Count)**
**Average Retail Prices (June 22, 2008 - June 13, 2015)**
***By Retailer***

HIGHLY CONFIDENTIAL

**Bigelow Green Tea (20-Count)**
**Average Retail Prices (June 22, 2008 - June 13, 2015)**
***By Retailer***



HIGHLY CONFIDENTIAL

# Exhibit 6

HIGHLY CONFIDENTIAL

**Bigelow Green Tea (20-Count)**
**Vons Average Retail Prices (June 22, 2008 - June 14, 2014)**
*Over Time (Four-Week Periods)*



HIGHLY CONFIDENTIAL

**Bigelow Green Tea (20-Count)**
**Ralphs Average Retail Prices (June 22, 2008 - June 13, 2015)**
*Over Time (Four-Week Periods)*

**Bigelow Green Tea (20-Count)**
**Ralphs And Vons Average Retail Prices (June 22, 2008 - June 13, 2015)**
*Over Time (Four-Week Periods)*



**Bigelow Green Tea (20-Count)**
**Ralphs And Vons Average Retail Prices (June 22, 2008 - June 13, 2015)**
*Over Time (Four-Week Periods)*



**Bigelow Green Tea (20-Count)**
**Ralphs And Vons Average Retail Prices (June 22, 2008 - June 13, 2015)**
*Over Time (Four-Week Periods)*



HIGHLY CONFIDENTIAL

**Bigelow Green Tea (20-Count)**
**Ralphs And Vons Average Retail Prices (June 22, 2008 - June 13, 2015)**
*Over Time (Four-Week Periods)*



HIGHLY CONFIDENTIAL

**Bigelow Green Tea (20-Count)**
**Ralphs And Vons Average Retail Prices (June 22, 2008 - June 13, 2015)**
*Over Time (Four-Week Periods)*



**Bigelow Green Tea (20-Count)**
**Ralphs And Vons Average Retail Prices (June 22, 2008 - June 13, 2015)**
*Over Time (Four-Week Periods)*



HIGHLY CONFIDENTIAL

**Bigelow Green Tea (20-Count)**
**Ralphs And Vons Average Retail Prices (June 22, 2008 - June 13, 2015)**
*Over Time (Four-Week Periods)*



HIGHLY CONFIDENTIAL

# Exhibit 7

HIGHLY CONFIDENTIAL



**Bigelow Green Tea (20-Count)**
**Average Retail Prices (June 22, 2008 - June 13, 2015)**

**Bigelow Green Tea (20-Count)**
**Average Retail Prices (June 22, 2008 - June 13, 2015)**
*Grocery Stores - By California City*



HIGHLY CONFIDENTIAL

# Exhibit 8

HIGHLY CONFIDENTIAL

**Bigelow Green Tea (20-Count And 40-Count)**
**Average Retail Prices (June 22, 2008 - June 13, 2015)**
*Grocery Stores - By Package Size*

**Bigelow Green Tea (20-Count And 40-Count)**
**Average Retail Prices Per Tea Bag (June 22, 2008 - June 13, 2015)**
*Grocery Stores - By Package Size*

HIGHLY CONFIDENTIAL

**Bigelow Green Tea (20-Count And 40-Count)**
**Average Retail Prices (June 22, 2008 - June 13, 2015)**
*Grocery Stores - By Package Size*

# Exhibit 9

HIGHLY CONFIDENTIAL

**Bigelow Green Tea Products**
**Product Attributes Identified In 575 Positive Online Customer Reviews**

| Product Attribute[a] | Number Of References To Attribute[e] | | |
|---|---|---|---|
| | Unique Reviews[b] | References[c] | Percentage Of Reviews[d] |
| **Flavor, Freshness, or Aroma** | **222** | **397** | **38.6%** |
| Flavor (e.g., "flavor," "taste," "delicious," "flavorful") | 206 | 339 | 35.8% |
| Freshness (e.g., "fresh," "fresher," "freshness") | 31 | 33 | 5.4% |
| Aroma (e.g., "aroma," "scent," "smell") | 17 | 25 | 3.0% |
| **Price** | **89** | **102** | **15.5%** |
| Price (e.g., "price," "bargain," "inexpensive," "value") | 89 | 102 | 15.5% |
| **Packaging** | **34** | **45** | **5.9%** |
| Packaging (e.g. "packaging," "packaged," "packages") | 34 | 45 | 5.9% |
| **Caffeine Content** | **29** | **43** | **5.0%** |
| Caffeine (i.e., "caffeine") | 16 | 17 | 2.8% |
| Decaf (i.e., "decaf," "decaff," "decaffeinated") | 21 | 26 | 3.7% |
| **Quality** | **17** | **20** | **3.0%** |
| Quality (i.e., "quality") | 17 | 20 | 3.0% |
| **Refreshment** | **16** | **17** | **2.8%** |
| Refreshing (e.g., "refreshing," "refresher," "refresh," "invigorate," "invigorating") | 16 | 17 | 2.8% |
| **Health or Antioxidants** | **41** | **47** | **7.1%** |
| General Health (e.g., "health," "healthy," "healthier," "healthiest," "healthiness") | 37 | 39 | 6.4% |
| Antioxidants (e.g., "antioxidant," "antioxidants," "anti-oxidant," "anti-oxidants") | 7 | 8 | 1.2% |

Notes:

(a) Attributes mentioned in reviews are not mutually exclusive - one review can mention multiple attributes.

(b) Refers to the number of unique reviews mentioning a given attribute.

(c) Refers to the total number of times a given attribute is mentioned.

(d) Refers to the number of unique reviews mentioning a given attribute, divided by the total number of unique 4- or 5-star product reviews.

(e) Attribute counts were identified using the scan, count, and proc sql commands in SAS 9.4.

Source:

[1] Amazon product reviews for Bigelow Green Tea products, including Green Tea (B000GG0BNE), Green Tea Decaffeinated (B000GG5J18), Green Tea with Mint (B000GG1O8A), Green Tea with Lemon (B000GG5IYQ), Green Tea with Lemon Decaffeinated (B000GG5J0Y), Green Tea with Pomegranate (B0057625ZA), Green Tea with Pomegranate Decaffeinated (B0052HX7YM), Green Tea with Pomegranate Iced Tea (B002BGBM5S), Green Tea with Peach (B000GG1O80), Green Tea with Wild Blueberry and Acai (B000R4HQPG), Green Tea with Wild Blueberry and Acai Decaffeinated (B005SHNQW4), and Green Tea with Mango (B000GG0BNO).

HIGHLY CONFIDENTIAL

**Bigelow Green Tea Products**
**Product Attributes Identified In 575 Positive Online Customer Reviews**

| Product Attribute | Words Searched |
| --- | --- |
| **Flavor, Freshness, or Aroma** | |
| Flavor | "flavor," "flavour," "taste," "tasty," "delicious," "flavors," "yummy," "flavored," "flavoring," "flavorful" |
| Freshness | "fresh," "fresher," "freshness," "freshly" |
| Aroma | "aroma," "scent," "smell," "smells" |
| **Price** | |
| Price | "price," "priced," "bargain," "inexpensive," "value" |
| **Packaging** | |
| Packaging | "packaging," "packaged," "packages" |
| **Caffeine Content** | |
| Caffeine | "caffeine," "caffeinated" |
| Decaf | "decaf," "decaff," "decaffeinated" |
| **Quality** | |
| Quality | "quality" |
| **Refreshment** | |
| Refreshing | "refreshing," "refresher," "refresh," "invigorate," "invigorating" |
| **Health or Antioxidants** | |
| General Health | "health," "healthy," "healthier," "healthiest," "healthiness" |
| Antioxidants | "antioxidant," "antioxidants," "anti-oxidant," "anti-oxidants" |

HIGHLY CONFIDENTIAL

# Exhibit 10

HIGHLY CONFIDENTIAL

**Reasons For Purchasing And/Or Benefits Received From Challenged Products**
**Examples Of Excerpts From Positive Amazon.com Reviews**

| Excerpts From Positive Amazon.com Reviews | Product | Reviewer Name | Review Date |
|---|---|---|---|
| **Flavor, Freshness, or Aroma** | | | |
| I've tried lots of more expensive flavored teas but all of them seem to suffer from either the fruit flavor being so weak that you can barely taste it, or else so strong that it entirely overpowers the flavor of the tea.  This one seems to do a good job of falling in the middle.  The mango flavor is definitely noticeable but (at least to me) not overpowering.  Adds a nice smell to the whole room as well.  Highly recommended. | Green Tea with Mango | M. Walker | 12/26/2009 |
| I was first offered this tea at a conference.  I don't typically drink fruity teas but I was in a blueberry mood and decied [sic] to go with it.  When you open the tea bag, the scent of blueberries is very noticeable.  I prefer to avoid sweeteners (artificial and real) in my tea and this is a tea that is easily consumed without sugar or honey.  It is simple and unfussy.  The flavor notes are clear.  I've since purchased this tea a few times and find it to be a great breakfast tea. | Green Tea with Wild Blueberry and Acai | Seek Felicity | 10/14/2011 |
| Bigelow Green Tea with Mint has a good flavor.  I drink mostly black teas, followed in frequency by some herbal blends, but not much green tea.  When I do grab the occasional green tea bag, though, I prefer this Green Tea with Mint variety over a straight green tea. Green Tea with Mint doesn't add any other flavors.  The package lists only green tea and mint leaves as ingredients.  The mint's presence is quite strong, even sharp, when I give a freshly opened tea bag the deep sniff test (my favorite moment with tea!) before placing it in the cup.  Once it is steeped, though, the mint is less pronounced, and I think the mint flavor is less strong than in Bigelow's Plantation Mint black tea.  In fact, in the aroma of the steeped tea, the mint is not particularly noticeable--the most noticeable scent to me once the tea is steeped is one very similar to that of fresh grass cuttings, and I mean that in a good way.  The smell is pleasant. For a mint tea, I prefer the Bigelow Plantation Mint, but then, I mostly prefer black teas.  If you like green teas, Bigelow Green Tea with Mint is a good variety. | Green Tea with Mint | H.D. Jones | 6/21/2009 |
| I love green tea, have been pleased with many of the Bigelow Tea flavors.  My favorite, by far, is the Green Tea with Peach.  It is not overpowering peach flavor, but you can definitely taste it and smell the delicate aroma.  It pairs excellently with green tea and I religiously drink it EVERY morning when I wake up.  I do not find a need to sweeten it, although if I make iced tea with it, I will sometimes add a touch of light agave nectar for a little change.  One tea bag, properly steeped, is a highlight of my morning and because of the individual tea bags (which are packaged so as not to get torn or damaged by the elements) come with me in my bag and I drink it at work and throughout the day. I definitely recommend to anyone who loves a nice aroma and pleasant tasting green tea. | Green Tea with Peach | J.D. | 2/20/2011 |
| I had been drinking Bigelow Plantation Mint Tea forever and did not like the taste of Green Tea. I had heard the benefits of green tea but wasn't willing to sacrifice taste.  When Bigelow came out with Green Tea with Mint I tried it and the flavor was a bit milder than what I was used to but it was great.  I have been hooked on it since.  If you love mint flavor and want a healthier alternative to black tea this is the one!!! | Green Tea with Mint | A. Scholz | 4/16/2010 |
| I am a tea drinker and I love my tea and this is one of the best packaged teas that I have had.  I like the way Bigelow packages their tea to preserve freshness and this one is no exception.  A perfect blend of green tea and lemon!  Other teas either have too much lemon taste or not enough.  Bigelow's is perfect! | Green Tea with Lemon | J. Stroh | 5/6/2007 |
| This tea is far superior to any brand we have used.. The flavor is great and it does noy [sic] keep us awake at night! | Green Tea | Cindy G Sims | 2/8/2013 |
| found this tea by accident.  tried so many I was going to give up.  It can be steeped for quite some time, and never turns bitter.  It is flavorful & rewarding.  love it!! | Green Tea | V. Buckler | 5/14/2013 |
| We start our day with a cup of this delightful tea. It is crisp and refreshing-hot or cold.  Unlike some green teas that tend to be overpowering, it has a light, but distinct flavor.  The touch of lemon makes it perfect.  Highly recommend it for those who love green tea, but don't care for the usual musty flavor. | Green Tea with Lemon | Mrs. Nancy L. Rosengren | 12/1/2010 |

**Reasons For Purchasing And/Or Benefits Received From Challenged Products**
**Examples Of Excerpts From Positive Amazon.com Reviews**

| Excerpts From Positive Amazon.com Reviews | Product | Reviewer Name | Review Date |
|---|---|---|---|
| **Price** | | | |
| I'm not a tea expert by any means, so it's hard for me to comment much on the taste - it tastes like other green teas to me.  The price is right, and bulk is great for heavy tea drinkers. | Green Tea | bneff | 1/8/2013 |
| Great tasting tea for a good price. | Green Tea | John | 9/13/2015 |
| I would have never thought this would be a good combination but after having a chilled 'green tea sweetened with mint and honey' I was on the hunt for the perfect green tea with mint combination.  I work in a coffee and tea shop and none of the teas we sell came close to what I was looking for.  I found this tea at my grocery store and purchased it on a whim to try it out because it was inexpensive.  It is now my favorite tea.  I have gone through it so fast and will probably buy this bulk package.  It is even better sweetened with some honey! | Green Tea with Mint | Julianne | 5/16/2011 |
| My wife drinks a LOT of this tea and it's not always available locally in stores. I think she is trying to single handedly keep Bigelow in business. Anyway, she likes it and the price is great. | Green Tea with Peach | Steve | 12/30/2014 |
| This is an excellent Green tea and the price is reasonable. | Green Tea | Arthur Shad | 11/5/2014 |
| Love this product and the price is great!!!!! I'm so hooked to the product. You have a faithful customer. | Green Tea | Denisse | 2/14/2015 |
| The tea is quite good, and it's inexpensive | Green Tea Decaffeinated | ZachB | 9/18/2015 |
| I like to brew tea in a small coffee maker that brews automatically so that it is ready when I wake up.  The lemon flavor makes this green tea very delicious.  It's nice to wake up to it.  The price is also excellent! | Green Tea with Lemon | SO-K | 6/10/2015 |
| **Caffeine Content** | | | |
| excellent value for the price. Recently started a pretty strict diet and cut out coffee. This gives me a caffeine boost with the added benefit of the metabolism kick start. | Green Tea | M | 10/8/2015 |
| Great value on an always great product!  Healthy and relaxing, great both iced or hot.  Decaff is important for diabetics since caffeine can cause sugar spikes, and this tea is great without the caffeine.  You don't miss it. | Green Tea Decaffeinated | nerdfighter | 11/6/2013 |
| This is great tasting green tea and it's decaffeinated so I can drink it in the evening before bed. | Green Tea Decaffeinated | Gina B | 4/25/2014 |
| Green tea, at least 2 cups a day.  Plain green tea tastes like it's made with dried pasture grass, but Bigelow added PEACH, my favorite flavor! It's low caffeine and delicious!  I sweeten it and have some peachful moments a couple times a evening. | Green Tea with Peach | Phoebe Hopper | 6/17/2013 |
| GREAT taste, reasonable amount of caffeine, but not overwhelming. Tasty! :)) | Green Tea with Wild Blueberry and Acai | Raul Odin | 6/15/2013 |
| My favorite tea bag.  The mango flavor is quite light, refreshing and not too caffeinated, so I can drink it at any time at work or the many restaurants that have a limited selection. | Green Tea with Mango | Holly Oswald | 2/8/2014 |

HIGHLY CONFIDENTIAL

**Reasons For Purchasing And/Or Benefits Received From Challenged Products**
**Examples Of Excerpts From Positive Amazon.com Reviews**

| Excerpts From Positive Amazon.com Reviews | Product | Reviewer Name | Review Date |
|---|---|---|---|
| **Refreshment** | | | |
| I've always heard about the very many benefits of Green Tea, but only got around to drinking it when I was down with the flu about 5 months ago and had a very sore throat. Unfortunately, the brand I picked up randomly (Lipton Green Tea) kept leaving a bitter after-taste in my mouth. It was one of those things I had to force myself to drink. So not fun. But then *drumroll* I found Bigelow Green Tea with Lemon! I loved it. It was as refreshing as it was soothing, all this without any unhealthy/artificial additions. Drinking this product frequently throughout the day worked wonders for my sore throat and health-o-meter, and converted me into a die-hard fan. My morning cuppa tea and quiet time is a prized part of my routine now. By the way, here's the lazy person's three-step process of drinking this tea - Boil 1 cup of water in the microwave for about 1-2 minutes. Immediately drop in the teabag and let steep for 3-5 minutes. Enjoy your lovely cup of freshness. | Green Tea with Lemon | Nee | 4/19/2011 |
| I have been using the Bigelow Green Tea w/Lemon for about 3 years now and find it to be refreshing and soothing first thing in the morning. Very easy on the stomach. | Green Tea with Lemon | Yvette Strom | 11/12/2008 |
| I never thought I would be a daily tea drinker but this green tea has converted me. Living in the Southwest where it gets quite hot in the summer, this tea with some ice and just a pinch of honey or sugar is as refreshing as jumping in a swimming pool. You can deepen the flavor by adding more tea bags but i use my automatic 12 cup coffee pot and 6 tea bags to make 12 cups of tea.  That way it steeps as the water passes through as well as it cools.  Try it, you may convert as well! | Green Tea | Amazon Customer | 5/15/2010 |
| We start our day with a cup of this delightful tea. It is crisp and refreshing-hot or cold.  Unlike some green teas that tend to be overpowering, it has a light, but distinct flavor.  The touch of lemon makes it perfect.  Highly recommend it for those who love green tea, but don't care for the usual musty flavor. | Green Tea with Lemon | Mrs. Nancy L. Rosengren | 12/1/2010 |
| I have been drinking tea since I was old enough to steal my mother's mug for a sip of orange pekoe, which is over 30 years ago now. This tea is light, refreshing, and natural-tasting in the best way possible. It kicks the butt of Celestial Seasonings, which I stopped drinking since switching to this brand full-time. I like the distinctive flavor, the healthiness of the green tea, and that if it were a blind taste test I could still tell you which one this one was with a sip, or a smell of the yummy aroma. I hope they always make this tea, because it is worth keeping a case around, knowing it will never go to waste or be forgotten in the back shelf. You will drink every box of this tea and come back for more. I drop two bags in a large mug of hot water, and steep it 3 minutes, no more, no less. Never boil the water, it messes with the flavor. I once brought a mug of this to my trusting husband and he took one nip of it and gave me a serious look, 'Damn, this is good tea!' I already knew it was, but it is always nice to hear someone else say it, too. | Green Tea with Lemon | Sliver | 2/25/2012 |
| **Packaging** | | | |
| This is a good tea that is priced right.  I also like how the packages are sealed off for freshnrss [sic]. | Green Tea | rickster | 3/17/2014 |
| I like how the bags are individually wrapped to keep them fresh. | Green Tea Decaffeinated | Gina B | 4/25/2014 |
| I love the fact that these tea bags are individually packaged in foil-lined packs; tea stays fresh and delicious until you're ready to enjoy a cup. | Green Tea Decaffeinated | Amazon Enthusiast | 5/17/2009 |
| I am a tea drinker and I love my tea and this is one of the best packaged teas that I have had.  I like the way Bigelow packages their tea to preserve freshness and this one is no exception.  A perfect blend of green tea and lemon!  Other teas either have too much lemon taste or not enough. Bigelow's is perfect! | Green Tea with Lemon | J. Stroh | 5/6/2007 |
| One word- awesome. I like the way they seal the tea bags to preserve them. That's the key to the product's freshness I believe. Comes in a nicely packed container. | Green Tea | Aditya Gogoi | 9/8/2014 |

HIGHLY CONFIDENTIAL

**Reasons For Purchasing And/Or Benefits Received From Challenged Products**
**Examples Of Excerpts From Positive Amazon.com Reviews**

| Excerpts From Positive Amazon.com Reviews | Product | Reviewer Name | Review Date |
|---|---|---|---|
| **Quality** | | | |
| This is by far one of the better green teas I have tasted. Delicate flavor, not bitter, very smooth. I have done some research on this company, and they seem to be doing things by the book. There are other popular and much more expensive tea companies that have been reprimanded several times by the FDA, and they STILL haven't come into compliance for pesticides etc. ....ALSO, the PRICE IS RIGHT!! 40 bags for this price is unbeatable anywhere. You will not be disappointed! | Green Tea | Danielle Brandt | 9/6/2015 |
| I find this Peach Green Tea to be the BEST and I do not tire of drinking it everyday...usually 4-6 cups daily. Some green tea is overly bitter and trying to drink it everyday gets to be a chore rather than a pleasure. But not this Bigelow tea. There is a perfect balance of the tea and peach flavor and it is easier on the stomach because the green tea flavor is fresh and delicate rather than astringent and overbearing. Bigelow has good quality control because every cup is equally yummy and there are no grassy or fishy flavors some other manufacturers' teas have. You can be confident that this is high quality tea and very enjoyable. Drink it by the case as I do...it tastes great and it is good for you to boot! | Green Tea with Peach | river rat 222 | 12/17/2011 |
| Definitely one of my favorite teas.  All Bigelo teas are high quality and the green mint is light and refreshing either hot or iced.  No sweetener needed. | Green Tea with Mint | Jonathan | 11/14/2010 |
| This Brand of Green tea will continue to be my go to brand. Very good quality and taste. | Green Tea with Peach | Rkn2903 | 8/8/2015 |
| I'm a tea fanatic & I love this tea. Green tea quality is great & the peach extract makes this really tasty. I can see myself getting through all 120 packets quick. | Green Tea with Peach | N. Kadakia | 8/1/2014 |
| **Health or Antioxidants** | | | |
| I have been drinking tea every day for the past 4 years or so, and this is one tea I have not grown tired of.  It has a delicate flavor, but when I drink it I can tell I am getting lots of antioxidants.  I also like the Celestial Seasonings green teas, but I get bored with those flavors after drinking them for a long time.  Other than this tea, there is only one other tea I have not grown tired of, and it is a loose-leaf tea from Japan that is found in asian grocery stores.  It comes in a purplish metal tin can.  A normal price to pay for this tea is $2-2.50 for a box of 20 bags, so this is a great deal. | Green Tea | Alexander Smith | 2/13/2007 |
| I've had this product for a while and I'm still working my way through. Tastes great and really feels clean in my body. Great for people who want to detox or just drink something healthier than soda or coffee. | Green Tea | Alex | 5/9/2014 |
| Bigelow green tea is not only healthy but also delicious. It has a distinct hint of lemon that I really like. I drink this every morning to start my day right. It;s been helping me a lot too with my digestion. My wife also drink it and we both agree that it;s a very powerful antioxidant. Our friends can tell the difference as we started looking younger since we started our fancy of Bigelow green tea. | Green Tea | Michael Jacobs | 3/11/2015 |
| Great tasting!  Considered  the healthiest beverage on the planet,  I buy these 120 bags at a time so I won't run out.  I keep the bags in an air-tight container which keeps them fresh.  Green tea's antioxidants and nutrients help with everything from brain function, weight loss, and even constipation. | Green Tea with Mint | D. Marquez | 3/29/2015 |
| i cant believe having green tea is so easy with these one… different flavors like mango jasmine and lemon etc...u wont be bored and at the same time get healthy anti-oxidants.. | Green Tea with Lemon | ushatadikonda | 4/15/2014 |

Source:

[1]  Amazon product reviews for Bigelow Green Tea products, including Green Tea (B000GG0BNE), Green Tea Decaffeinated (B000GG5J18), Green Tea with Mint (B000GG1O8A), Green Tea with Lemon (B000GG5IYQ), Green Tea with Lemon Decaffeinated (B000GG5J0Y), Green Tea with Pomegranate (B0057625ZA), Green Tea with Pomegranate Decaffeinated (B0052HX7YM), Green Tea with Pomegranate Iced Tea (B002BGBM5S), Green Tea with Peach (B000GG1O80), Green Tea with Wild Blueberry and Acai (B000R4HQPG), Green Tea with Wild Blueberry and Acai Decaffeinated (B005SHNQW4), and Green Tea with Mango (B000GG0BNO).

HIGHLY CONFIDENTIAL

# Exhibit 11

HIGHLY CONFIDENTIAL

**Customer Ratings Of Selected Bigelow Green Tea Products On Amazon.com**

| Rating | Green Tea | | Green Tea with Mango | | Green Tea with Peach | | Green Tea with Mint | | Green Tea with Lemon | | Green Tea with Lemon Decaffeinated | | Green Tea Decaffeinated | | Green Tea with Wild Blueberry and Acai | | Pomegranate (Iced Tea) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 Stars | 189 | 67% | 43 | 93% | 53 | 88% | 41 | 89% | 36 | 77% | 18 | 82% | 22 | 85% | 17 | 68% | 13 | 68% |
| 4 Stars | 42 | 15% | 1 | 2% | 4 | 7% | 3 | 7% | 7 | 15% | 3 | 14% | 0 | 0% | 2 | 8% | 4 | 21% |
| 3 Stars | 17 | 6% | 1 | 2% | 1 | 2% | 1 | 2% | 1 | 2% | 1 | 5% | 3 | 12% | 3 | 12% | 1 | 5% |
| 2 Stars | 16 | 6% | 0 | 0% | 1 | 2% | 1 | 2% | 3 | 6% | 0 | 0% | 0 | 0% | 2 | 8% | 0 | 0% |
| 1 Star | 20 | 7% | 1 | 2% | 1 | 2% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 4% | 1 | 4% | 1 | 5% |
| Total Reviews | 284 | | 46 | | 60 | | 46 | | 47 | | 22 | | 26 | | 25 | | 19 | |
| Overall Rating[a] | 4.3 Stars | | 4.8 Stars | | 4.8 Stars | | 4.8 Stars | | 4.6 Stars | | 4.8 Stars | | 4.6 Stars | | 4.3 Stars | | 4.5 Stars | |

Notes:

(a) Overall Ratings are calculated as the average rating of all individual reviews and may differ from overall ratings presented on Amazon.com. According to Amazon.com, "Amazon calculates a product's star ratings using a machine learned model instead of a raw data average. The machine learned model takes into account factors including: the age of a review, helpfulness votes by customers and whether the reviews are from verified purchases."

Source:

[1] Amazon product reviews for Bigelow Green Tea products, including Green Tea (B000GG0BNE), Green Tea Decaffeinated (B000GG5J18), Green Tea with Mint (B000GG1O8A), Green Tea with Lemon (B000GG5IYQ), Green Tea with Lemon Decaffeinated (B000GG5J0Y), Green Tea with Pomegranate (B0057625ZA), Green Tea with Peach (B000GG1O80), Green Tea with Wild Blueberry and Acai (B000R4HQPG), and Green Tea with Mango (B000GG0BNO).